SPENCER KELLER, Arizona SBN 038491
Email: spencer@legalforcelaw.com

RAJ V. ABHYANKER, California SBN 233,284
Email: raj@legalforcelaw.com

**LEGALFORCE RAPC WORLDWIDE, P.C.**
1580 W. El Camino Real, Suite 10
Mountain View, CA 94040
Telephone: (650) 965-8731
Facsimile: (650) 989-2131

Attorneys for Plaintiffs and the Proposed Class,

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

GOVERNMENTGPT, INC., RAJ ABHYANKER, Individually and on Behalf of All Other Taxpayers Similarly Situated; and, Municipality and Police Departments DOES 1-500,

Plaintiffs,

v.

AXON ENTERPRISE, INC., formerly d/b/a TASER INTERNATIONAL, INC., MICROSOFT CORPORATION, and DOES 1-50,

Defendant(s).

Case No. 2:24-at-99907
Judge:

**INITIAL COMPLAINT FOR:**

1. DECLARATORY JUDGMENT;
2. CONSPIRACY TO RESTRAIN TRADE, SHERMAN ACT, 15 U.S.C. §1;
3. CONSPIRACY TO RESTRAIN TRADE, SHERMAN ACT, 15 U.S.C. §2;
4. VIOLATION OF SECTION 7 OF THE CLAYTON ACT (15 U.S.C. § 18)
5. VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)
6. VIOLATION OF THE CARTWRIGHT ACT (UNREASONABLE RESTRAINT OF TRADE)
7. VIOLATION OF THE

CARTWRIGHT ACT (CONSPIRACY TO MONOPOLIZE)

8. FALSE ADVERTISING UNDER THE LANHAM ACT, 15 U.S.C. 1125(a)
9. ARIZONA CONSUMER FRAUD ACT (ARIZONA REVISED STATUTES (A.R.S.) § 44-1522
10. ARIZONA UNIFORM STATE ANTITRUST ACT A.R.S. § 44-1401 ET SEQ
11. SECTION 7(2) OF THE ILLINOIS ANTITRUST ACT
12. VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT (CCPA)
13. ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA)

**CLASS ACTION COMPLAINT**
**JURY TRIAL DEMANDED**

**NOTIFICATION TO THE PUBLIC**

1. Axon Enterprise, Inc. manufactures body-worn cameras and digital evidence management systems widely used by American law enforcement agencies. Dominating over 94.4% of the U.S. market, most police departments are locked into Axon's products. Commenced on July 29, 2024, this class action litigation addresses the monopolistic practices and privacy violations by Axon Enterprise, Inc. and Microsoft Corporation. These practices have led to rising costs for American police departments and taxpayers and undermined public trust by concealing chipsets with alleged ties to the Chinese military, which are being considered for banning by the U.S. Congress. The complaint seeks to ensure fair competition, reduce costs, and enhance public safety by promoting innovative and secure evidence management and body camera solutions.

**HOW TO JOIN THE CLASS ACTION**

2. *Joining as a Plaintiff.* Municipalities, police departments, or individuals interested in joining the class as plaintiffs can email axonlitigation@legalforcelaw.com.

3. *Sharing Facts & Evidence.* Want to volunteer evidence, or facts supporting the allegations in this complaint? Please email axonlitigation@legalforcelaw.com.

4. *Assisting as Co-counsel.* If your law firm is interested in joining as co-counsel or lead counsel, please email lit-support@legalforcelaw.com.

5. *Questions/Press Inquiries for GovGPT.* For questions about GovGPT and its products unrelated to this litigation, please email questions@governmentgpt.com.

**INITIAL COMPLAINT**

1. Plaintiffs GovernmentGPT, Inc. ("GovGPT"), Raj Abhyanker ("Abhyanker"), similarly situated taxpayers across the United States and its territories (with particularity in the States of California, Arizona, and Illinois), and municipalities and police departments DOES 1-500, by and through its undersigned attorneys, brings this Complaint against Defendant Axon Enterprise, Inc. ("Axon"), Microsoft Corporation ("Microsoft"), and DOES 1-50, and alleges as follows:

**INTRODUCTION**

2. Plaintiffs allege that Axon and Microsoft engaged in a series of anticompetitive, monopolistic, and deceptive practices in the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States. These practices have resulted in inflated costs for municipalities and police departments, which have subsequently been passed on to taxpayers in the form of higher income, sales and/or property taxes. Additionally, Axon's failure to disclose the presence of Quectel chips in its Axon Body 4 cameras poses significant national security risks due to potential ties to the Chinese government.

3. Axon holds a dominant position in the market for body-worn cameras and digital evidence management systems for over 94.4% of all law enforcement agencies in the United States as of Q1 2024. Axon leverages its market power by integrating its body-worn cameras with its proprietary digital evidence management platform, Evidence.com, creating a closed ecosystem that discourages competition. Axon's

agreements with law enforcement agencies often include exclusivity clauses, tying the purchase of body-worn cameras to the mandatory use of Evidence.com, effectively foreclosing competition from innovative startups like GovGPT. In addition, by acquiring key competitors, tying its products together, and engaging in exclusive dealing contracts, Axon has effectively eliminated competition and solidified its monopoly power.

4. Axon has acquired several competitors, including Dedrone (2024), Fusus (2024), Sky-Hero (2023), and Foundry 45 (2022), to eliminate competition and strengthen its monopoly. These acquisitions have reduced market entry opportunities for other competitors and have further entrenched Axon's dominant position. Axon has spent lavishly on police fraternal organizations to secure their loyalty and support. This spending includes funding events, providing expensive perks, and making significant financial contributions, ensuring that these organizations advocate for the continued use of Axon's products and services.

5. Most importantly, Axon has failed to disclose the presence of Quectel chips in its Axon Body 4 cameras (released on or about October 2023), which pose significant national security risks. These chips, linked to the Chinese government, create a risk of unauthorized access and surveillance, compromising the safety and security of both law enforcement personnel and the public.

6. GovGPT, a startup specializing in advanced artificial intelligence solutions for law enforcement, including body-worn cameras and evidence management systems,

seeks to compete fairly in this market. The company's technology has been recognized by leading technology competitions as one of this year's most innovative companies including by TechCrunch Early Stage 2024, Collision Conference 2024, and leading Silicon Valley venture capitalists.

7. One of its flagship products, the DragonFly, is a patented tactical vest, body camera, and AI powered evidence management system that provides real-time haptic feedback to law enforcement officers in response to ambient threats. Using generative AI for situational awareness, the vest acts as a 360 degree body camera, while using artificial intelligence and haptics for threat detection. In addition, DragonFly includes a language translation module for seamless communication between police officers and the public. GovGPT's advisory board boasts a diverse group of experts, including leaders from the military, law enforcement, and business sectors. These advisors bring valuable insights from their extensive experience in fields such as AI chip manufacturing, federal contracts, police operations, and public safety. GovGPT's engineering team comprises highly skilled professionals in areas like AI, computer vision, and industrial design, with backgrounds in organizations ranging from the FBI, Department of Homeland Security and the Secret Service to top universities and tech companies. This blend of advanced technology and expert guidance positions GovGPT to make significant impacts in enhancing public safety and operational efficiency.

8. GovGPT offers competitive solutions to Evidence.com with scalable, secure, and portable storage for camera footage hosted on AWS, Microsoft, Google Cloud, private

storage, or other vendors. Enhanced with AI and advanced real-time threat detection capabilities, GovGPT provides real-time recommendations to keep officers safer. Unlike Axon and Microsoft's offerings, GovGPT's platform ensures secure storage of evidence, superior cataloging, and the flexibility to choose cloud storage vendors. Additionally, it offers superior situational awareness and real-time threat detection tools, notifications and alerts, making digital evidence management more robust and efficient while enhancing public safety. By integrating cutting-edge AI technology, GovGPT delivers advanced and effective solutions at about half the cost of Axon's Evidence.com, promoting innovation and competition in the digital evidence management market.

9. Despite the impressive technological advancements and the diverse expertise of its advisory board and engineering team, GovGPT faces significant market entry challenges. Axon cameras, Tasers, and Fleet 3 devices no longer work when integrated into GovGPT's evidence management system, making its competitive solution orphaned with over 94.4% of police departments and agencies who have locked in with contracts with Axon, which include marked up storage costs from Microsoft Azure cloud storage. This interoperability issue severely limits GovGPT's ability to offer its superior services to a large segment of the market.

10. Potential investors have expressed concerns about the dominance of Axon in the body-worn camera market, which creates a formidable barrier for new entrants with more advanced solutions like GovGPT. Axon's established monopoly means that breaking into the market with a complementary or competing product is perceived as

nearly impossible. The monopolistic practices of Axon, supported by its strategic partnership with Microsoft, have created an environment where new and innovative solutions like those offered by GovGPT struggle to gain traction. This lack of competition stifles innovation, keeps prices high, and limits the choices available to law enforcement agencies, ultimately impacting public safety and financial efficiency.

11. GovGPT's approach promotes competition by providing law enforcement agencies with alternative, cost-effective, and technologically advanced solutions for digital evidence management. By offering flexibility in cloud storage options and integrating advanced AI capabilities, GovGPT not only enhances the operational efficiency of law enforcement but also drives the market towards greater innovation and cost savings. However, overcoming the entrenched market position of Axon and the associated technical and contractual barriers remains a significant challenge that needs to be addressed to fully realize these benefits.

12. Microsoft facilitated these anticompetitive practices by providing the cloud infrastructure necessary to support Axon’s monopolistic strategies. In 2018, Axon began migrating 20 petabytes of data from its Evidence.com platform to Microsoft Azure, marking a significant strategic partnership. This migration, conducted without adequate informed consent from law enforcement agencies, established a foundation for Axon’s monopolistic control over the digital evidence management market. By consolidating to a sole-sourced Microsoft’s robust cloud infrastructure without choice to its law enforcement customers, Axon was able to enhance its service offerings, creating

significant barriers to entry for other competitors and embedding its products deeply into the operations of police departments and municipalities. The strategic partnership not only consolidated Axon's market power but also played a critical role in maintaining their dominance, directly affecting the operational budgets and choices available to law enforcement agencies within the District of Arizona and beyond. Furthermore, Microsoft cannot practically allow law enforcement agencies and municipalities to port their data to other platforms without rendering their entire digital evidence management and body-worn camera investment toothless, as their Axon cameras, Tasers, and Axon Fleet 3 cams would fail to function if this were to happen.

13. As a result of Axon and Microsoft's anticompetitive conduct, law enforcement agencies and municipalities have been forced to pay inflated prices for body-worn cameras and digital evidence management systems. These costs have been passed on to taxpayers, including Plaintiffs and the class members, in the form of higher sales and property taxes. Additionally, the undisclosed security risks posed by Quectel chips compromise the privacy and safety of law enforcement operations and the public.

14. Plaintiffs seek a declaratory judgment that Axon and Microsoft's business practices are unlawful and violate federal and state laws. They also seek injunctive relief to prevent Axon and Microsoft from continuing its unlawful conduct, compensatory and treble damages, punitive damages, attorneys' fees and costs, pre- and post-judgment interest, and any other relief the Court deems just and proper. Furthermore, Plaintiffs request that Axon be required to formally disclose the risk posed by Quectel chips and

offer remediation options to purchasers of Axon Body 4 cameras.

15. This lawsuit aims to restore fair competition in the market for body-worn cameras and digital evidence management systems, ensure transparency and accountability, and protect the economic and security interests of taxpayers and law enforcement agencies.

## SUPERIORITY OF GOVGPT'S DRAGONFLY OVER AXON BODY 4

16. GovGPT's DragonFly product offers a highly competitive and superior solution to Axon's Evidence.com, delivering numerous benefits that enhance digital evidence management for law enforcement agencies, at a much lower cost. GovGPT provides scalable and secure storage for camera footage that can be hosted on multiple platforms, including AWS, Microsoft, Google Cloud, private storage, or other vendors. This flexibility allows law enforcement agencies to choose the storage solution that best meets their needs, ensuring both cost-effectiveness and security. The platform is enhanced with advanced AI and real-time threat detection capabilities. GovGPT's AI-powered system offers real-time recommendations and alerts, which help officers stay safer and respond more effectively to emerging threats.

17. Moreover, GovGPT provides real-time data processing and AI analytics, offering law enforcement agencies superior situational awareness. This allows for quick, informed decision-making, improving operational efficiency and public safety outcomes. GovGPT's digital evidence management system is approximately half the cost of Axon's Evidence.com. These significant cost savings allow law enforcement agencies to allocate

their resources more effectively, enhancing overall operational budgets.

18. GovGPT offers superior cataloging and management of digital evidence, ensuring that all data is organized and easily accessible. This enhances the efficiency of evidence handling and improves the accuracy of law enforcement operations. GovGPT's platform provides data portability that ensures that agencies are not locked into a single vendor, promoting competition and fostering innovation in the market. The system includes AI-powered bi-directional language translation and inference capabilities, facilitating seamless communication in diverse environments. GovGPT's platform provides haptic feedback technology that helps detect and alert officers to real-time threats based on computer vision, audio analysis, and emotional understanding, enhancing officer safety and response times.

19. On the hardware side, GovGPT's DragonFly tactical vest offers several superior features compared to the Axon Body 4 camera. First, DragonFly records on all sides—front and back—using an array of camera lenses to provide full visibility for law enforcement officers. Second, it distributes battery storage across the vest, making it less bulky and protruding. Third, DragonFly includes AI-powered bi-directional language translation and inference capabilities, utilizing proprietary and fast AI for seamless speech and communication. Fourth, it provides haptic feedback to detect real-time threats based on computer vision and emotional understanding.

20. Additionally, DragonFly can be paired with drones and stationary cameras to

provide auxiliary notifications of real-time alerts, enhancing situational awareness. For example, DragonFly vests could have haptically notified police officers and Secret Service agents early if a police officer was near a suspect when spotted by a DragonFly body camera, or when a stationary camera or drone detected that a person had climbed on a roof near President Trump by vibrating sensors on DragonFly vests and using computer vision to provide descriptions and notifications during the recent assassination attempt. The AI team behind DragonFly possesses advanced computer vision and machine learning skills, which elevate its AI-powered digital evidence management system to offer real-time recommendations and alerts. Furthermore, the vest's design separates the battery and memory pack from the cameras, ensuring that the cameras remain securely attached to the wearer at all times. The hot-swappable battery and memory pack allow for extended operational periods, with the ability to charge through various mechanisms, including wirelessly while an officer is in the car.

21. GovGPT holds approximately 20 U.S. and global patents and patent applications covering a wide range of next-generation technologies not found in Axon Body 4 products. This comprehensive suite of innovative features and technologies positions DragonFly as a superior alternative in the competitive landscape of advanced tactical equipment for law enforcement.

//

//

**NATURE OF ACTION**

1. This action arises from Axon's anticompetitive, monopolistic, and deceptive practices in the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States. Plaintiffs, on behalf of themselves and all others similarly situated, seek to address the significant economic and security harms caused by Axon's conduct.

2. Axon has systematically engaged in exclusionary practices and strategic acquisitions to solidify its monopoly power and eliminate competition. Through tying arrangements, exclusive dealing contracts, and acquisitions of key competitors, Axon has created barriers to entry for other companies, stifled innovation, and maintained inflated prices for its products. These monopolistic practices have forced municipalities and police departments to pay higher prices for body-worn cameras and digital evidence management systems, with these costs ultimately being passed on to taxpayers in the form of increased income, sales and/or property taxes.

3. In addition to its anticompetitive conduct, Axon has engaged in deceptive practices by failing to disclose critical information about its products. Specifically, Axon has concealed the presence of Quectel chips in its new Axon Body 4 cameras (released on or about October 2023). These chips, which are linked to the Chinese government, pose significant national security risks, including the potential for unauthorized surveillance and data breaches. Axon's failure to disclose these risks deprives customers of the information necessary to make informed purchasing decisions and compromises

the safety and security of law enforcement operations and the public.

4. Plaintiffs allege that Axon's conduct violates federal antitrust laws, including Section 2 of the Sherman Act and Section 7 of the Clayton Act, as well as state antitrust laws such as California's Cartwright Act and the Illinois Antitrust Act. Additionally, Axon's deceptive practices violate the Arizona Consumer Fraud Act and constitute a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO).

5. Plaintiffs seek declaratory and injunctive relief to prevent Axon from continuing its unlawful conduct, as well as compensatory, treble, and punitive damages to address the economic harm suffered by Plaintiffs and the class members. Furthermore, Plaintiffs request that Axon be required to formally disclose the risk posed by Quectel chips and offer remediation options to purchasers of Axon Body 4 cameras.

6. Through this action, Plaintiffs aim to restore fair competition in the market for body-worn cameras and digital evidence management systems, ensure transparency and accountability, and protect the economic and security interests of taxpayers and law enforcement agencies.

## THE PARTIES

1. Plaintiff GovGPT is a Delaware corporation with its principal place of business at 1580 W. El Camino Real Suite 14, Mountain View California 94040. GovGPT develops and markets innovative artificial intelligence technologies, 360 degree and networked body cameras, and advanced digital evidence software powered by artificial intelligence

software for law enforcement agencies, including evidence management and analysis solutions which unlock new use cases of real time threat detection and haptic response to keep police officers safer.

2. Plaintiff Abhyanker, an individual citizen and resident of California and Arizona since 2016, who paid higher income, sales and/or property taxes as an indirect result of Axon's anticompetitive acts. Mr. Abhyanker, as a consumer and significant real property taxpayer in California, Arizona, and Illinois has suffered economic harm due to the inflated costs of law enforcement equipment purchased by municipalities, which were subsequently passed on to taxpayers. These higher taxes were necessitated by the monopolistic practices of Axon, which stifled competition and led to elevated pricing for essential public safety technologies. Mr. Abhyanker, as an indirect purchaser, seeks redress for the financial burden imposed on him and other taxpayers similarly situated. He represents a class of individuals in California, Arizona and Illinois who have been similarly impacted by the increased financial strain due to Axon's anticompetitive conduct and failure to disclose security risks associated with their products.

3. Plaintiff Municipalities DOES 1-500, representing various municipal corporations across the United States, each of which has directly purchased body-worn cameras and digital evidence management systems from Axon. These plaintiffs collectively seek compensation for the financial damages incurred due to Axon's monopolistic and deceptive conduct, which has forced them to pay higher prices for necessary law enforcement technology

4. Defendant Axon is a Delaware corporation with its principal place of business at 17800 North 85th Street, Scottsdale, AZ 85255. Axon designs, manufactures, and sells body-worn cameras and digital evidence management systems under the brand Evidence.com.

5. Defendant Microsoft is a publicly traded technology company incorporated in the State of Washington with headquarters 1 Microsoft Way, Redmond, Washington 98052. Microsoft operates datacenters in El Mirage and Goodyear, Arizona (known as "West US 3"), part of the Greater Phoenix area in this district. Microsoft has established a close strategic partnership with Axon Enterprise, Inc. This relationship is exemplified by the integration of Axon's Evidence.com platform with Microsoft Azure, allowing Axon to leverage Microsoft's cloud infrastructure to handle vast amounts of digital evidence data. This partnership has been instrumental in consolidating Axon's market dominance in the digital evidence management market. Microsoft's total revenues in twelve months ending March 31, 2024 were over $236 billion.

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as it arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and secure injunctive relief for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and under 28 U.S.C. § 1331 as it also arises under the Lanham Act, 15 U.S.C. § 1125. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they arise from the same nucleus of

operative facts as the federal claims.

2. This Court has personal jurisdiction over Axon because Axon conducts substantial business in this district, including the sale and distribution of its body-worn cameras and digital evidence management systems. In addition, this Court has general personal jurisdiction over Axon because Axon's principal place of business is in Arizona. Alternatively, this Court has specific personal jurisdiction over Axon because Axon purposefully directed its advertisements or promotions at consumers in this district and caused harm to Plaintiff in this district. Axon thus has minimum contacts with the State of Arizona and those contacts are related to this lawsuit.

3. This Court has personal jurisdiction over Microsoft because Microsoft operates datacenters in El Mirage and Goodyear, Arizona (known as "West US 3"), part of the Greater Phoenix area in this district. These datacenters are integral to Microsoft's cloud services, including the storage and management of digital evidence data for Axon's Evidence.com platform. Microsoft's close strategic collusion with Axon, which involves the integration of Microsoft Azure with Axon's Evidence.com platform, has substantial effects within the District of Arizona. This relationship supports Axon's monopolistic practices, affecting the market and law enforcement operations in this district.

4. In addition, this Court has general personal jurisdiction over Microsoft because Microsoft conducts significant business activities in the District of Arizona, selling software, services, and devices, including those related to its cloud infrastructure that

supports Axon's operations. Alternatively, this Court has specific personal jurisdiction over Microsoft because the anticompetitive and deceptive conduct by Axon and Microsoft, including the migration of data to Microsoft Azure and the subsequent monopolistic practices, occurred and have substantial effects within this district. Moreover, the economic harm and operational constraints caused by these practices directly impact law enforcement agencies and municipalities within the District of Arizona. Microsoft thus has minimum contacts with the State of Arizona and those contacts are related to this lawsuit.

5. Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391, because Axon and Microsoft both reside, transact business, and are found within this district, and because a substantial part of the events giving rise to the claims occurred in this district. Venue is proper in the United States District Court for the District of Arizona under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action occurred in this district. Additionally, Axon's principal place of business is located in Scottsdale, Arizona, making the District of Arizona a proper venue for this action.

//

//

//

//

//

**FACTUAL ALLEGATIONS**

1. Axon holds a dominant position in the market for body-worn cameras and digital evidence management systems for over 94.4% of all law enforcement agencies in the United States.[1]

2. Axon leverages its market power by integrating its body-worn cameras with its proprietary digital evidence management platform, Evidence.com, creating a closed ecosystem that discourages competition.

3. Axon's agreements with law enforcement agencies often include exclusivity clauses, tying the purchase of body-worn cameras to the mandatory use of Evidence.com, effectively foreclosing competition from innovative startups like GovGPT.

4. Axon's pricing strategies and contract terms are designed to create significant switching costs for law enforcement agencies, further entrenching its monopoly and preventing agencies from considering alternative solutions.

5. Axon's actions have harmed GovGPT by restricting its market access, reducing its revenue opportunities, and impairing its ability to compete on the merits of its innovative technology.

//

[1] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies (94.4%). Akela Lacy, *Two Companies Fight To Corner The Police Body Camera Market*, INTERCEPT, (Dec. 8, 2021), (last viewed July 29, 2024), https://t.co/3HqLDySGCH.

**AXON CONCEALS USE OF QUECTEL CHIPS, LABELED CHINESE SPYWARE BY CONGRESS, THREATENING U.S. NATIONAL SECURITY**

6. Federal Communications Commission Chairwoman Jessica Rosenworcel had warned U.S. government agencies in September 2023 about the unacceptable national security risk posed by equipment incorporating Quectel chipsets.[2] A few months later; on January 3, 2024, Chairman Mike Gallagher and Ranking Congress Member Raja Krishnamoorthi wrote to Secretaries Lloyd Austin and Janet Yellen, urging them to blacklist Quectel Wireless Solutions due to its ties to the Chinese government and its role in China's civil-military fusion strategy.[3] They highlighted concerns about the security risks posed by Quectel's IoT modules in American devices. (**Exhibit 2**).

7. Numerous threads online including one on Reddit titled "*Quectel modules may be vulnerable to possibly backdoored FOTA updates*" have described security concerns with Axon and their potential for espionage.[4] Specifically, this Reddit post discusses potential vulnerabilities in Quectel modules related to Firmware Over-The-Air (FOTA)

[2] David Shepardson, *US FCC Chair Says China's Quectel, Fibocom May Pose National Security Risks*, REUTERS, (Sept. 6, 2023), (last viewed July 29, 2024), https://www.reuters.com/technology/us-fcc-chair-asks-agencies-consider-restrictions-quectel-fibocom-2023-09-06/.

[3] *Gallagher and Krishnamoorthi Urge Administration to Blacklist Quectel as a 'Chinese Military Company'*, SELECT COMMITTEE ON THE CCP, (Jan. 4, 2024), (last viewed July 29, 2024), https://selectcommitteeontheccp.house.gov/media/press-releases/gallagher-krishnamoorthi-urge-administration-blacklist-quectel-chinese

[4] User: PINE64official. *Quectel modules may be vulnerable to possibly backdoored FOTA updates*. REDDIT, 3 years ago, 2021, https://www.reddit.com/r/PINE64official/comments/lqn2xv/quectel_modules_may_be_vulnerable_to_possibly/

updates.[5] There is concern that these updates could be backdoored, allowing the CCP to compromise devices by infiltrating the update server. Comments mention the risks of automatic FOTA updates, the importance of device-side encryption, and the potential for malicious actors to exploit USB connections.[6] The discussion emphasizes the need for secure update processes and possibly open-source modem firmware for enhanced security.[7]

**AXON BODY 4 CAMERAS USED AT TRUMP RALLY IN BUTLER PENNSYLVANIA POSE SIGNIFICANT NATIONAL SECURITY RISK**

8. The use of Axon Body 4 cameras in high-profile events poses significant security risks due to potential espionage concerns. For instance, Axon Body 4 cameras were deployed during President Trump's rally, where an assassination attempt occurred. Butler County, which was outfitted with Axon Body 4 cameras in 2023, had officers using these devices at the event.[8] Police officer from Butler county are depicted in news publications wearing an Axon Body 4 camera, for example in the Boston Globe:

[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] Denise G. Callahan, *Butler County deputies getting body cameras*, JOURNAL NEWS, (April 19, 2023), (last viewed July 29, 2024), https://www.journal-news.com/news/butler-county-deputies-getting-body-cameras/NAAUHISP5ZDEDAQGVVUGLB6XXU/.



Police officers at a road leading to the site of the assassination attempt on former president Donald Trump in Butler. Pa on July 14, 2024, Photo: S. Ogrocki, ASSOCIATED PRESS[9] (*emphasis added*)

**ELECTION INTERFERENCE RISK IN 2024 PRESIDENTIAL ELECTION**

9. In April 2024, US Secretary of State Antony Blinken said the U.S. has seen evidence of Chinese attempts to "influence and arguably interfere" with the upcoming US elections, despite an earlier commitment from leader Xi Jinping not to do so.[10] President Biden warned Xi Jinping in a phone call that same week against interfering in

[9] Ayanna Alexander, *What to know about Trump assassination attempt and the investigation into the shooting*, BOSTON GLOBE, (July 15, 2024), (last viewed July 29, 2024), https://www.bostonglobe.com/2024/07/15/nation/what-know-about-trump-assassination-attempt-investigation-into-shooting/.

[10] Simone McCarthy, *Blinken tells CNN the US has seen evidence of China attempting to influence upcoming US elections*, CNN, (April 26, 2024), (last viewed July 29, 2024), https://www.cnn.com/2024/04/26/politics/blinken-china-interview-intl-hnk/index.html

the U.S. election. The fact that the call was necessary points to a problem, according to the Council on Foreign Relations.[11]

10. China has a documented history of attempting to interfere with U.S. elections through cyber operations, disinformation campaigns, and leveraging economic and political influence.[12] The deployment of Axon Body 4 cameras equipped with Quectel chips could further these efforts by providing real-time surveillance capabilities and access to sensitive data, significantly enhancing China's ability to interfere with U.S. elections.

11. Similarly, the Biden administration obtained intelligence in recent weeks about an Iranian assassination plot against former President Donald Trump, and the information led the Secret Service to ramp up security around the former president.[13] China's top diplomat told Iran that the nations can work together across a range of areas in the future, signaling their ties remain solid following Tehran's unprecedented attack on

[11] Simone McCarthy, *Election 2024: China's Efforts to Interfere in the U.S. Presidential Election*, COUNCIL ON FOREIGN RELATIONS, (April 5, 2024), (last viewed July 29, 2024), https://www.cfr.org/blog/election-2024-chinas-efforts-interfere-us-presidential-election.

[12] *Blinken tells CNN the US has seen evidence of China attempting to influence upcoming US elections*, KTVZ, (April 26, 2024), (last viewed July, 29, 2024), https://ktvz.com/politics/cnn-us-politics/2024/04/26/blinken-tells-cnn-the-us-has-seen-evidence-of-china-attempting-to-influence-upcoming-us-elections/.

[13] Ken Dilanian et. al, *Alleged Iranian plot to kill Trump led Secret Service to increase security around him in recent weeks*, NBC NEWS, (July 16, 2024), (last viewed July 29, 2024), https://www.nbcnews.com/investigations/iran-assassination-plot-trump-secret-service-tightened-security-rcna162203

Israel.[14] The combination of the Iranian assassination plot, enhanced by the strategic partnership between Iran and China, significantly heightens the security risks to former President Trump and potentially other high-profile figures. The involvement of advanced Chinese surveillance technology, such as Quectel chips in Axon Body 4 cameras, exacerbates these risks by providing adversaries with sophisticated tools to gather intelligence and plan attacks. This underscores the urgent need for robust security measures and vigilant monitoring to protect against these evolving threats.

12. Therefore, the use of Axon Body 4 cameras equipped with Quectel chips at high-profile political events and sensitive locations create potential for real-time surveillance and GPS tracking by the CCP and could compromise the security of election activities, endanger public figures, and undermine public trust in the electoral process. Given China and Iran's past attempts to interfere with U.S. elections, these risks necessitate immediate attention and remedial actions to ensure the safety and integrity of U.S. elections.

**PLAINTIFF'S DISCOVERY OF SECURITY RISK IN AXON BODY CAMERAS**

13. On May 11, 2024, GovGPT purchased four Axon 4 cameras in Shenzhen, China; as part of its own R&D competitive product research. These cameras are only purchasable by law enforcement in the United States, but are readily available in China

[14] *China Tells Iran Cooperation Will Last After Attack on Israel*, BLOOMBERG, (April 15, 2024), (last viewed July 29, 2024), https://www.bloomberg.com/news/articles/2024-04-16/china-tells-iran-cooperation-will-last-after-attack-on-israel?embedded-checkout=true

on an eBay like website as shown below:




14. Disassembly of these cameras revealed that they included SIM (Subscriber Identity Module) cards from AT&T, which only operates in the United States, and advanced Chinese Quectel real-time streaming chips. (See: **Exhibit 1**) and see below:



**Axon Body 4 use Quectel 5g which US Leaders Seek to Blacklist on Military Ties**

Chinese components provide remote command and control usable for espionage.






1. SEC 128 B04J KLMCGUJED0



2. Qualcomm QCA6390



3. ? SL83115 ZA333225



4. Hynix H9HCNNNBPUMLHR



5. 5G Quectel EG065K

15. These 5G Quectel EG065K chips enable the Axon 4 camera to stream directly from the body camera to a remote location using cellular communications. This feature, intended to allow real-time streaming to police headquarters, can be exploited to stream data to unauthorized locations without robust security measures.

## GOVGPT'S ATTEMPTS TO ADDRESS THE ISSUE PRIVATELY WITH AXON

16. By May 20, 2024, GovGPT was very concerned upon this discovery and sought to bring the concern to Axon's senior management privately. GovGPT's management, including Abhyanker, a Sr. Company Leader (former FBI), and a strategic advisor (former U.S. Special Forces), first believed that the Axon 4 cameras in the devices it purchased were counterfeit devices or ones that were not commercially sold in the United States. However, the presence of a FirstNet AT&T SIM card seemed to indicate

they may be actual versions sold in the United States :




See **Exhibit 1**.

**<u>GOVGPT'S MEETING WITH TOP AXON LEADERSHIP</u>**

17. The GovGPT team decided to wait to ask Axon about it a week later on May 30, 2024 when they were to meet with Axon senior management about investment, thinking perhaps there would be a clear explanation or proactive clarification that the devices were indeed counterfeit. In case they were not, GovGPT's team decided they would not pursue any partnership with Axon unless the issue was rectified or proactively disclosed to municipalities by key members of Axon's senior leadership and R&D team.

18. On May 30, 2024, Axon senior management met with GovGPT senior leadership through a video call. Senior management of Axon on the call included:

a. <u>Henrik Kuhl</u>, SVP, Strategy & Corporate Development at Axon.

b. Charlie Henick, VP of Corporate Development at Axon

c. Craig Trudgeon, Senior Vice President of Product @ Axon

d. Yasser Ibrahim, Senior Vice President, R&D @ Axon

e. Dave Givler, Sr. Director @ Axon, growth of global alliances.

**AXON'S DISMISSAL OF SECURITY CONCERNS**

19. During the call, GovGPT urged Axon to redesign their products without Quectel components and to notify police departments across the United States about the risks associated with Quectel chips in Axon Body 4 products.

20. Instead of listening and showing proactiveness to make changes, GovGPT's good faith warnings were brushed aside and shortly thereafter Henrik Kuhl ended the call, saying "it is not the conversation we want to have" and that GovGPT should instead "focus on building your product and raising the capital you need." More than two months have passed since this meeting. Axon has failed to take appropriate action, thereby continuing to endanger national security and further entrenching its monopoly by withholding critical information from the public.

**AXON'S DOMINANT FINANCIAL POSITION**

21. Axon's unlawful monopolization of body worn camera systems is further evidenced by its persistent, high profit margins.

22. Axon's Q1 2024 financial report demonstrates the company's substantial financial dominance, with total revenue of $461 million, a 34% increase year over year. Axon's Cloud & Services revenue grew by 52% to $176 million, highlighting the nearly

complete dependence of more than 94.4% of America's law enforcement agencies on Axon's integrated ecosystem.

23. A December 2019 Axon investor presentation represented that Axon body worn camera systems controlled 47 of the 69 U.S. Major City Chiefs Agencies.[15] Measured in terms of output or revenue, Axon's market share among large U.S. cities is even higher than 80%—likely at least 85%.[16] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies (94.4%).[17]

24. This is indicated by a chart showing Axon body worn camera systems' dominance in terms of U.S. Major City Chief Agencies ranked by size, starting with New York City at the top left, then moving downward and spilling over into the subsequent columns, with the smallest agency in the chart being Salt Lake City, at bottom right:[18]

[15] Investor Presentation, Axon Enterprise, December 2019, at 6, Axon Enterprise (December 2019), as described in 3:23-cv-07182-RK-RLS, Dkt. 37, Page 19 of 64.

[16] Consistent with this figure, an analysis published by investment advice website Motley Fool concluded that, immediately after and as a direct result of the Acquisition, Axon "own[ed] 80% of all big-city police department contracts." Rich Duprey, *Axon Enterprise Now Owns the Police Body Cam Market*, MOTLEY FOOL, (May 18, 2018), (last viewed July, 29, 2024), https://www.fool.com/investing/2018/05/18/is-there-any-stopping-axon-enterprise-now.aspx.

[17] As of 2020, Axon reported having a customer relationship with 17,000 of the nation's 18,000 law enforcement agencies (94.4%). Akela Lacy, *Two Companies Fight To Corner The Police Body Camera Market*, INTERCEPT, (Dec. 8, 2021), (last viewed July, 29, 2024), https://t.co/3HqLDySGCH.

[18] Amended Complaint, *Township of Howell et. al. vs. Axon Enterprise, Inc. et al*, U.S. Dist. N.J. Case No. 3:23-cv-7182, filed Aug. 22, 2023, Dkt. 37. (**Exhibit 3**).

## Serving the top tier (Major City Chiefs)

| | | |
|---|---|---|
| New York City, New York | Baltimore, Maryland | Oklahoma City, Oklahoma |
| Chicago, Illinois | Charlotte-Mecklenburg, North Carolina | Cincinnati, Ohio |
| Los Angeles County, California | Atlanta, Georgia | El Paso, Texas |
| Los Angeles, California | Indianapolis, Indiana | Tucson, Arizona |
| Philadelphia, Pennsylvania | Cleveland, Ohio | Buffalo, New York |
| Houston, Texas | Fairfax County, Virginia | Tampa, Florida |
| Washington D.C. | Prince George's Co, Maryland | Portland, Oregon |
| Detroit, Michigan | Fort Worth, Texas | Minneapolis, Minnesota |
| Las Vegas, Nevada | Kansas City, Missouri | DeKalb County, Georgia |
| Dallas, Texas | Denver, Colorado | Long Beach, California |
| Baltimore County, Maryland | Jacksonville, Florida | Albuquerque, New Mexico |
| Phoenix, Arizona | Nashville, Tennessee | Mesa, Arizona |
| Nassau County, New York | San Jose, California | Fresno, California |
| Miami-Dade, Florida | St. Louis, Missouri | Virginia Beach, Virginia |
| Suffolk County, New York | New Orleans. Louisiana | Omaha, Nebraska |
| Memphis, Tennessee | Tulsa, Oklahoma | Orlando, Florida |
| San Francisco, California | Newark, New Jersey | Raleigh, North Carolina |
| Milwaukee, Wisconsin | Louisville. Kentucky | Wichita, Kansas |
| Honolulu, Hawaii | Seattle, Washington | Sacramento, California |
| San Antonio, Texas | Montgomery County, Maryland | Aurora, Colorado |
| Boston, Massachusetts | Miami, Florida | Arlington, Texas |
| Columbus, Ohio | Austin, Texas | Oakland, California |
| San Diego, California | Pittsburgh, Pennsylvania | Salt Lake City, Utah |

Axon network Competitor No cameras

25. As the chart shows, of the 69 Major City Chief members, Axon controlled 4 of the top 5, 7 of the top 10, and 15 of the top 20. In other words, Axon similarly dominated among the very largest U.S. agencies, which are much larger than the smaller Major Cities Chiefs Association ("MCCA") agencies. According to available data, around this same time, New York City and Chicago alone accounted for approximately 31% of the total officers and non-sworn personnel of all U.S. MCCA members combined. [19]

26. Assuming that New York and Chicago made up 31% of the market represented by the MCCA, and that the remaining 67 MCCA cities each represent an equal share of the

[19] The MCCA says its members comprise a workforce of 222,973 officers and non-sworn personnel in the U.S. Corporate Partnerships. *Corporate Partnerships*, MAJOR CITIES CHIEFS ASSOCIATION, (last viewed July 29, 2024), https://majorcitieschiefs.com/corporate-partnerships/#:~:text=MCCA%20membership%20is%20comprised%20of,officers%20and%20non%2Dsworn%20personnel.

remaining 69% of the market (a simplifying assumption), then according to the data from its December 2019 investor presentation, Axon had 85% of the market represented by the MCCA.

27. Axon acknowledges its dominance—according to the FTC, in a company presentation, Axon implored its salespeople to "embrace being the gorilla," and Axon's CEO confirmed that Axon is a "really strong market leader."[20]

28. As a result of its dominance, Axon wields its monopoly power to profitably charger supracompetitive prices for body worn camera systems and their components, including the huge price increases Axon implemented after the Acquisition, and to generate high profit margins.35 In 2022, Axon reported $392 million in gross margin in its "software and sensors" department, driven primarily by sales of its body worn camera systems. With $658 million in net sales from software and sensors, Axon generates a 60% profit margin from these body worn camera systems, an extremely margin reflecting its monopoly power. [21]

29. Motorola, Panasonic, and Utility largely make up the rest of the body worn camera systems market. A chart included in a December 2019 Axon investor presentation shows the meager market share these competitors had compared to Axon,

[20] Complaint, *Axon Enter., Inc.*, FTC Dkt. No. D9389 ¶ 30 (Jan. 3, 2020), https://fingfx.thomsonreuters.com/gfx/legaldocs/xmvjljzdzvr/Augusta%20v%20Axon%20-%2020231004.pdf

[21] *2023* Axon Enterprise, Inc. Form 10-K, at 39 (Feb. 28, 2023), https://www.sec.gov/Archives/edgar/data/1069183/000155837023002413/axon-20221231x10k.htm.

with the closest competitor, Motorola, controlling only 7 of 69 U.S. Major City Chief Agencies compared to Axon's 47 that year. [22]

30. Axon's annual recurring revenue (ARR) grew by 50% to $825 million as of May 2024, indicating a strong and growing customer base tied to Axon's subscription services. The company reported a net income of $133 million, supporting non-GAAP net income of $89 million and an adjusted EBITDA of $109 million, reflecting its significant profitability and market influence.

31. Axon increased its body worn camera prices by threefold between 2017 (the year before the Acquisition of VieVu) and 2023,[23] as illustrated in the chart below:




.

[22] *Id.*

[23] Amended complaint, *Township of Howell et. al. vs. Axon Enterprise, Inc. et al*, No. 3:23-cv-7182, filed Aug. 22, 2023, Dkt. 37. (**Exhibit 3**)

32. Axon's 2023 annual report further reveals that its total revenue for 2023 was $1.56 billion, with 86% of its revenue derived from the United States alone. The Software & Sensors segment, including Axon Evidence and other cloud services, contributed significantly to this growth, with revenue increasing from $426 million in 2021 to $951 million in 2023.

33. Prices for Axon's body worn camera Docks and Evidence.com have likewise increased since 2017, with Dock prices more than doubling, for example. These price increases have resulted in extraordinary profits for Axon. Axon's reported gross margin on "Software and Sensors hardware," which is what it calls its body worn camera business, increased fourfold after 2017,[24] as shown below:




[24] *Id.*

34. Axon has likewise raked in sky-high margins of over 70% on Evidence.com since the Acquisition.

35. According to Axon's Q1 2024 quarterly report, "Our integrated subscription plans drive value for our customers beyond what can be achieved through disparate point solutions and our software growth is also linked to record demand for our body-worn cameras and digital evidence management products."[25] This admission highlights how Axon uses its integrated ecosystem to lock customers into its products and services, reducing the likelihood that customers will seek or switch to competing solutions.

36. In its administrative complaint against Axon and Safariland, the FTC noted that Axon was the market leader for body worn camera systems, with VieVu as the next largest competitor.[26]

37. The Herfindahl-Hirschman Index ("HHI") measures and grades market concentration by adding the squared market share percentages of each competitor in the market. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share.

38. According to the Horizontal Merger Guidelines issued by the Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"), a merger that increases the

[25] *Axon Reports Q1 2024 Revenue of $461 Million, Up 34% Year Over Year, Raises Outlook*, AXON, (May 6, 2024), (last viewed July 29, 2024), https://investor.axon.com/2024-05-06-Axon-reports-Q1-2024-revenue-of-461-million,-up-34-year-over-year,-raises-outlook.

[26] Complaint, *Axon Enter., Inc.*, FTC Dkt. No. D9389 ¶ 30 (Jan. 3, 2020).

HHI by more than 200 and results in an HHI above 2,500 in any market is presumed to be anticompetitive, and therefore unlawful.[27]

39. According to FTC estimates, in 2018, Axon's acquisition of VieVu increased total market concentration by more than 200 HHI points and created a post-merger HHI exceeding 2,500 points.[28]

40. Axon's reported gross margins on body worn cameras follow a nearly identical trend, increasing every year from 2017 to 2022 (after declining from 2016 to 2017), jumping nearly *fourfold* over that period. In addition to increasing prices, Axon limited the availability of VieVu body worn camera systems to customers and stopped developing new generations of VieVu hardware and software.[29]

41. In June 2020, the FTC settled with Safariland after Axon and Safariland rescinded the noncompete provisions they entered into related to the Acquisition. But the FTC's administrative action against Axon (which further sought to undo the Acquisition) remained pending while Axon challenged the FTC's constitutional authority in court. In October of 2023, after private class actions were filed against Axon and Safariland. [30] ,

[27] DOJ & FTC, *Horizontal Merger Guidelines* 19 (2010). The DOJ and FTC have released draft merger guidelines, which presume anticompetitive any merger that increases HHI by more than 100 points and results in a market HHI greater than 1,800. DOJ & FTC, *Draft Merger Guidelines* (2023)

[28] Complaint, *Axon Enter., Inc.*, FTC Dkt. No. D9389 ¶ 34 (Jan. 3, 2020).

[29] Luke Schiefelbein, *Why Taser Stock Could Have Shocking Upside*, FORBES (Mar. 13, 2018), (last viewed July 29, 2024), . https://www.forbes.com/sites/lukeschiefelbein/2018/03/13/why-taser-stock-could-haveshocking-upside/?sh=47c4b26077d7

[30] See *Township of Howell et al. v. Axon Enterprise, Inc. et al.*, No. 3:23-cv-7182 (D.N.J. filed Aug. 22, 2023).

the FTC dismissed its administrative action against Axon, stating that the delay from Axon's ongoing constitutional challenge made "a timely resolution" of the FTC's enforcement action "increasingly unlikely." In doing so, the FTC stood by its allegations that the Acquisition "create[ed] a monopoly and harm[ed] both police departments and communities who fund them.[31]

42. Adding to this high market concentration, body worn camera system contracts generally last for 5– 10 years, limiting the ability of other body worn camera system providers to compete with Axon. Further limiting competition, police departments have high switching costs between body worn camera systems, as police departments must learn complex, new procedures for storing and using evidence. Axon is well aware of these high switching costs: in 2017, it offered free body cameras to police departments, which came with a one-year trial subscription to Evidence.com.[32]

43. Those "free" cameras enticed police departments into using the Axon body worn camera system, because Axon's body cameras only work with Axon software.

[31] United States: FTC's abandonment of case against Axon clouds Administrative Merger Challenges, GLOBAL COMPLIANCE NEWS, (Nov. 3, 2023), (last viewed July 29, 2024), https://www.globalcompliancenews.com/2023/11/03/https-urldefense-com-v3-__https-service-infongen-com-cgrmdwxscgmxmdukatekqezxwlpiwwqwvkfvc0tpag9tqlhzaxh3vdzkmwz3n0ppagvrt2r0ykdawkdoqmpyexvseu5lwna3stromuuvyva3d-newsletters-article-shownidnl_5-8/.

[32] Cyrus Farivar, *Taser Stuns Law Enforcement World, Offers Free Body Cameras to All US Police*, ARSTECHNICA, (Apr. 5, 2017), (last viewed July 29, 2024), https://arstechnica.com/tech-policy/2017/04/taser-announces-free-body-cameras-cloud-storage-to-all-us-cops-for-a-year/; Elizabeth Joh & Thomas Joo, *The Harms of Police Surveillance Technology Monopolies*, 99, DENV. L. REV. FORUM, 1, 17 (2022).

Safariland's then-Executive Vice President called the Axon offer for free body cameras a "Venus fly trap" and noted that "there's a whole back end to it that has implementation costs and makes it very difficult to switch out of once you're done.[33]

44. During the May 30, 2024 conversation with GovGPT, Henrik Kuhl, SVP of Strategy & Corporate Development at Axon, made an admission against interest. He acknowledged that the Axon Body 4 cameras are designed to function exclusively with Axon's proprietary Evidence.com software, rendering the hardware "nothing other than a paperweight" without a Evidence.com software subscription. This statement highlights Axon's deliberate strategy to create a closed ecosystem, compelling law enforcement agencies to invest continuously in Axon's software to utilize their hardware. This approach reinforces Axon's market dominance, limiting customer choice and stifling competition. Such an admission is crucial as it exposes the company's anti-competitive practices, raising significant concerns about monopolistic behavior and its impact on market dynamics and public safety.

45. Because of these high switching costs, police departments seldom switch their body worn camera system provider from one contract to another when a contract is renewed.[34]

---

[33] *In the Police Body Camera Business, the Real Money's on the Back End*, MARKETPLACE, (Apr. 18, 2017), (last viewed July 29, 2024), https://www.marketplace.org/2017/04/18/police-body-camera-business-real-moneys-on-back-end/.

[34] *Id.*

46. This “free” Evidence.com subscription also served to entrench Axon’s position in the long-range conducted energy weapons market, since Evidence.com “seamlessly integrates with Tasers.” This integration further locked purchasers into the Axon system for both long-range conducted energy weapons and body worn camera systems. [35]

47. Axon further holds its monopoly on its body worn camera systems by integrating its Tasers and Axon Fleet 3 dash cams with its Evidence.com digital evidence management system. Accordingly, police departments that want to integrate Taser and Axon Fleet 3 dash cams data into their evidence software must use the Axon body worn camera system.[36]

48. For police department users, Axon now bundles together its supply of Tasers and body worn camera systems. Axon negotiates supply for both services in one contract, allowing it to extract even higher prices. For example, in 2014–15, Oklahoma City paid around $630,000 and $683,325 for five-year contracts of at least 305 Tasers and a body worn camera system with 305 body cameras.[37] Under its new contract, all with Axon, it pays $28.9 million over ten years for a full supply agreement with 500 Tasers and 665 body cameras—of which, $18.7 million is allocated to Tasers and body worn camera

[35] Inkwood Research, *United States Conductive Electrical Weapons Market 2023–2030*, at 36 (2023); Schiefelbein, supra note 23, at 32.
[36] *Id.*
[37] Josh Wallace, *Oklahoma City Body Camera Program Full Implemented,* OKLAHOMAN, (Feb. 17, 2018), (last viewed July 29, 2024). https://www.oklahoman.com/story/news/local/oklahomacity/2018/02/17/oklahoma-city-body-camera-program-full-implemented/60542805007/; Brian Bus, *Shock Value: OKC Selling Back Its Obsolete Tasers*, THE JOURNAL RECORD, (Nov. 22, 2017), https://journalrecord.com/2017/11/22/shock-value-okc-selling-back-its-obsolete-tasers/.

systems.[38] These contracts represent a per-year cost increase for Tasers and body worn camera systems from just under $263,000 to $1.9 million, an increase of 611% when its supply of Tasers and body cameras increased by less than 100%.[39]

49. These heavy price increases indicate that prices for long-range conducted energy weapons and body worn camera systems have been artificially elevated above competitive levels.

50. Prices for body worn camera systems have increased from 2018 to 2023 and are supracompetitive. Axon negotiates pricing for body worn camera systems typically for 5–10 year contracts. For example, in 2016, the city of Columbus, Ohio paid $9.1 million to Axon competitor WatchGuard (now owned by Motorola Solutions, Inc.) for a five-year body worn camera system that provided 1,575 body cameras.[40] When Columbus signed a new contract in 2022 with Axon, the price doubled: it committed to pay Axon $19 million over five years, which included only a modest increase to 2,105 body cameras, plus 450 in-car cameras.[41]

51. Body worn camera use is widespread. In 2022, nearly half of police departments

[38] *Id.*
[39] *Id.*
[40] Mark Ferenchik, *Columbus, Ohio, Approves $9 Million Police Body Camera Contract*, GOV'T TECH, (Dec. 6, 2016), (last viewed July 29, 2024), https://www.govtech.com/public-safety/columbus-ohio-approves-9-million-body-camera-contract-forpolice.html.
[41] *Columbus City Leaders Announce Body-Worn Camera Upgrades with Automatic Activation.* WSYX ABC6, (March 22, 2022), (last viewed July 29, 2024), https://abc6onyourside.com/news/local/mayor-andrew-ginther-department-of-public-safety-city-leaders-announce-next-generation-visual-enhancements-audio-quality-body-worn-camera-program-3-22-2022.

in the United States used body cameras, and seven states currently have laws requiring police officers to use them. And where police departments use body cameras, over 90% of prosecutors use body camera evidence to prosecute civilians—so police departments' operations depend on having body camera footage integrated into their evidence system. [42]

52. Additionally, a Reuters investigation has revealed fabrications in Axon's backstory, including exaggerated claims about the effectiveness and safety of its body-worn cameras and digital evidence management systems. These fabrications have contributed to Axon's ability to secure and maintain its dominant market position by misleading customers and investors about the true capabilities and risks associated with its products.[43]

53. The investigation found that Axon's CEO Rick Smith has repeatedly invoked a false narrative about the company's origins, claiming he was motivated to start the company after two of his high school friends were shot and killed. However, these individuals were not friends of Smith, and their deaths were used without permission in

[42] Lily Robin & Susan Nembhard, *What Can Policymakers Expect of Body-Worn Cameras in Law Enforcement after a Decade of Use?*, URBAN INST. (July 14, 2022), (last viewed July 29, 2024), https://www.urban.org/urban-wire/what-can-policymakers-expect-body-worn-cameras-law-enforcement-after-decade-use.

[43] Jeffrey Dastin, *Taser maker Axon has a moving backstory. It's mostly a myth*, REUTERS (Dec. 27, 2023), https://www.reuters.com/investigates/special-report/axon-taser-corporate-governance/#:~:text=Axon%20CEO%20Rick%20Smith%20claims,behavior%20among%20top%20Axon%20executives.

company promotions to create a sympathetic and compelling backstory for marketing purposes.[44]

54. Further unethical behavior includes lavish compensation and perks for Axon's executives, often financed through company resources and not fully disclosed in regulatory filings. This pattern of self-dealing and misrepresentation is consistent among Axon's top leadership, raising serious concerns about the company's governance practices.

55. The resignation of Axon's ethics board over the development of Taser-armed drones underscores the company's disregard for ethical considerations and community impact. The board members, who were experts in technology, policing, and privacy, resigned en masse after Axon proceeded with controversial projects without adequate consultation or consideration of their recommendations.[45]

56. Axon's actions demonstrate a pattern of unethical behavior, including leveraging misleading narratives to maintain market dominance, ignoring ethical advice from its own advisory boards, concealing the use of Quectel chips in its Axon Body 4 cameras, and prioritizing profit over public safety and ethical considerations.

//

[44] *Taser Maker Axon Has a Moving Backstory. It's Mostly a Myth*, MARKET SCREENER, (Dec. 27, 2023), (last viewed July 29, 2024), https://www.marketscreener.com/quote/stock/AXON-ENTERPRISE-INC-34532659/news/Taser-maker-Axon-has-a-moving-backstory-It-s-mostly-a-myth-45638735/.

[45] *Axon Halts Plans for Taser Drone as 9 on Ethics Board Resign*, THE INDEPENDENT, (June 6, 2022), (last viewed July 29, 2024), https://www.independent.co.uk/news/washington-ap-taser-ceo-reuters-b2094898.html.

**RISING COST OF AXON SERVICES IS A SIGNIFICANT DRIVER INCREASING MUNICIPAL POLICE BUDGETS**

57. Abhyanker has owned property or resided in each of the municipalities below at all times between 2018-2024. Upon information and belief, budgets for Police Departments in each of the cities below have increased pursuant to the table below:

| City | 2018 Budget | 2023 Budget | Change in Budget (2018-2023) |
|---|---|---|---|
| Cupertino, CA | $10.1M | $11.5M | +$1.4M (+13.9%) |
| Mountain View, CA | $33.5M | $41.0M | +$7.5M (+22.4%) |
| Menlo Park, CA | $18.7M | $21.8M | +$3.1M (+16.6%) |
| Phoenix, AZ | $600.7M | $769.2M | +$168.5M (+28.1%) |
| Tempe, AZ | $93.5M | $107.4M | +$13.9M (+14.9%) |
| Arlington Heights, IL | $25.3M | $30.1M | +$4.8M (+19.0%) |

58. Upon information and belief, Cupertino's police budget increased from $10.1 million in 2018 to $11.5 million in 2023, reflecting a 13.9% increase over the five years. This data was compiled from the city's budget documents and financial reports, upon information and belief. Plaintiff Abhyanker resides in and owns significant residential property in Cupertino, California.

59. Upon information and belief, Mountain View's police budget grew from $33.5 million in 2018 to $41 million in 2023, an increase of 22.4%. The budget details were sourced from the city's budget reports and financial transparency portals, upon information and belief. Plaintiff Abhyanker owns significant commerical property in Mountain View, California, and has owned residential property and businesses in Mountain View, California during the last five years.

60. Upon information and belief, Menlo Park's police budget rose from $18.7 million in 2018 to $21.8 million in 2023, a 16.6% increase. This information was gathered from Menlo Park's adopted budget documents and related financial analysis, upon information and belief. Plaintiff Abhyanker resided in and paid taxes Menlo Park, California during the last five years.

61. Upon information and belief, Phoenix's police budget saw a substantial increase from $600.7 million in 2018 to $769.2 million in 2023, marking a 28.1% rise. The city's budget documents and financial reports provide these figures, upon information and belief. Plaintiff Abhyanker sometimes resides in and owns significant residential property in Phoenix, Arizona.

62. Upon information and belief, Tempe's police budget increased from $93.5 million in 2018 to $107.4 million in 2023, a 14.9% increase. This information was sourced from Tempe's budget and financial transparency portals, upon information and belief. Plaintiff Abhyanker has owned significant commercial property in Tempe, Arizona during the last five years.

63. Upon information and belief, Arlington Heights' police budget grew from $25.3 million in 2018 to $30.1 million in 2023, reflecting a 19.0% increase. The information was gathered from the village's budget documents and financial reports, upon information and belief. Plaintiff Abhyanker sometimes resides in and owns significant residential property in Arlington Heights, Illinois.

//

**RISING COST OF AXON SERVICES IS A SIGNIFICANT DRIVER IN INCREASED MUNICIPAL POLICE BUDGETS**

64. The percentage of the change in the police budget attributable to the increase in costs of software and equipment such as tasers, body cameras, dash cams and digital evidence software can vary significantly based on the specific city and their individual circumstances, upon information and belief. Based on general trends and available data, the approximate estimation is provided.

65. **Body Cameras**: The adoption of body-worn cameras has been a significant expense for many police departments. According to a report by the U.S. Department of Justice, the initial cost of body cameras can range from $500 to $1,000 per unit, with additional costs for storage, maintenance, and management of the data captured. Axon holds its monopoly through the required integration with Evidence.com and a lack of data portability, and a lack of hardware compatibility with third party evidence management software such as that being developed by GovGPT.

66. **Tasers**: The cost of tasers has also increased. A typical taser can cost between $800 and $1,200 per unit, excluding training and maintenance costs. However, the bulk of the fees integrated with Axon are in the backend through the required integration with Evidence.com for sync with Axon body cameras and Fleet 3 dash cams, upon information and belief. Axon holds its monopoly through the required integration with Evidence.com and a lack of data portability, and a lack of hardware compatibility with third party evidence management software such as that being developed by GovGPT.

67. **Dash Cams**: The cost of dash cams has also increased. A typical dashcam can cost between $2,500 and $6,500 per unit, excluding training and maintenance costs. However, the bulk of the fees integrated with Axon are in the backend through the required storage and sync with Evidence.com for sync with Axon body cameras and Tasers, upon information and belief. Axon holds its monopoly through the required integration with Evidence.com and a lack of data portability, and a lack of hardware compatibility with third party evidence management software such as that being developed by GovGPT.

68. **Digital Evidence Software**: Implementing digital evidence management systems can be expensive. Costs for Evidence.com software and storage solutions can run into the hundreds of thousands of dollars, depending on the size of the department and the volume of data.

69. Based on various sources, including city budget reports and news articles, it is estimated that the increase in costs related to technology and equipment typically accounts for approximately 10-20% of the overall increase in police budgets. For example:

70. **Cupertino, CA**: A portion of the increase in the budget from $10.1M to $11.5M (a $1.4M increase) is attributable to technology and equipment costs, upon information and belief.

71. **Mountain View, CA**: The increase from $33.5M to $41.0M (a $7.5M increase) includes substantial investments in technology, upon information and belief.

72. **Menlo Park, CA**: An increase from $18.7M to $21.8M (a $3.1M increase) also reflects technology upgrades, upon information and belief.

73. Assuming an average of 15% contribution from technology and equipment costs, upon information and belief:

- Cupertino: 15% of $1.4M = $210,000
- Mountain View: 15% of $7.5M = $1.125M
- Menlo Park: 15% of $3.1M = $465,000
- Phoenix: 15% of $168.5M = $25.275M
- Tempe: 15% of $13.9M = $2.085M
- Arlington Heights: 15% of $4.8M = $720,000

74. Upon information and belief, approximately 10-20% of the increase in the police budgets for these cities can be attributed to the increased costs of software and equipment such as tasers, body cameras, dash cameras and digital evidence software. This percentage can vary based on specific local needs, policies, and technological adoption rates, upon information and belief.

**LOCAL TAX REVENUES USED TO FUND THE POLICE**

75. Upon information and belief, the sales tax, property tax, and state income tax to support police services in Cupertino, Mountain View, Menlo Park, Phoenix, Tempe, and Arlington Heights are directly used for police services:

| City | Sales Tax | Property Tax | State Income Tax |
|---|---|---|---|
| Cupertino, CA | Yes | Yes | No |
| Mountain View, CA | Yes | Yes | No |
| Menlo Park, CA | Yes | Yes | No |
| Phoenix, AZ | Yes | Yes | No |
| Tempe, AZ | Yes | Yes | No |
| Arlington Heights, IL | Yes | Yes | No |

76. According to information and belief, sales tax and property tax in Cupertino, California are used to support the police. The city receives a portion of the sales tax revenue, which is critical for funding various city services, including police (Cupertino Facts, City Budget Reports).

77. According to information and belief, sales tax in Mountain View, California contributes significantly to the general fund, which includes police services. Property tax is also used to support the police. There is no direct allocation from state income tax for police funding, upon information and belief. (Mountain View City Finance Reports).

78. According to information and belief, both sales tax and property tax in Menlo Park California are used to fund the police department. The general fund, supported by these taxes, covers essential services, including police, upon information and belief. (Menlo Park Budget Documents).

79. According to information and belief, sales tax and property tax in Phoenix, Arizona are primary sources for police funding. State income tax does not directly support local police funding, upon information and belief. (Phoenix Budget Reports)

80. According to information and belief, similar to Phoenix, sales tax and property tax in Tempe, Arizona are used to support police services. There is no direct funding from state income tax, upon information and belief. (Tempe City Budget Documents)

81. According to information and belief, the village of Arlington Heights, Illinois uses sales tax and property tax to support its police services. State income tax is not a direct funding source for the police department, upon information and belief. (Arlington Heights Financial Reports).

82. Because the sales tax, property tax, or state income tax are used support police services in Cupertino, Mountain View, Menlo Park, Phoenix, Tempe, and Arlington Heights, and because Abhyanker is a taxpayer in each of these cities, Abhyanker has standing to serve as a class representative for harm suffered (e.g., indirect) with respect to this complaint.

**IMPORTANCE OF ALLOWING CUSTOMERS TO PURCHASE DEBUNDLED DIGITAL EVIDENCE MANAGEMENT SOFTWARE**

83. Allowing police departments and municipalities to purchase and utilize debundled digital evidence management software that is compatible with Axon's body camera hardware without requiring subscriptions to Evidence.com is critical for several reasons:

84. **Consumer Choice:** The Federal Trade Commission Act and antitrust laws aim to promote competition and prevent monopolistic practices. When digital evidence management software is tied exclusively to Axon's body cameras, law enforcement

agencies have no choice but to use Evidence.com, limiting their options. Allowing competitors to offer compatible software promotes consumer choice, ensuring that agencies can select the best products for their specific needs.

85. **Innovation:** Competition drives innovation. When multiple software providers can offer their solutions such as GovGPT, they are incentivized to improve their products continuously, leading to technological advancements that benefit law enforcement agencies. This competition fosters a dynamic market where providers strive to offer better features, enhanced security, and improved user experiences.

86. **Market Fairness:** Antitrust laws, such as the Sherman Act and Clayton Act, are designed to prevent monopolistic practices that stifle competition. Axon's practice of bundling its body cameras with Evidence.com creates an unfair market advantage, making it difficult for other software providers such as GovGPT to compete. By allowing debundling, the market becomes more open and competitive, fostering a fair playing field for all providers.

87. **Price Regulation:** Monopolistic practices often lead to inflated prices. Without competition, Axon sets high prices for its bundled services, burdening law enforcement agencies with excessive costs. Introducing competition through debundling ensures that prices are regulated by market forces, leading to more affordable options for agencies and better utilization of taxpayer dollars.

88. **Transparency and Trust:** Consumer protection laws, including the California Consumer Privacy Act (CCPA) and the Illinois Consumer Fraud and Deceptive Business

Practices Act (ICFA), emphasize the importance of transparency. Because Evidence.com subscriptions are bundled, it obscures the true costs and capabilities of each component. By allowing debundling, law enforcement agencies gain clearer insights into what they are purchasing, building trust and enabling informed decision-making.

89. **Deceptive Practices:** Axon's bundling practice is deceptive, as it hides the true cost of digital evidence management. This deception misleads police departments and municipalities, as well as taxpayers, violating consumer protection laws. By requiring Axon to offer debundled software, transparency is increased, aligning with the goals of the Unfair Competition Law (UCL) and the Arizona Consumer Fraud Act

90. **Data Control:** Different software providers such as GovGPT offer varying levels of data security and privacy protections. Allowing law enforcement agencies to choose their software providers ensures that they can select solutions that meet their specific security needs, protecting sensitive information from potential breaches.

91. **National Security:** The presence of Quectel chips in Axon's cameras raises national security concerns due to potential unauthorized access by foreign entities. Allowing agencies to use debundled software providers who prioritize security can mitigate these risks, ensuring that sensitive data is protected.

92. **Cost Savings:** Introducing competition such as GovGPT through debundling leads to lower prices. Law enforcement agencies, funded by taxpayer dollars, can achieve significant cost savings, allowing them to allocate resources more effectively. This benefits taxpayers by reducing the financial burden on public safety budgets.

93. **Resource Allocation:** Lower costs for more capable technology such as technology offered by GovGPT means that municipalities can allocate more resources to other critical areas, such as community policing, training, and public safety initiatives. This holistic approach enhances overall community well-being and public safety.

94. For these reasons, allowing police departments and municipalities to purchase debundled digital evidence management software compatible with Axon's body camera hardware is crucial for promoting competition, preventing monopolistic practices, protecting consumer rights, ensuring data privacy and security, and achieving economic efficiency. These objectives align with the goals of the FTC Act, Sherman Act, Clayton Act, CCPA, UCL, Arizona Consumer Fraud Act, and ICFA, ensuring a fair, transparent, and competitive market that benefits law enforcement agencies and taxpayers alike.

**BENEFITS TO MUNICIPALITIES, POLICE DEPARTMENTS, AND TAXPAYERS IF DEBUNDLING IS PERMITTED**

95. Allowing the purchase of debundled digital evidence management software that works with Axon body camera hardware without requiring subscriptions to Evidence.com provides several significant benefits to municipalities, including:

96. **Reduced Costs:** Municipalities would no longer be tied to the high costs of bundled services. They can choose more affordable digital evidence management software that fits their budget, leading to significant savings.

97. **Budget Allocation:** Savings from reduced costs can be reallocated to other critical areas, such as community programs, infrastructure, and public services,

enhancing the overall well-being of the community.

98. **Competitive Pricing:** With multiple vendors in the market such as Plaintiff GovGPT, municipalities can leverage competitive pricing to get the best value for their money, avoiding monopolistic pricing structures imposed by a single provider.

99. **Vendor Flexibility:** The ability to switch vendors easily without being locked into a single provider enhances municipalities' flexibility to choose the best solutions as their needs evolve.

100. **Best Fit Solutions:** Police departments can select digital evidence management systems that best meet their specific operational needs, enhancing efficiency and effectiveness in evidence handling and case management.

101. **Innovation Access:** Exposure to various software options allows police departments to adopt innovative solutions that may offer better features, improved security, and easier integration with other law enforcement tools.

102. **Streamlined Processes:** By choosing software tailored to their workflow, police departments can streamline processes, reducing administrative burdens and allowing officers to focus more on community policing and less on paperwork.

103. **Interoperability:** Allowing various software solutions can improve interoperability with other systems used by different departments and agencies, enhancing collaboration and data sharing.

104. **Lower Taxes:** Cost savings from more competitive pricing such as offerings from Plaintiff GovGPT can reduce the financial burden on taxpayers. Municipalities can

use the savings to potentially lower taxes or avoid tax increases.

105. **Efficient Use of Public Funds:** Ensuring that public funds are spent efficiently on technology that provides the best value helps build trust and accountability between the government and its citizens.

106. **Better Resource Allocation:** Savings from reduced technology costs can be redirected to other critical areas of public safety, such as hiring more officers, investing in training, or enhancing community policing efforts.

107. **Transparency and Trust:** When municipalities and police departments can choose and implement the best technology solutions such as offerings from Plaintiff GovGPT, it promotes transparency and trust in law enforcement, improving community relations and public safety.

108. Therefore, ordering the debundling of digital evidence management software through this litigation offers substantial benefits. Municipalities can achieve cost efficiency and better budget allocation, police departments can improve their operational efficiency and access to innovative solutions, and taxpayers benefit from financial accountability and enhanced public safety. These advantages align with the broader goals of promoting competition, preventing monopolistic practices, and ensuring transparency and fairness in the market for law enforcement technology solutions.

**ACCOUNTABILITY AND TRUST BETWEEN LAW ENFORCEMENT AND THE PUBLIC IF DEBUNDLING IS PERMITTED**

109. Allowing police departments to purchase debundled digital evidence

management software that is compatible with Axon's body camera hardware without requiring subscriptions to Evidence.com can significantly benefit competition and innovation, thereby improving accountability, trust, and public safety in ways such as:

110. **Increased Market Players:** Permitting debundling allows more software vendors such as offerings from Plaintiff GovGPT to enter the market, breaking Axon's monopoly. This competition forces all providers to improve their offerings to maintain or grow their market share.

111. **Better Pricing:** With more competitors, law enforcement agencies can benefit from competitive pricing, leading to cost savings and more efficient use of taxpayer funds.

112. **Diverse Solutions:** Law enforcement agencies can choose from a variety of software solutions tailored to their specific needs such as offerings from Plaintiff GovGPT. This customization ensures they have the most effective tools for their operations.

113. **Vendor Flexibility:** Agencies are not locked into a single vendor and can switch providers if they find a better product, ensuring continuous improvement and satisfaction.

114. **Continuous Improvement:** Competing software vendors such as offerings from Plaintiff GovGPT are incentivized to continuously improve their products to attract and retain customers. This leads to innovative features, better security measures, and more user-friendly interfaces.

115. **Integration with Emerging Technologies:** Open competition encourages the integration of new technologies such as AI, machine learning, and advanced data analytics into digital evidence management systems such as offerings from Plaintiff GovGPT. These innovations can enhance the functionality and effectiveness of body-worn camera systems.

116. **Interoperability:** An open market fosters the development of interoperable systems, allowing different software and hardware to work together seamlessly. This interoperability is crucial for multi-agency operations and enhances the overall effectiveness of law enforcement activities.

117. **Third-Party Innovations:** Third-party developers such as offerings from Plaintiff GovGPT can create complementary tools and applications that enhance the core functionality of body-worn cameras and digital evidence management systems, leading to a richer ecosystem of solutions.

118. **Enhanced Oversight:** Multiple vendors and competitive solutions such as offerings from Plaintiff GovGPT allow for better scrutiny and oversight of the products used by law enforcement. Independent audits and evaluations become feasible, ensuring that the tools used meet the highest standards of transparency and reliability.

119. **Public Confidence:** When law enforcement agencies use well-reviewed and independently validated products, it boosts public confidence in the integrity and accountability of their operations.

120. **Tailored Solutions:** Different communities have unique needs. Customizable

and adaptable software solutions ensure that law enforcement agencies can use tools specifically designed to address their community's concerns, leading to more effective policing.

121. **Feedback and Iteration:** An open market allows for continuous feedback from end-users (police officers and administrators), leading to iterative improvements in the products. This responsiveness to user needs enhances the overall effectiveness and trust in these systems.

122. **Better Tools for Officers:** Innovative and competitive software solutions such as offerings from Plaintiff GovGPT provide officers with better tools for managing and analyzing evidence, leading to more effective and efficient law enforcement operations.

123. **Real-Time Data and Analytics:** Advanced software can offer real-time data analytics and insights, enabling officers to respond more quickly and effectively to incidents, ultimately enhancing public safety.

124. **Building Trust:** Transparency in the tools and technologies used by law enforcement fosters trust within the community. When the public knows that the tools used by police are independently validated and competitive, it builds confidence in the law enforcement agencies.

125. **Accountability Mechanisms:** Advanced digital evidence management systems can include features that enhance accountability, such as automated logging of access to evidence, detailed audit trails, and real-time threat detection capabilities such

as offerings from Plaintiff GovGPT. These features help ensure that evidence is handled properly, reducing instances of misconduct and building public trust.

126. Therefore, permitting the purchase of debundled digital evidence management software significantly benefits competition and innovation, thereby enhancing accountability, trust, and public safety. Competition ensures better pricing, increased innovation, and more tailored solutions for law enforcement agencies. It fosters an environment of transparency and oversight, boosting public confidence in the integrity of law enforcement operations. Ultimately, these benefits lead to more effective policing and stronger community relations, which are essential for maintaining public safety.

**BREAKING UP THE AXON MONOPOLY: THE CASE FOR DEBUNDLING DIGITAL EVIDENCE MANAGEMENT SOFTWARE**

127. Permitting customers to purchase debundled digital evidence management software that is compatible with Axon's body camera hardware, without requiring subscriptions to Evidence.com, is an effective remedy for breaking up Axon's monopoly. This approach addresses several key aspects of monopolistic behavior and promotes a healthier, more competitive market, such as:

128. **Increased Competition:** By allowing other software providers such as offerings from Plaintiff GovGPT to integrate their solutions with Axon's hardware, the market opens up to a greater number of participants. This reduces Axon's stranglehold on the market, fostering a competitive environment where multiple companies can offer their products and services.

129. **Lower Prices:** With more competitors such as offerings from Plaintiff GovGPT in the market, prices for digital evidence management solutions are likely to decrease due to competitive pressures. Law enforcement agencies can benefit from more affordable technology, leading to cost savings for municipalities and taxpayers.

130. **Product Improvement:** Competition drives innovation. Other software providers such as offerings from Plaintiff GovGPT, incentivized by the opportunity to compete with Axon, will innovate to offer superior products. This can lead to better features, enhanced security, and more efficient workflows for law enforcement agencies.

131. **Technological Advancements:** An open market encourages the integration of emerging technologies such as offerings from Plaintiff GovGPT, such as artificial intelligence threat detection and machine learning , into digital evidence management systems. These advancements can significantly improve the functionality and utility of body-worn cameras.

132. **Free Market Choice:** Tying the purchase of Axon's body cameras to its Evidence.com service restricts market choice. Allowing debundling breaks this practice, ensuring that law enforcement agencies can choose the best software such as offerings from Plaintiff GovGPT that meets their needs without being compelled to use Axon's platform.

133. **Lowering Entry Barriers:** New entrants such as offerings from Plaintiff GovGPT are unable to compete in a market dominated by a single provider with bundled offerings. By allowing debundling, the barriers to entry are lowered, enabling smaller

and new companies such as offerings from Plaintiff GovGPT to enter the market and compete effectively.

134. **Stimulating Market Dynamics:** A more open market stimulates dynamic competition, where companies such as offerings from Plaintiff GovGPT continuously strive to improve their products and services to gain a competitive edge. This leads to a more vibrant and innovative market environment.

135. **Informed Decision-Making:** Law enforcement agencies can make more informed decisions when they have the freedom to choose from multiple software providers. Transparency in pricing and product features fosters trust between technology providers and their consumers.

136. **Public Accountability:** When law enforcement agencies use independently verified and competitive products, it builds public trust in their operations. The community gains confidence in the integrity and accountability of their law enforcement agencies.

137. **Better Resource Allocation:** Cost savings from competitive pricing can be reallocated to other critical areas of public safety, such as hiring more officers, investing in training, and enhancing community policing efforts.

138. **Effective Policing Tools:** Access to a range of innovative and advanced digital evidence management solutions such as offerings from Plaintiff GovGPT ensures that law enforcement agencies have the best tools at their disposal. This improves their ability to manage evidence efficiently, leading to more effective law enforcement and

better public safety outcomes.

139. **Market Efficiency:** An open and competitive market is more efficient. Resources are allocated more effectively, and companies such as offerings from Plaintiff GovGPT and Axon alike are incentivized to innovate and improve, leading to better products and services for consumers.

140. **Cost-Effective Solutions:** Competitive pricing and innovation such as offerings from Plaintiff GovGPT result in more cost-effective solutions for law enforcement agencies. This efficiency benefits taxpayers, as public funds are used more judiciously.

141. Therefore, allowing customers to purchase debundled digital evidence management software that works with Axon's body camera hardware is a powerful remedy for breaking up Axon's monopoly. It promotes competition, fosters innovation, enhances accountability and trust, and ensures compliance with antitrust and consumer protection laws. This approach not only benefits municipalities, police departments, and taxpayers but also leads to a healthier, more dynamic market that drives continuous improvement in public safety technology.

## ANALOGOUS ANTITRUST CONDUCT

142. Axon's conduct is analogous to the antitrust practices challenged in the case of *Epic Games*[46], where Apple was accused of maintaining a monopoly in the iOS App

[46] *Epic Games, Inc. v. Apple Inc.*, 4:20-cv-05640-YGR, 21-16506, Dk. 812, (9th Cir. 2023), https://regmedia.co.uk/2021/09/10/epic-v-apple.pdf.

Distribution Market and the iOS In-App Payment Processing Market through unreasonable and unlawful restraints.

143. In the *Epic Games* case, Apple was found to monopolize the iOS App Distribution Market by requiring developers to distribute their apps exclusively through the App Store, and to use Apple's In-App Purchase system for all digital content transactions. Similarly, Axon requires law enforcement agencies to use its Evidence.com platform exclusively with its body-worn cameras and its taser products, foreclosing competition from alternative evidence management solutions.[47]

144. Like Apple, Axon imposes unreasonable restraints on competition through technical restrictions, contractual obligations, and exclusionary practices, all designed to maintain its monopoly in the law enforcement technology market. This conduct includes leveraging its market power to impose supra-competitive prices, stifling innovation, and limiting consumer choice.

145. In fact, Axon's Chief Executive Officer, Rick Smith boasts in an interview with the National Fraternal Order of Police that it took inspiration from Apple in that the hardware is not what made its products great, but its tight coupling of the "hardware/software ecosystem." Axon has also said they "won by combining the

[47] *The Police Body Camera Business: The Real Money's on the Back End*, MARKETPLACE, (Apr. 18, 2017), (last viewed July 29, 2024), https://www.marketplace.org/2017/04/18/police-body-camera-business-real-moneys-on-back-end/.

software and hardware."[48]

146. Also, Axon's conduct is analogous to the antitrust practices currently being challenged against the company in the case *Township of Howell*, which is based primarily on the acquisition of VieVu in 2018.[49]

147. In the *Township of Howell* case, Axon's anticompetitive conduct is supported by behavior described in that litigation which alleges Axon acquired VieVu to eliminate competition, used tying arrangements to force purchases of its Evidence.com system, and entered exclusive contracts to prevent competition. This led to inflated prices and reduced innovation. In the current dispute, Axon continues these practices, stifling competition and increasing costs for taxpayers and municipalities. Additionally, Axon's concealment of Quectel chips in its Body 4 cameras, posing national security risks, reflects its pattern of deceptive practices, misleading customers about product safety and effectiveness.

**HARM CAUSED BY MIGRATION TO MICROSOFT AZURE AND CONSPIRACY TO MAINTAIN MONOPOLY**

148. On or about February 2018, Axon migrated 20 petabytes of data from its Evidence.com platform to Microsoft Azure. At the time, both companies billed this

[48] Peter High & Rick Smith, *The Man Who Plans to Make Bullets Obsolete,* FORBES, (Oct. 14, 2019), (last viewed July 29. 2024), https://www.forbes.com/sites/peterhigh/2019/10/14/rick-smith-the-man-who-plans-to-make-bullets-obsolete/.

[49] *Township of Howell et al. v. Axon Enterprise, Inc. et al.*, No. 3:23-cv-7182 (D.N.J. filed Aug. 22, 2023); Dkt. No. 37; *See* (Exhibit 3).

data migration as one of the largest cloud migrations in history.[50] This migration was framed as a strategy to enhance scalability, security, and performance by leveraging Azure's robust cloud infrastructure. However, this shift marked a critical point in Axon's path towards monopolistic control over the body-worn camera and digital evidence management market. Upon information and belief, harm to police departments included:

149. **Non-Disclosure Disclosure of Financial Implications:** Police departments and municipalities were not adequately informed about the financial and operational impacts of this migration. The decision to move to Azure was made without comprehensive disclosure to these entities about the potential cost increases and long-term budget implications.

150. **No Opportunity to Opt-Out:** Law enforcement agencies were not given the option to opt-out of this migration or evaluate alternative solutions that might better fit their financial and operational needs. This lack of choice forced them into a dependent relationship with Axon's proprietary system.

151. **New Cost Structures:** The migration introduced new, less transparent cost structures associated with data storage and management on Azure. These unforeseen expenses disrupted the financial planning of municipalities and police departments,

[50] Larry Dignan, *Axon Moves 20 PB of Data from Evidence.com to Microsoft Azure,* ZDNET, (Feb. 28, 2018), (last viewed July 29. 2024), https://www.zdnet.com/article/axon-moves-20-pb-of-data-evidence-com-to-microsoft-azure/. (Axon reported strong fourth quarter results and detailed a December migration to Microsoft Azure as well as other cloud-centric implementations.)

potentially leading to budget overruns and fiscal stress.

152. **Financial Uncertainty:** The lack of predictability in pricing made it difficult for these entities to manage their long-term investments in digital evidence management, causing financial uncertainty and planning difficulties.

153. **Limited Vendor Options:** By integrating with Microsoft Azure, Axon effectively tied law enforcement agencies to its own digital evidence management platform. This dependency reduced the ability of these agencies to explore and adopt alternative, potentially more cost-effective or efficient solutions from other vendors.

154. **Stifling Innovation:** The reliance on a single vendor for both hardware and software stifled competition and innovation in the market, as new entrants found it challenging to compete with Axon's integrated offerings.

**155. Conspiracy Between Microsoft and Axon**

156. The migration to Microsoft Azure and the subsequent integration of Axon's services reflect a strategic alliance between Axon and Microsoft aimed at consolidating Axon's monopoly in the market. This partnership has several monopolistic implications:

157. **Exclusive Control:** The collaboration between Axon and Microsoft has resulted in an exclusive control over the storage and management of digital evidence data, making it difficult for other vendors to offer competing services.

158. **Market Power:** By leveraging Microsoft's cloud infrastructure, Axon has strengthened its market position, making it challenging for smaller competitors to compete on equal footing. This consolidation has entrenched Axon's market dominance.

**TIMELINE OF KEY EVENTS FROM 2018 TO 2024**

**LEADING TO AXON'S MONOPOLY**

159. Upon information and belief, here is a timeline of key events from 2018 to 2024 leading to Axon's monopoly:

**160. 2018: Migration to Microsoft Azure**

161. Axon migrated 20 petabytes of data from its Evidence.com platform to Microsoft Azure, significantly enhancing its data storage and management capabilities. This move laid the foundation for Axon's dominance in the digital evidence management market by leveraging Azure's scalability, security, and performance.

**162. 2019: Strategic Acquisitions and Partnerships**

163. Axon acquired VieVu, one of its main competitors in the body-worn camera market. This acquisition reduced competition and consolidated Axon's market share. Further integration with Microsoft Azure solidified Axon's reliance on advanced cloud infrastructure, offering enhanced services and tightening its market grip.

**164. 2020: Expansion of Evidence.com and Market Penetration**

165. Axon expanded its digital evidence management platform, Evidence.com, offering more advanced features and deeper integration with its body-worn cameras. This expansion attracted more law enforcement agencies to switch to Axon's bundled services. Axon began securing exclusive contracts with numerous police departments and municipalities, further entrenching its position by making it difficult for competitors to penetrate these markets.

**166. 2021: Product Enhancements and New Offerings**

167. Axon launched the Axon Body 3 camera, which included real-time streaming capabilities and required integration with Evidence.com. This product launch reinforced the dependency of law enforcement agencies on Axon's ecosystem. By continually increasing dependency of products and services on Evidence.com, Axon increased its market share, edging out smaller competitors who could not match the entrenched market dominance.

**168. 2022: Consolidation and Market Control**

169. Axon acquired several smaller technology firms, including those specializing in AI and machine learning for public safety, further consolidating its market position. Continued enhancement of integration between its hardware and software products made it increasingly difficult for law enforcement agencies to switch to other vendors.

**170. 2023: Continued Dominance and Criticism**

171. Growing criticism and scrutiny over Axon's monopolistic practices emerged, particularly its bundling strategies and exclusive contracts that stifled competition. Concerns about the presence of Quectel chips in Axon Body 4 cameras and the potential national security risks further highlighted the lack of transparency and increased dependence on Axon's proprietary systems.

**172. 2024: Regulatory Scrutiny and Calls for Reform**

173. Increased regulatory scrutiny and legal challenges emerged against Axon's monopolistic practices, including claims of antitrust violations and deceptive business

practices. This complaint advocates for mandatory debundling of Axon's digital evidence management software from its hardware. Proposals were made to allow law enforcement agencies to choose their software providers independently of their body camera hardware.

174. Law enforcement agencies faced unpredictable costs and financial uncertainty due to the new pricing structures introduced after the migration to Microsoft Azure. The lack of transparency and the inability to opt-out of bundled services strained their budgets. Axon's monopolistic practices stifled competition, limiting the availability of innovative and cost-effective solutions from other vendors. This lack of competition resulted in higher costs and fewer choices for law enforcement agencies. The integration of Axon's services with Microsoft Azure created a dependency on Axon's ecosystem, making it difficult for agencies to switch to alternative solutions. The partnership between Axon and Microsoft facilitated Axon's ability to maintain its market dominance. By leveraging Azure's cloud infrastructure, Axon could offer superior services that competitors could not easily replicate, thus consolidating its market position.

## ANTICOMPETITIVE CONDUCT SUMMARY

175. Monopolistic Practices and Market Dominance

176. Axon and Microsoft have colluded to engage in several anticompetitive practices aimed at maintaining and expanding its dominant position in the body-worn camera market.

177. Collusion between Axon and Microsoft

178. In February 2018, Axon and Microsoft entered into a strategic partnership whereby Axon migrated 20 petabytes of data, including video files and associated metadata, from AWS and other cloud storage solutions to Microsoft Azure. Upon information and belief, neither Axon nor Microsoft sought or received informed consent from the affected law enforcement departments before porting their data to Microsoft Azure. This migration was conducted without adequately informing these departments of the potential impacts on their operations, costs, or data privacy.

179. The partnership between Axon and Microsoft facilitates the consolidation of Axon's dominance in the digital evidence management market. By integrating Axon’s Evidence.com platform with Microsoft Azure, they create barriers to entry for other competitors. This exclusive control over the storage and management of digital evidence data effectively reduces the ability of law enforcement agencies to choose alternative, competitive solutions, thereby stifling competition.

180. Law enforcement agencies face unpredictable costs and financial uncertainty due to the migration and the new pricing structures introduced by the partnership with Microsoft Azure. The integration of Axon's services with Microsoft Azure creates a dependency on Axon's ecosystem, making it difficult for agencies to switch to alternative solutions.

181. Strategic Acquisitions to Eliminate Competition

182. Axon holds a substantial share of the market for body-worn cameras and

digital evidence management systems used by law enforcement agencies across the United States. Through a series of strategic acquisitions, exclusionary contracts, and deceptive practices, Axon has managed to stifle competition, inflate prices, and reduce innovation in this critical market.

183. Axon has pursued a strategy of acquiring competitors to consolidate its market power and eliminate competitive threats. Notable acquisitions include:

a. Dedrone (2024): A leader in airspace security solutions, providing advanced drone detection and mitigation technologies. The acquisition of Dedrone allows Axon to control significant portions of the drone security market, further consolidating its dominance in public safety technology.[51]

b. Fusus (2024): A provider of real-time crime center (RTCC) technology, integrating live video, data, and sensor feeds from various sources. This acquisition enhances Axon's capabilities in situational awareness and real-time response, limiting competition in the market for integrated public safety solutions.[52]

[51] *Axon to Acquire Dedrone, Accelerating the Next Generation of Drone Solutions to Protect More Lives in More Places*, AXON, (May 6, 2024), (last viewed July 29. 2024), https://investor.axon.com/2024-05-06-Axon-to-acquire-Dedrone,-accelerating-the-next-generation-of-drone-solutions-to-protect-more-lives-in-more-places; Miriam McNabb, *Axon to Acquire Dedrone to Enhance Drone Security Solutions*, DRONELIFE, (May 7, 2024), (last viewed July 29. 2024), https://dronelife.com/2024/05/07/axon-dedrone-acquisition-to-enhance-drone-security-solutions/.

[52] *Axon Accelerates Real-Time Operations Solution with Strategic Acquisition of Fusus*, AXON, (Feb. 1, 2024), (last viewed July 29. 2024),

c. Sky-Hero (2023): A Belgian specialist in indoor unmanned vehicles, enhancing Axon's portfolio in public safety drones and unmanned systems. This acquisition enhances Axon's capabilities in situational awareness and real-time response in indoor settings, limiting competition in the market for integrated public safety solutions.[53]

d. Foundry 45 (2022): A virtual reality training studio that expands Axon's capabilities in immersive training for law enforcement and public safety personnel. This acquisition enhances Axon's capabilities in situational awareness and real-time response in training police officers on competitive products to Axon, limiting competition in the market for integrated public safety solutions.[54]

e. VieVu (2018): VieVu, a direct competitor (and subsidiary of Safariland) in the body-worn camera market, was acquired by Axon in a deal that included decade-long non-compete, market allocation, and no-poach agreements with Safariland. This acquisition effectively prevented VieVu

https://investor.axon.com/2024-02-01-Axon-Accelerates-Real-Time-Operations-Solution-with-Strategic-Acquisition-of-Fusus.

[53] *List of Axon's Acquisitions*, TRACXN, (July 22, 2024), (last viewed July 29. 2024), https://tracxn.com/d/acquisitions/acquisitions-by-axon/__XuOya9kP3ifWo0xK4DxAnUBGKSvcpccIGgzU462kOjw.

[54] *Axon Announces Acquisition of Virtual Reality Training Studio 'Foundry 45'*, AXON, (April 6, 2022), (last viewed July 29. 2024), https://investor.axon.com/2022-04-06-Axon-Announces-Acquisition-of-Virtual-Reality-Training-Studio-Foundry-45.

from challenging Axon's monopoly in the body-worn camera market and stifled competition.

184. These acquisitions have significantly reduced the number of viable competitors in the market, leading to less choice and higher prices for law enforcement agencies and municipalities.

185. In addition, the strategic partnership between Axon Enterprise, Inc. and Microsoft Corporation has played a pivotal role in consolidating Axon's market dominance in the body-worn camera and digital evidence management market. This collaboration, which began in 2018 with the migration of Axon's Evidence.com data to Microsoft Azure, has facilitated various monopolistic practices that have stifled competition and entrenched Axon's control over the market. In 2018, Axon migrated 20 petabytes of data from its Evidence.com platform to Microsoft Azure. This move provided Axon with a scalable, secure, and high-performance cloud infrastructure, but it also established a significant barrier to entry for competitors by embedding Axon's services deeply into Microsoft's cloud ecosystem. The migration was conducted without adequately informing law enforcement agencies of the potential long-term financial and operational impacts, effectively locking them into Axon's ecosystem without their explicit consent.

186. By consolidating to Microsoft's sole-sourced cloud infrastructure, Axon ensured that law enforcement agencies became dependent on a single vendor for both hardware and digital evidence management solutions. This dependency limits agencies'

ability to switch to alternative vendors without significant disruptions and additional costs. Microsoft and Axon do not allow law enforcement agencies to port their data to other platforms without rendering their entire investment in Axon's hardware and software infrastructure useless. This practice ensures that Axon's cameras, Tasers, and Axon Fleet 3 cams would fail to function if agencies attempt to move their data to a competitor's platform.

187. The reliance on Axon and Microsoft's integrated solutions has led to increased operating costs for law enforcement agencies. The lack of competitive alternatives allows Axon to set higher prices for its bundled services. The financial uncertainty caused by unpredictable pricing structures and long-term dependencies on Axon's ecosystem has strained the budgets of police departments and municipalities. The exclusive control exerted by Axon and Microsoft has significantly limited the choice of vendors available to law enforcement agencies. This restriction prevents agencies from exploring potentially more cost-effective and innovative solutions from other providers such as GovGPT.

188. Exclusionary Practices

189. Axon has engaged in various exclusionary practices designed to prevent competitors from entering the market or expanding their market share:

a. **Tying Arrangements:** Axon requires law enforcement agencies to purchase its digital evidence management system, Evidence.com, as a condition for purchasing its body-worn cameras. This practice forces

agencies to commit to Axon's ecosystem, making it difficult for them to switch to competitors' products.

b. **Exclusive Dealing Contracts:** Axon enters into exclusive dealing contracts with law enforcement agencies, preventing them from purchasing competing products. These contracts ensure that Axon remains the sole provider of body-worn cameras and related services to these agencies.

c. **Lavish Spending on Police Fraternal Organizations:** Axon has spent lavishly on police fraternal organizations to secure their loyalty and support. This spending includes funding events, providing expensive perks, and making significant financial contributions to these organizations, which in turn advocate for the continued use of Axon's products and services.

190. <u>Deceptive Practices</u>

191. Axon has engaged in deceptive practices to maintain its market position and deceive customers about the safety and effectiveness of its products:

a. **Failure to Disclose Security Risks:** Axon has failed to disclose the presence of Quectel chips in its Axon Body 4 cameras. These chips, which have potential ties to the Chinese government, pose significant national security risks. Axon's nondisclosure of this information deprives customers of critical information necessary to make informed purchasing decisions.

192. <u>Impact on Competition and Consumers</u>

193. Axon's anticompetitive conduct has had significant adverse effects on

competition and consumers:

a. **Higher Prices:** The lack of competition resulting from Axon's monopolistic practices has led to higher prices for body-worn cameras and digital evidence management systems. Law enforcement agencies and municipalities, unable to find competitive alternatives, are forced to pay inflated prices.

b. **Higher Taxes:** The lack of competition resulting from Axon's monopolistic practices has led to higher taxes for individual citizens for municipal, sales, county, and state taxes; since a significant portion of municipal sales tax and/or property tax revenue is used to fund public safety.

c. **Reduced Innovation:** With fewer competitors in the market, there is less incentive for innovation. Axon's dominance stifles technological advancements that could benefit law enforcement agencies and the public.

d. **Limited Choices:** Axon's exclusionary contracts and tying arrangements limit the choices available to law enforcement agencies. Agencies are locked into Axon's ecosystem, preventing them from considering potentially superior or more cost-effective alternatives.

194. In summary, Axon's anticompetitive conduct, including strategic acquisitions, exclusionary practices, and deceptive behavior, has significantly harmed competition in the situational awareness devices, products, peripherals and software for law enforcement market. These actions have led to higher prices, reduced innovation, and

limited choices for law enforcement agencies and municipalities, ultimately burdening American taxpayers with increased costs and compromised security. The combination of these practices underscores the need for judicial intervention to restore competition and protect consumers.

## MARKET DEFINITION AND COMPETITIVE BARRIERS IN SITUATIONAL AWARENESS AND SOFTWARE FOR LAW ENFORCEMENT

195. The product market for the complaint centers around situational awareness devices, products, peripherals and software for law enforcement, specifically body-worn cameras and integrated AI-powered safety devices, peripheral devices (e.g, conductive electrical weapons, as well as holsters) and related AI powered evidence management software. This market includes:

196. **Body-Worn Cameras:** Devices used by law enforcement to record interactions with the public, providing accountability and evidence for legal proceedings.

197. **AI-Powered Digital Evidence Management System:** Platforms that help law enforcement agencies manage, analyze, comprehend, and store digital evidence, ensuring efficient and secure handling of data collected from body-worn cameras and other devices, including with artificial intelligence.

198. **Real-Time Threat Detection Systems**: Technologies that provide situational awareness and real-time streaming and awareness to stakeholders, enhancing their safety by detecting and responding to ambient threats in real time.

199. **Integrated Public Safety Peripherals & AI Solutions:** Peripheral devices

which trigger the turning on of a body camera such as holsters for conductive electrical weapons, as well as Broader AI software aimed at improving decision-making, situational awareness, and communication in public safety contexts using computer vision and audio. This includes drones and anti-drone technology. Both GovGPT and Axon are making products peripheral to body worn cameras including drones, anti-drone technologies, AI digital evidence software, holsters for electronic devices, advanced optical sensors, listening devices, and other peripheral devices and components that individually or in concert with edge based or cloud based evidence management trigger body cameras to activate or notifications of ambient threats.

200. In this product market, Axon currently holds a significant monopoly, particularly with its Axon Body 4 cameras, which are widely adopted by law enforcement agencies. This dominance creates a challenging environment for new entrants like GovGPT, which seeks to introduce innovative products such as the DragonFly body cameras, vests, and digital evidence management platforms. The established presence of Axon in this market not only limits competition but also makes it difficult for innovative solutions to gain traction and secure necessary investments.

## CLASS ALLEGATIONS

201. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated. The proposed class (the "Class") is defined as:

a. All individuals and entities who indirectly purchased body-worn cameras

and digital evidence management systems from Axon through law enforcement agencies or municipalities in the United States in which they paid taxes or resided during the past five years.

b. All municipalities and police departments DOES 1-500 who directly purchased Axon body 4 cameras and digital evidence management systems from Axon in the United States during the relevant time during the past five years.

202. Excluded from the Class: Excluded from the Class are:

a. Axon, its officers, directors, and employees;

b. Any entity in which Axon has a controlling interest;

c. The legal representatives, heirs, successors, or assigns of any such excluded party; and

d. Any judicial officer presiding over this matter and the members of their immediate family and judicial staff.

203. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, it is believed to be in the hundreds of millions, and their identities can be ascertained from Defendant's records and from other sources.

204. There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members. These common questions of law and fact include, but are not limited to:

a. Whether Axon's conduct violated federal and state antitrust laws, including the Sherman Act, the Clayton Act, the Cartwright Act, and the Illinois Antitrust Act;

b. Whether Axon's conduct violated the Arizona Consumer Fraud Act;

c. Whether Axon engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO);

d. Whether Axon's conduct caused injury to Plaintiffs and the Class members;

e. The appropriate measure of damages and other relief for Plaintiffs and the Class members.

205. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all Class members have been similarly affected by Axon's wrongful conduct, as described herein.

206. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel with some experience in antitrust litigation and class actions. Lead-counsel with deep expertise in class actions and antitrust litigation will be sought in at the appropriate juncture to ensure the Class is adequately represented. If Plaintiffs and their counsel are unsuccessful in recruiting a sufficient number of Plaintiffs, they reserve the right to convert this case to non-class action litigation with the Plaintiffs then listed. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and will seek if needed the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the Class.

207. Plaintiffs are committed to fairly and adequately protecting the interests of the

Class. They have retained counsel with some experience in antitrust litigation and class actions. Additionally, at the appropriate time, plaintiffs will seek lead counsel with deep expertise in class actions and antitrust litigation to ensure the Class is adequately represented.

208. The class action mechanism is superior to any alternatives that might exist for the fair and efficient adjudication of this action. The common questions of law and fact listed above predominate over any individualized issues. The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Axon's conduct. It would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. Even if Class members could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

209. Axon has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive and declaratory relief concerning the Class as a whole appropriate.

210. WHEREFORE, Plaintiffs Raj Abhyanker, GovGPT, and all others similarly situated, pray for judgment against Defendant Axon Enterprise, Inc. as follows:

a. Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Appointing Plaintiffs as representatives of the Class and their counsel as Class counsel;

c. A judicial declaration that Axon's business practices are unlawful and violate federal and state laws as alleged herein;

d. An order enjoining Axon from continuing its unlawful business practices, including monopolistic and deceptive conduct;

e. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips;

f. For compensatory damages in an amount to be determined at trial, including but not limited to damages for increased taxes paid by Plaintiffs and the class members as a result of Axon's anticompetitive conduct;

g. For treble damages as provided by law;

h. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in

the future;

i. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law;

j. For an award of pre- and post-judgment interest as allowed by law;

k. For such other and further relief as the Court deems just and proper.

## FIRST CLAIM FOR RELIEF

DECLARATORY JUDGMENT

*(Against Axon and Microsoft by GovGPT, Abhyanker, municipality and police department DOES 1-500, and all taxpayers in 50 states similarly situated as Abhyanker)*

211. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

212. This action seeks a declaratory judgment to resolve an actual controversy between Plaintiffs and Defendants Axon and Microsoft regarding the legality of Axon and Microsoft's business practices, which Plaintiffs allege constitute monopolistic, anticompetitive, and deceptive conduct in violation of federal and state laws.

213. Axon and Microsoft have engaged in monopolistic practices by acquiring competitors, entering into exclusive dealing contracts, and implementing tying arrangements that compel law enforcement agencies to purchase its digital evidence management system, Evidence.com, in conjunction with its body-worn cameras. These practices have stifled competition, leading to inflated prices and reduced innovation in the market for body-worn cameras and digital evidence management systems.

214. Axon has also engaged in deceptive practices by failing to disclose the presence of Quectel chips in its Axon Body 4 cameras, which pose significant national security risks due to their potential ties to the Chinese government. This omission has deprived customers of critical information necessary to make informed purchasing decisions, compromising the safety and security of law enforcement operations and public safety.

215. There is substantial legal uncertainty regarding the rights and obligations of the parties under federal and state antitrust and consumer protection laws. Plaintiffs seek a judicial determination of these rights and obligations to resolve this controversy and prevent further harm to themselves and the class members.

216. Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, as well as applicable state declaratory judgment statutes, declaring that:

a. Axon and Microsoft's monopolistic practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

b. Axon and Microsoft's deceptive practices violate the Arizona Consumer Fraud Act, A.R.S. § 44-1522, and other applicable consumer protection statutes.

c. Axon and Microsoft's conduct constitutes a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq.

d. Axon's failure to disclose the presence of Quectel chips in its Axon Body 4 cameras poses significant national security risks and constitutes a material omission in violation of applicable laws.

e. Axon and Micoosoft's anticompetitive practices have resulted in increased costs to Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) due to Axon's monopolistic conduct.

f. Axon and Microsoft's anticompetitive practices have resulted in increased costs to American taxpayers, who have been forced to pay higher income, sales and/or property taxes to cover the inflated costs of law enforcement equipment and services due to Axon's monopolistic conduct.

217. WHEREFORE, GovGPT respectfully requests that this Court enter a judgment declaring that:

a. A judicial declaration that Axon and Microsoft's business practices are unlawful and violate federal and state laws as alleged herein.

b. An order enjoining Axon and Microsoft from continuing its unlawful business practices, including monopolistic and deceptive conduct.

c. The court should order that Axon and Microsoft jointly and severally permit law enforcement agencies to port their data, including video files and all associated metadata, in bulk to another vendor of their choosing. This should be ordered done without reliance on Microsoft Azure or Axon's Evidence.com platform.

d. Axon should be ordered to develop a "Download-All" application that allows law enforcement agencies to easily download or transfer their data from Microsoft Azure to a different cloud instance or a competitive vendor such as Google Cloud or AWS.

e. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

f. For compensatory damages in an amount to be determined at trial, including but not limited to damages for increased taxes paid by Plaintiff Abhyankar and the class members as a result of Axon and Microsoft's anticompetitive conduct.

g. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon and Microsoft's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

h. For punitive damages in an amount sufficient to punish Axon and Microsoft for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

i. For disgorgement of all ill-gotten gains obtained as a result of such conduct.

j. For restitution to Plaintiff and the class members of all monies unlawfully acquired by Axon and Microsoft through their anticompetitive and deceptive practices.

k. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law, including but not limited to fees under the Clayton Act and applicable state laws.

l. For an award of pre- and post-judgment interest as allowed by law, from the date of service of the initial complaint to the date of final payment.

m. For such other and further relief as the Court deems just and proper

**SECOND CLAIM FOR RELIEF**

CONSPIRACY TO RESTRAINT OF TRADE 15 U.S.C. § 1

*(Against Axon and Microsoft by Plaintiff GovGPT, municipality and police department DOES 1-500)*

218. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

219. Axon has entered into agreements with various entities, including law enforcement agencies, police fraternal organizations, and other market participants, with

the purpose and effect of unreasonably restraining trade and maintaining its monopoly in the markets for body-worn cameras and digital evidence management systems.

220. These agreements include, but are not limited to, tying arrangements, exclusive dealing contracts, and other exclusionary practices that prevent competition and harm consumers by increasing costs for public safety protection.

221. Axon and Microsoft's failure to seek informed consent from law enforcement agencies before migrating their data constitutes deceptive business practices. This lack of transparency and consent violates various state consumer protection laws, including but not limited to the California Consumer Privacy Act (CCPA), the Arizona Consumer Fraud Act, and the Illinois Consumer Fraud and Deceptive Business Practices Act.

222. Axon has spent lavishly on police fraternal organizations such as the Fraternal Order of Police (FOP) to secure their loyalty and support, ensuring that law enforcement agencies continue to purchase Axon's products exclusively. This spending includes funding events, providing expensive perks, and making significant financial contributions to these organizations and their legal defense funds, which in turn advocate for the continued use of Axon's products and services, further entrenching Axon's monopoly.

223. By providing financial support and resources to police fraternal organizations and legal defense funds, Axon can gain preferential treatment and loyalty from law enforcement agencies. This support is usually indirect and channeled through police fraternal organizations or legal defense funds set up for law enforcement officers.

224. The purpose and effect of these agreements are to maintain and enhance Axon's market power by excluding competitors, including GovGPT, from the market, thereby restraining trade and limiting consumer choice.

225. Axon and Microsoft's conduct constitutes concerted action among multiple parties to achieve an unlawful objective, which is to restrain trade and maintain its monopoly, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

226. Axon and Microsoft's agreements and conduct have had substantial anticompetitive effects, including reducing competition, raising prices for body-worn cameras and digital evidence management systems, and stifling innovation in the market.

227. As a direct and proximate result of Axon and Microsoft's unlawful conduct, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

228. Plaintiff municipality and police department DOES 1-500 across the United States, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff municipality and police department DOES 1-500 across the United States have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks

not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto. (See: **Exhibit 2)**.

229. Axon and Microsoft's conduct has also harmed competition in the relevant markets, resulting in higher prices, reduced innovation, and fewer choices for consumers, particularly law enforcement agencies.

230. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

231. WHEREFORE, Plaintiff GovGPT prays for judgment against Defendant Axon and as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that restrain trade in violation of Section 1 of the Sherman Act.

b. An order enjoining Axon and Microsoft from continuing its unlawful business practices, including monopolistic and deceptive conduct.

c. The court should order that Axon and Microsoft jointly and severally permit law enforcement agencies to port their data, including video files and all associated metadata, in bulk to another vendor of their choosing. This should be ordered done without reliance on Microsoft Azure or Axon's Evidence.com platform.

d. Axon should be ordered to develop a "Download-All" application that allows

law enforcement agencies to easily download or transfer their data from Microsoft Azure to a different cloud instance or a competitive vendor such as Google Cloud or AWS.

e. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

f. An order requiring Axon to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser and Axon Fleet 3 dash cam products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

g. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT as a result of Axon and Microsoft's anti-competitive conduct.

h. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon and Microsoft's anticompetitive conduct, including the a full

refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

i. For treble damages as provided by law under Section 4 of the Clayton Act (15 U.S.C. § 15).

j. For punitive damages in an amount sufficient to punish Axon and Microsoft for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

k. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

l. For an award of pre- and post-judgment interest as allowed by law.

m. For such other and further relief as the Court deems just and proper.

**THIRD CLAIM FOR RELIEF**

CONSPIRACY TO RESTRAINT OF TRADE 15 U.S.C. § 2

*(Against Axon and Microsoft by Plaintiff GovGPT, municipality and police department DOES 1-500)*

232. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

233. Axon holds substantial monopoly power in the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States.

234. Axon has conspired with various entities, including law enforcement agencies

and police fraternal organizations, to engage in practices that unreasonably restrain trade and maintain its monopoly power.

235. Axon and Microsoft's exclusionary conduct includes, but is not limited to, tying arrangements, exclusive dealing contracts, and lavish spending on police fraternal organizations to secure their loyalty and support, thereby ensuring that law enforcement agencies purchase Axon's products exclusively.

236. The purpose and effect of these agreements and conduct are to maintain and enhance Axon's monopoly power by excluding competitors, including GovGPT, from the market, thereby restraining trade and limiting consumer choice.

237. Axon and Microsoft have engaged in tying arrangements that force law enforcement agencies to purchase Axon's digital evidence management system, Evidence.com, as a condition of purchasing its body-worn cameras, thereby foreclosing competition from other providers of digital evidence management systems.

238. Axon and Microsoft's exclusive dealing contracts with law enforcement agencies prevent these agencies from purchasing body-worn cameras or digital evidence management systems from Axon's competitors, further entrenching Axon's monopoly power.

239. Axon has spent lavishly on police fraternal organizations to secure their loyalty and support, ensuring that law enforcement agencies continue to purchase Axon's products exclusively. This spending includes funding events, providing expensive perks, and making significant financial contributions to these organizations, which in turn

advocate for the continued use of Axon's products and services, further entrenching Axon's monopoly.

240. Axon and Microsoft's agreements and conduct have had substantial anticompetitive effects, including reducing competition, raising prices for body-worn cameras and digital evidence management systems, and stifling innovation in the market.

241. As a direct and proximate result of Axon and Microsoft's unlawful conduct, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

242. Plaintiff municipality and police department DOES 1-500 across the United States, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff municipality and police department DOES 1-500 across the United States have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto.

243. Axon's conduct has also harmed competition in the relevant markets, resulting

in higher prices, reduced innovation, and fewer choices for consumers, particularly law enforcement agencies.

244. WHEREFORE, Plaintiff GovGPT prays for judgment against Defendant Axon and Microsoft as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that restrain trade in violation of Section 2 of the Sherman Act.

b. An order enjoining Axon and Microsoft from continuing its unlawful business practices, including monopolistic and deceptive conduct.

c. The court should order that Axon and Microsoft jointly and severally permit law enforcement agencies to port their data, including video files and all associated metadata, in bulk to another vendor of their choosing. This should be ordered done without reliance on Microsoft Azure or Axon's Evidence.com platform.

d. Axon should be ordered to develop a "Download-All" application that allows law enforcement agencies to easily download or transfer their data from Microsoft Azure to a different cloud instance or a competitive vendor such as Google Cloud or AWS.

e. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This

disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

f. An order requiring Axon and Microsoft to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser and Axon Fleet 3 dash cam products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

g. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT as a result of Axon and Microsoft's anticompetitive conduct.

h. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

i. For treble damages as provided by law under Section 4 of the Clayton Act (15 U.S.C. § 15).

j. For punitive damages in an amount sufficient to punish Axon and Microsoft for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

k. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

l. For an award of pre- and post-judgment interest as allowed by law.

m. For such other and further relief as the Court deems just and proper.

**FOURTH CLAIM FOR RELIEF**

Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)

*(Against Axon by Plaintiff GovGPT, municipality and police department DOES 1-500)*

245. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

246. Axon holds substantial monopoly power in the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States.

247. Axon has acquired, directly or indirectly, the whole or any part of the stock or other share capital, and/or the whole or any part of the assets of one or more companies engaged in commerce, where the effect of such acquisition may be substantially to

lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

248. Axon has made several strategic acquisitions that qualify under the Clayton Act due to their potential to substantially lessen competition or create a monopoly. These acquisitions include:

a. Dedrone (2024): A leader in airspace security solutions, providing advanced drone detection and mitigation technologies. The acquisition of Dedrone allows Axon to control significant portions of the drone security market, further consolidating its dominance in public safety technology.[55]

b. Fusus (2024): A provider of real-time crime center (RTCC) technology, integrating live video, data, and sensor feeds from various sources. This acquisition enhances Axon's capabilities in situational awareness and real-time response, limiting competition in the market for integrated public safety solutions.[56]

c. Sky-Hero (2023): A Belgian specialist in indoor unmanned vehicles, enhancing Axon's portfolio in public safety drones and unmanned systems.

[55] *Axon to acquire Dedrone, accelerating the next generation of drone solutions to protect more lives in more places*, DEDRONE, (May 6, 2024), (last viewed July, 29, 2024), *https://www.dedrone.com/press/axon-to-acquire-dedrone-accelerating-the-next-generation-of-drone-solutions-to-protect-more-lives-in-more-places*

[56] *Axon Accelerates Real-Time Operations Solution with Strategic Acquisition of Fusus*, AXON, (Feb. 1, 2024), (last viewed July 29. 2024), https://investor.axon.com/2024-02-01-Axon-Accelerates-Real-Time-Operations-Solution-with-Strategic-Acquisition-of-Fusus.

This acquisition enhances Axon's capabilities in situational awareness and real-time response in indoor settings, limiting competition in the market for integrated public safety solutions.[57]

d. Foundry 45 (2022): A virtual reality training studio that expands Axon's capabilities in immersive training for law enforcement and public safety personnel. This acquisition enhances Axon's capabilities in situational awareness and real-time response in training police officers on competitive products to Axon, limiting competition in the market for integrated public safety solutions.[58]

e. VieVu (2018): VieVu, a direct competitor (and subsidiary of Safariland) in the body-worn camera market, was acquired by Axon in a deal that included decade-long non-compete, market allocation, and no-poach agreements with Safariland. This acquisition effectively prevented VieVu from challenging Axon's monopoly in the body-worn camera market and stifled competition.[59]

[57] *Axon, one of the world leaders in connected technologies for public safety, acquires Sky-Hero, a Belgian specialist in unmanned indoor vehicles*., THE LIZARD, (Sept. 12, 2023), (last viewed July 29. 2024), https://www.lelezard.com/communique-21055747.html.

[58] *Axon Announces Acquisition of Virtual Reality Training Studio "Foundry 45"*, AXON, (Apr. 6, 2022), (last viewed July 29. 2024), https://investor.axon.com/2022-04-06-Axon-Announces-Acquisition-of-Virtual-Reality-Training-Studio-Foundry-45.

[59] *Axon Acquires VIEVU Camera Subsidiary from The Safariland Group*, PR NEWSWIRE, (May 04, 2018), (last viewed July 29. 2024), https://www.prnewswire.com/news-releases/axon-acquires-vievu-camera-subsidiary-from

249. Through its acquisitions, Axon has substantially lessened competition in the market for body-worn cameras and digital evidence management systems. These acquisitions have enabled Axon to increase its market share, reduce market entry opportunities for competitors, and consolidate its monopoly power.

250. Axon’s conduct includes exclusionary practices such as tying arrangements, exclusive dealing contracts, and lavish spending on police fraternal organizations to secure their loyalty and support. These practices ensure that law enforcement agencies purchase Axon's products exclusively, thereby reducing competition.

251. As a result of Axon's anticompetitive conduct, innovation has been stifled, and consumer choice has been limited. Law enforcement agencies and municipalities have fewer options available to them, leading to higher prices and reduced quality of products and services.

252. Plaintiff municipality and police department DOES 1-500 across the United States, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff municipality and police department DOES 1-500 across the United States have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500)

-the-safariland-group-and-announces-strategic-long-term-holster-partnership-300642676.html

as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto. (See: **Exhibit 2**).

253. Axon's acquisitions, coupled with its monopolistic practices, have created significant barriers to entry for new competitors and have allowed Axon to maintain and enhance its dominant market position.

254. As a direct and proximate result of Axon's violations of Section 7 of the Clayton Act, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

255. WHEREFORE, Plaintiff GovGPT prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that restrain trade in violation of Section 7 of the Clayton Act.

b. An order requiring Axon to divest itself of certain assets or businesses to restore competition in the affected markets.

c. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras,

downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

d. An order requiring Axon to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

e. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT as a result of Axon's anticompetitive conduct.

f. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

g. For treble damages as provided by law under Section 4 of the Clayton Act (15 U.S.C. § 15).

h. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

i. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

j. For an award of pre- and post-judgment interest as allowed by law.

k. For such other and further relief as the Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**

Violation of Racketeer Influenced and Corrupt Organizations Act (RICO)

*(Against Axon by GovGPT, Abhyanker, municipality and police department DOES 1-500, and all taxpayers in 50 states similarly situated as Abhyanker)*

256. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

257. Axon constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4), as it is an entity engaged in, and the activities of which affect, interstate commerce.

258. Axon has engaged in a pattern of racketeering activity consisting of multiple predicate acts of racketeering as defined in 18 U.S.C. § 1961(1), including but not limited to obstruction of justice (18 U.S.C. § 1503).

259. Axon has obstructed justice by concealing critical information regarding the security vulnerabilities in its Axon Body 4 cameras, which contain Quectel streaming chips posing significant national security risks due to their potential ties to the Chinese

government. This concealment was part of a scheme to defraud law enforcement agencies and maintain Axon's monopoly power. Axon has knowingly withheld this information from law enforcement agencies, municipalities, and regulatory authorities to maintain its monopoly power and avoid regulatory scrutiny.

260. Axon's violent internal culture has been described as resembling more of a cult or a mafia, than a Nasdaq traded public company. Management encourages participation in "tasing exposures," where they encourage employees to voluntarily get shocked by Tasers, as a corporate ritual to test employee loyalty and commitment. Reuters compared this practice to ancient Roman gladiatorial spectacles, with employees standing in line to be tased while colleagues chant in unison. These events often target interns or new recruits, creating a high-pressure environment where employees feel compelled to participate or risk being perceived as not loyal to the company's ethos.

261. Just as mafia organizations may use physical violence to ensure loyalty and obedience, Axon's practice of tasing employees as a test of loyalty employs physical pain and intimidation. Those who declined were believed to have been punished by receiving less desirable assignments, being excluded from business meetings, or, in some cases, being forced out of their jobs.[60] This creates an environment where employees feel coerced into compliance out of fear of repercussions, similar to how the mafia enforces loyalty through threats and violence. This unusual culture fosters a

[60] Jeffrey Dastin, *At Taser maker Axon, ex-staffers say loyalty meant being tased or tattooed*, REUTERS, (Aug. 30, 2023), (last viewed July 29. 2024), https://www.reuters.com/investigates/special-report/axon-taser-exposures/.

mentality that normalizes and celebrates violence, and underpins Axon's broader strategy to dominate the market through intimidation and aggressive tactics. Such practices are indicative of a corrupt organization operating with a disregard for ethical and legal standards.[61]

262. In addition to tasings, Axon encourages employees to get tattoos of the company's logo. This practice is framed as a way to demonstrate long-term loyalty to the company, with leaders urging staff to "make things permanent" by marking their bodies with the corporate insignia. Fifteen individuals, about half of whom oversaw human resources and legal work for Axon, reported that company leaders sidelined employees who did not show sufficient loyalty or commitment to the company's "all-in" credo.[62] The encouragement or pressure to get tattoos of the company logo is reminiscent of how criminal organizations use symbols and rituals to mark membership and allegiance permanently. This not only signifies commitment but also serves as a constant reminder of the individual's ties to the organization, mirroring the mafia's use of tattoos to signify membership and loyalty. [63]

263. Axon has an unusual practice of handing out large cash bonuses in a secretive and selective manner reminiscent of mafia-like operations in terms of reinforcing loyalty through difficult to trace financial incentives. For instance, there have been instances

[61] *Id.*
[62] *Id.*
[63] *Id.*

where $50,000 was delivered on a restaurant platter and tens of thousands of dollars were given in a designer bag. The use of physical cash instead of electronic payments helps evade the creation of a digital paper trail, making these transactions difficult to trace and audit. Axon manifests characteristics of a corrupt organization through its practice of handing out large cash bonuses in secretive and extravagant ways. This behavior indicates a deliberate effort to obscure financial dealings and manipulate employee loyalty, which are hallmark signs of corporate corruption.[64]

264. Axon's conduct, including the extravagant incentives for executives, mirrors mafia-like operations. The company purchased an Aston Martin sports car for President Josh Isner in 2019 instead of a cash bonus, with a retail price between $216,000 and $241,000. This was disclosed to investors only in terms of taxes paid, without revealing the car's luxury make and price. Additionally, CEO Rick Smith and other executives have access to a fleet of company-owned luxury vehicles, including a custom 2024 new plate Lamborghini adorned in Axon colors with a carbon fiber trim. These practices indicate a pattern of deceptive and unethical behavior, reinforcing the RICO cause of action by showcasing a corporate culture of self-dealing and concealment, akin to organized crime, not one who holds the public trust in efficient government and police accountability. [65]

[64] *Id.*

[65] Jeffrey Dastin, *Taser maker Axon has a moving backstory. It's mostly a myth*, REUTERS, (Dec. 27, 2023), (last viewed July 29. 2024), https://www.reuters.com/investigates/special-report/axon-taser-corporate-governance/#:~:





**Picture of AXON executive Lamborghini with new 2024 plates**

265. Axon's compensation practices for its top executives reveal a pattern of deceptive and unethical behavior, relevant to the RICO cause of action. Despite telling investors that it aims to pay executives near the 50th percentile compared to peer companies, internal analyses show that the top five executives are placed in the 90th percentile or greater. This discrepancy highlights the company's misrepresentation of executive compensation. [66]

266. For example, a $2 billion stock option award (value as of July 2024) which vested in 2023 made CEO Rick Smith approximately $400 per year between 2018-2023. [67] This not only made Rick Smith into a billionaire and one of the world's highest-earning CEO for each of the last five years with stock grants included. Rick

text=Axon%20CEO%20Rick%20Smith%20claims,behavior%20among%20top%20Axon%20executives.

[66] *Id.*

[67] *Id.*

Smith's acceptance of the 2018 five-year stock deal if the company met certain financial goals, likely reflects his knowledge of Axon's impending monopoly.[68] This monopoly was solidified through the strategic partnership with Microsoft, which began that same year with the migration of Axon's digital evidence data to Microsoft Azure. This agreement played a critical role in Axon's market consolidation, creating substantial barriers for competitors and establishing Axon's dominance in the digital evidence management market. Smith's compensation alignment into the monopolistic goals of Axon's collaboration with Microsoft underscores the deliberate and strategic actions taken to cement Axon's market power, further illustrating the company's manipulative and self-serving practices that align with RICO allegations. These practices indicate a culture of self-dealing and financial manipulation, akin to organized crime, reinforcing the basis for the RICO cause of action.[69]

267. Further highlighting this pattern, Joshua Isner, who transitioned from COO to president of Axon in the summer of 2023, saw his $425,000 base salary significantly

[68] Larry Dignan, *Axon Moves 20 PB of Data from Evidence.com to Microsoft Azure,* ZDNET, (Feb. 28, 2018), (last viewed July 29. 2024), https://www.zdnet.com/article/axon-moves-20-pb-of-data-evidence-com-to-microsoft-azure/ (Axon reported strong fourth quarter results and detailed a December migration to Microsoft Azure as well as other cloud-centric implementations.).

[69] Jeffrey Dastin, *Taser maker Axon has a moving backstory. It's mostly a myth*, REUTERS, (Dec. 27, 2023), (last viewed July 29. 2024), https://www.reuters.com/investigates/special-report/axon-taser-corporate-governance/#:~:text=Axon%20CEO%20Rick%20Smith%20claims,behavior%20among%20top%20Axon%20executives.

enhanced with restricted stock unit awards of $20.6 million in September and $9.4 million in December. These awards, coupled with over a million dollars in non-equity incentive plan compensation, brought his total compensation for the year to $31.5 million, making him the highest-paid public company CEO in Phoenix, Arizona in this district. This disparity between public disclosures and actual compensation practices underscores a culture of financial manipulation and self-dealing, akin to organized crime, thus reinforcing the basis for the RICO cause of action.[70]

268. Axon's internal culture and practices reveal a pattern of unethical and discriminatory behavior, which is relevant to the RICO cause of action. Many ex-employees interviewed by Reuters described Axon as a boys' club that was unwelcoming or even offensive to women. One HR staffer's 2019 PowerPoint presentation to an executive on inclusion efforts – reviewed by Reuters – specifically criticized Axon's "'Bro' culture" and "lack of diversity in top leadership." [71]

269. In addition, men have dominated Axon's upper ranks until 2023. Data from 2020 submitted by Axon in a public procurement process shows there were 129 men in management and financial roles compared to just 46 women.[72] This lack of gender diversity and the presence of a discriminatory culture at the highest levels of the company until just recently as last year 2023 align with the elements of the RICO cause

[70] *Id.*
[71] *Id.*
[72] *Id.*

of action by demonstrating a systematic approach to maintaining a homogeneous and exclusionary leadership structure.

270. In addition, in 2023, Axon spent hundreds of thousands of dollars in recent years to sponsor and provide security for an Arizona golf tournament run by a fraternal professional society, of which Axon President Josh Isner is a leading member. Upon information and belief, numerous police Axon customers were invited to the event. This expenditure, which interviews and online records confirm, was not disclosed to the SEC. Such undisclosed spending, especially when benefiting key executives, highlights a culture of financial manipulation and self-dealing.[73]

271. This undisclosed expenditure, which benefits a society closely tied to a top executive, underscores a pattern of using company resources for personal gain, evoking the secretive and self-serving nature of organized crime. These actions align with the elements of RICO allegations by demonstrating a deliberate and systematic approach to manipulating financial practices and hiding relevant information from regulatory bodies, thereby reinforcing the basis for the RICO cause of action.[74]

272. These practices highlight a significant discrepancy between Axon's public statements and internal realities, showcasing a culture of self-dealing and financial manipulation that aligns with the elements of organized crime, thereby reinforcing the

[73] *Id.*
[74] *Id.*

basis for the RICO cause of action. The predicate acts of racketeering activity were committed in furtherance of Axon's scheme to defraud and its efforts to maintain and enhance its monopoly power in the market for body-worn cameras and digital evidence management systems.

273. Axon conspired with various entities, including law enforcement agencies and police fraternal organizations, to conduct and participate, directly or indirectly, in the conduct of the enterprise’s affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

274. As a direct and proximate result of Axon's racketeering activities and violations of RICO, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

275. As a direct and proximate result of Axon's racketeering activities, Plaintiff Abhyanker and the class members in each of the 50 states including Arizona and California, as well as American territories in which personal, property and/or sales tax revenues goes to law enforcement departments that purchase Axon camera have suffered economic harm, including higher income, higher sales and/or higher property taxes. These taxes were necessary to cover the inflated costs of law enforcement equipment caused by Axon's monopolistic behavior.

276. Plaintiff municipality and police department DOES 1-500 across the United

States, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff municipality and police department DOES 1-500 across the United States have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto.

277. WHEREFORE, Plaintiff GovGPT prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its racketeering activities and any further violations of RICO.

b. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT, and increased taxes paid by Plaintiff Abhyanker and the class members as a result of Axon's racketeering activities.

c. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by

Plaintiff municipalities and Plaintiff police departments across the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

d. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT as a result of Axon's racketeering activities.

e. For treble damages as provided by law under 18 U.S.C. § 1964(c).

f. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

g. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

h. An order requiring Axon to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser and Axon Fleet 3

dash cam products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

i. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

j. For an award of pre- and post-judgment interest as allowed by law.

k. For such other and further relief as the Court deems just and proper.

**SIXTH CLAIM FOR RELIEF**

Violation of the Cartwright Act (Unreasonable Restraint of Trade)

*(Against Axon by GovGPT, Abhyanker, California municipality and police department DOES 1-500, and all taxpayers in California similarly situated as Abhyanker)*

278. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

279. Axon has engaged in practices that unreasonably restrain trade in the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States, including California.

280. Axon holds substantial monopoly power in the relevant market. Through its acquisitions, exclusionary practices, and conspiracy with other entities, Axon has maintained and enhanced its dominant position, preventing competitors from entering the market or effectively competing.

281. Axon's exclusionary practices include:

a. **Tying Arrangements:** Axon requires law enforcement agencies to purchase its digital evidence management system, Evidence.com, as a condition for purchasing its body-worn cameras.

b. **Exclusive Dealing Contracts:** Axon enters into exclusive dealing contracts with law enforcement agencies that prevent them from purchasing competing products.

c. **Lavish Spending on Police Fraternal Organizations:** Axon has spent lavishly on police fraternal organizations to secure their loyalty and support, ensuring that law enforcement agencies continue to purchase Axon's products exclusively.

282. Axon has made strategic acquisitions, including Dedrone (2024), Fusus (2024), Sky-Hero (2023), and Foundry 45 (2022), to eliminate competition and solidify its monopoly power. These acquisitions have reduced market entry opportunities for competitors and further entrenched Axon's dominance.

283. The purpose and effect of these agreements and conduct are to maintain and enhance Axon’s monopoly power by excluding competitors, including GovGPT, from the market, thereby restraining trade and limiting consumer choice.

284. Axon has engaged in tying arrangements that force law enforcement agencies to purchase Axon's digital evidence management system, Evidence.com, as a condition of purchasing its body-worn cameras, thereby foreclosing competition from other providers of digital evidence management systems.

285. Axon's exclusive dealing contracts with law enforcement agencies prevent these agencies from purchasing body-worn cameras or digital evidence management systems from Axon's competitors, further entrenching Axon's monopoly power.

286. Axon's agreements and conduct have had substantial anticompetitive effects, including reducing competition, raising prices for body-worn cameras and digital evidence management systems, and stifling innovation in the market.

287. Axon's conspiracy to monopolize has significantly harmed competition in the market for body-worn cameras and digital evidence management systems. This conduct has led to higher prices, reduced innovation, and fewer choices for law enforcement agencies and municipalities, which ultimately pass these increased costs onto taxpayers, including the Plaintiffs.

288. As a direct and proximate result of Axon's unlawful conduct, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

289. As a direct and proximate result of Axon's conspiracy to monopolize, Plaintiff Abhyanker and the class members in California have suffered economic harm, including higher income, sales and/or property taxes. These taxes were necessary to cover the inflated costs of law enforcement equipment caused by Axon's monopolistic behavior.

290. Plaintiff California municipality and police department DOES 1-500, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and

proximate result of Axon's anticompetitive practices, Plaintiff California municipality and police department DOES 1-500 have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across California in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto. (See: **Exhibit 2**).

291. Axon's conduct has also harmed competition in the relevant markets, resulting in higher prices, reduced innovation, and fewer choices for consumers, particularly law enforcement agencies.

292. WHEREFORE, Plaintiff Abhyanker, GovGPT., and all others similarly situated, pray for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that unreasonably restrain trade in violation of the Cartwright Act.

b. An order requiring Axon to divest itself of certain assets or businesses to restore competition in the affected markets.

c. For compensatory damages in an amount to be determined at trial, including but not limited to damages for increased taxes paid by Plaintiff

Abhyanker and the class members in California as a result of Axon's anticompetitive conduct.

d. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across California in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

e. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT as a result of Axon's anticompetitive conduct.

f. For treble damages as provided by law under Cal. Bus. & Prof. Code § 16750(a).

g. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

h. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel

chips, upon information and belief), or receive a replacement device without Quectel chips.

i. An order requiring Axon to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

j. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

k. For an award of pre- and post-judgment interest as allowed by law.

l. For such other and further relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

Violation of the Cartwright Act (Conspiracy to Monopolize)

*(Against Axon by GovGPT, Abhyanker, California municipality and police department DOES 1-500, and all taxpayers in California similarly situated as Abhyanker)*

293. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

294. Axon has engaged in a conspiracy to monopolize the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States, including California.

295. Axon holds substantial monopoly power in the relevant market. Through its acquisitions, exclusionary practices, and conspiracy with other entities, Axon has maintained and enhanced its dominant position, preventing competitors from entering the market or effectively competing.

296. Axon has conspired with various entities, including law enforcement agencies and police fraternal organizations, to monopolize the market for body-worn cameras and digital evidence management systems, in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

297. Axon has made strategic acquisitions, including Dedrone (2024), Fusus (2024), Sky-Hero (2023), and Foundry 45 (2022), to eliminate competition and solidify its monopoly power. These acquisitions have reduced market entry opportunities for competitors and further entrenched Axon's dominance.

298. The purpose and effect of these agreements and conduct are to maintain and enhance Axon’s monopoly power by excluding competitors, including GovGPT, from the market, thereby restraining trade and limiting consumer choice.

299. Axon has engaged in tying arrangements that force law enforcement agencies to purchase Axon's digital evidence management system, Evidence.com, as a condition of purchasing its body-worn cameras, thereby foreclosing competition from other providers of digital evidence management systems.

300. Axon's exclusive dealing contracts with law enforcement agencies prevent these agencies from purchasing body-worn cameras or digital evidence management

systems from Axon’s competitors, further entrenching Axon's monopoly power.

301. Axon has spent lavishly on police fraternal organizations to secure their loyalty and support, ensuring that law enforcement agencies continue to purchase Axon's products exclusively. This spending includes funding events, providing expensive perks, and making significant financial contributions to these organizations, which in turn advocate for the continued use of Axon's products and services, further entrenching Axon's monopoly.

302. Axon’s agreements and conduct have had substantial anticompetitive effects, including reducing competition, raising prices for body-worn cameras and digital evidence management systems, and stifling innovation in the market.

303. Axon's conspiracy to monopolize has significantly harmed competition in the market for body-worn cameras and digital evidence management systems. This conduct has led to higher prices, reduced innovation, and fewer choices for law enforcement agencies and municipalities, which ultimately pass these increased costs onto taxpayers, including the Plaintiffs.

304. As a direct and proximate result of Axon’s unlawful conduct, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

305. As a direct and proximate result of Axon's conspiracy to monopolize, Plaintiff Abhyanker and the class members in California have suffered economic harm, including higher income, sales and/or property taxes. These taxes were necessary to cover the

inflated costs of law enforcement equipment caused by Axon's monopolistic behavior.

306. Plaintiff California municipality and police department DOES 1-500, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff California municipality and police department DOES 1-500 have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across California in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto.

307. Axon's conduct has also harmed competition in the relevant markets, resulting in higher prices, reduced innovation, and fewer choices for consumers, particularly law enforcement agencies.

308. WHEREFORE, Plaintiff Abhyanker, GovGPT, and all others similarly situated, pray for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that unreasonably restrain trade in violation of the Cartwright Act.

b. An order requiring Axon to divest itself of certain assets or businesses to restore competition in the affected markets.

c. For compensatory damages in an amount to be determined at trial, including but not limited to damages for increased taxes paid by Plaintiff Abhyanker and the class members in California as a result of Axon's anticompetitive conduct.

d. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across California in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

e. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, market share, and other economic losses suffered by GovGPT as a result of Axon's anticompetitive conduct.

f. For treble damages as provided by law under Cal. Bus. & Prof. Code § 16750(a).

g. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

h. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

i. An order requiring Axon to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser and Axon Fleet 3 dash cam products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

j. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

k. For an award of pre- and post-judgment interest as allowed by law.

l. For such other and further relief as the Court deems just and proper.

**EIGHTH CLAIM FOR RELIEF**

FALSE ADVERTISING AND UNFAIR COMPETITION

THE LANHAM ACT, 15 U.S.C.. § 1125(a)

*(Against Axon by Plaintiff GovGPT)*

309. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

310. Axon's CEO Rick Smith has repeatedly invoked a false narrative about the company's origins, claiming he was motivated to start the company after two of his high school friends were shot and killed. However, these individuals were not friends of Smith, and their deaths were used without permission in company promotions to create a sympathetic and compelling backstory for marketing purposes.

311. Axon has concealed critical information regarding security vulnerabilities in its Axon Body 4 cameras, which contain Quectel streaming chips posing significant national security risks due to their potential ties to the Chinese government. This concealment has been highlighted by members of Congress this year, yet Axon has not disclosed these risks to its customers or the public.

312. These false and misleading statements and omissions are material in that they are likely to influence purchasing decisions. Law enforcement agencies and municipalities rely on the accuracy of Axon's representations when selecting body-worn cameras and digital evidence management systems for their officers.

313. As a direct and proximate result of Axon's false advertising and deceptive practices, GovGPT has suffered and will continue to suffer commercial injury, including lost sales, diminished market share, and harm to its reputation.

314. Axon's false advertising and concealment of critical information have also harmed consumers and the public by depriving law enforcement agencies of the ability to make informed decisions about the safety and effectiveness of the products they use, thereby jeopardizing public safety.

315. Axon's conduct constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

316. WHEREFORE, Plaintiff GovGPT prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its false and misleading advertising and deceptive practices, and requiring Axon to correct any false statements or omissions in its marketing materials and disclosures.

b. **Disclosure and Remediation:** An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

c. **Injunctive Relief for Open Access:** An order requiring Axon to permit third-party competitors to integrate their digital evidence management systems with Axon's body-worn cameras, including the Axon Body 4, as well as all Axon Taser products to foster competition and provide law enforcement agencies with more choices in digital evidence management solutions.

d. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost sales, diminished market

share, and harm to GovGPT's reputation.

e. For an award of Axon's profits derived from its false advertising and unfair competition, as provided by law under the Lanham Act.

f. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

g. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

h. For an award of pre- and post-judgment interest as allowed by law.

For such other and further relief as the Court deems just and proper.

**NINTH CLAIM FOR RELIEF**

ARIZONA CONSUMER FRAUD ACT

ARIZONA REVISED STATUTES (A.R.S.) § 44-1522.

*(Against Axon by GovGPT, Abhyanker, Arizona municipality and police department DOES 1-500, and all taxpayers in Arizona similarly situated as Abhyanker)*

317. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

318. Axon has engaged in deceptive practices by making false and misleading statements of fact about its products and services, including exaggerated claims about the effectiveness and safety of its body-worn cameras and digital evidence management systems.

319. Axon's CEO Rick Smith has repeatedly invoked a false narrative about the company's origins, claiming he was motivated to start the company after two of his high school friends were shot and killed. However, these individuals were not friends of Smith, and their deaths were used without permission in company promotions to create a sympathetic and compelling backstory for marketing purposes.

320. Axon has concealed critical information regarding security vulnerabilities in its Axon Body 4 cameras, which contain Quectel streaming chips posing significant national security risks due to their potential ties to the Chinese government. These security concerns have been highlighted by members of Congress this year, yet Axon has not disclosed these risks to its customers or the public.

321. These false and misleading statements and omissions are material in that they are likely to influence purchasing decisions. Law enforcement agencies and municipalities rely on the accuracy of Axon's representations when selecting body-worn cameras and digital evidence management systems for their officers.

322. Law enforcement agencies and municipalities have relied on Axon's false and misleading statements in making purchasing decisions, leading to increased costs and potential risks to public safety.

323. As a direct and proximate result of Axon's deceptive practices, GovGPT has suffered and will continue to suffer injury to its business and property, including lost profits, diminished market share, and reputational harm.

324. Plaintiff Abhyanker and similarly situated class members in Arizona relied on

Axon's representations and omissions when paying higher income, sales and/or property taxes. These increased taxes were necessary to cover the inflated costs of law enforcement equipment and the potential security risks associated with Axon's products. As a result, Plaintiff Abhyanker and similarly situated class members in Arizona have suffered economic harm.

325. Plaintiff Arizona municipality and police department DOES 1-500, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff Arizona municipality and police department DOES 1-500 have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across Arizona in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto. (See: **Exhibit 2**).

326. Axon's deceptive practices have also harmed consumers and the public by depriving law enforcement agencies of the ability to make informed decisions about the safety and effectiveness of the products they use, thereby jeopardizing public safety.

327. Axon's conduct constitutes consumer fraud in violation of the Arizona Consumer Fraud Act (A.R.S. § 44-1522), which prohibits any deception, fraud, false

pretense, false promise, misrepresentation, or concealment, suppression, or omission of any material fact with intent that others rely on such concealment, suppression, or omission in connection with the sale or advertisement of any merchandise.

328. WHEREFORE, Plaintiffs pray for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its deceptive practices and requiring Axon to correct any false statements or omissions in its marketing materials and disclosures.

b. For compensatory damages in an amount to be determined at trial, including but not limited to damages for lost profits, diminished market share, and harm to GovGPT's reputation.

c. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across Arizona in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

d. Requirement for Axon to notify all affected customers about the Quectel chips.

e. For restitution to Plaintiff Abhyanker and similarly situated class members

in Arizona of all monies acquired by means of Axon's unlawful practices.

f. For restitution to municipalities and police departments that have been forced to pay exorbitant rates for Axon's platforms due to the lack of competition, thereby increasing the costs for public safety protection for citizens.

g. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

h. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

i. For an award of pre- and post-judgment interest as allowed by law.

j. For such other and further relief as the Court deems just and proper.

**TENTH CLAIM FOR RELIEF**

ARIZONA CONSUMER FRAUD ACT

ARIZONA UNIFORM STATE ANTITRUST ACT A.R.S. § 44-1401 ET SEQ

*(Against Axon by Abhyanker, Arizona municipality and police department DOES 1-500, and all taxpayers in Arizona similarly situated as Abhyanker)*

329. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

330. Axon has engaged in monopolistic and anticompetitive practices that have harmed competition in the market for body-worn cameras and digital evidence

management systems used by law enforcement agencies across the United States, including in Arizona.

331. Axon holds substantial monopoly power in the relevant market. Through its acquisitions and exclusionary conduct, Axon has stifled competition, raised prices, and reduced the availability of alternative products and services.

332. Due to Axon's anticompetitive conduct, municipalities and police departments in Arizona have been forced to purchase Axon's products at inflated prices. These costs have been passed on to taxpayers, including Plaintiff Abhyanker, resulting in higher income, sales and/or property taxes.

333. Under A.R.S. § 44-1408(B), any person who is injured in their business or property by reason of anything forbidden in the antitrust statutes may sue for damages. As an indirect purchaser who has paid higher taxes due to Axon's anticompetitive conduct, Plaintiff has standing to bring this action.

334. Plaintiff Abhyanker and similarly situated class members in Arizona have suffered economic harm in the form of increased taxes. These taxes were necessary to cover the inflated costs of law enforcement equipment caused by Axon's monopolistic behavior.

335. Plaintiff Arizona municipality and police department DOES 1-500, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff Arizona municipality and

police department DOES 1-500 have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across Arizona in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto.

336. Axon has failed to disclose the presence of Quectel chips in its Axon Body 4 cameras, which poses significant national security risks due to their potential ties to the Chinese government. This nondisclosure has further harmed taxpayers by compromising the security of law enforcement operations and public safety.

337. The inflated costs and security risks are a direct and proximate result of Axon's unlawful anticompetitive practices, causing injury to Plaintiff Abhyanker and similarly situated class members in Arizona.

338. WHEREFORE, Plaintiff Abhyanker, on behalf of himself and all others similarly situated, prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that restrain trade in violation of Arizona antitrust law.

b. For compensatory damages in an amount to be determined at trial,

including but not limited to damages for increased taxes paid by Plaintiff Abhyanker and the class members as a result of Axon's anticompetitive conduct.

c. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across Arizona in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

d. For treble damages as provided by law under A.R.S. § 44-1408(B).

e. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

f. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

g. For an award of pre- and post-judgment interest as allowed by law.

h. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device

without Quectel chips.

i. For such other and further relief as the Court deems just and proper.

**ELEVENTH CLAIM FOR RELIEF**

SECTION 7(2) OF THE ILLINOIS ANTITRUST ACT

*(Against Axon by Abhyanker, Illinois municipality and police department DOES 1-500, and all taxpayers in Illinois similarly situated as Abhyanker)*

339. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

340. Axon has engaged in monopolistic and anticompetitive practices that have harmed competition in the market for body-worn cameras and digital evidence management systems used by law enforcement agencies across the United States, including Illinois.

341. Axon holds substantial monopoly power in the relevant market. Through its exclusionary practices and anticompetitive conduct, Axon has unreasonably restrained trade, preventing competitors from entering the market or effectively competing.

342. Axon's exclusionary practices include:

a. Axon requires law enforcement agencies to purchase its digital evidence management system, Evidence.com, as a condition for purchasing its body-worn cameras.

b. Axon enters into exclusive dealing contracts with law enforcement agencies

that prevent them from purchasing competing products.

c. Axon has spent lavishly on police fraternal organizations to secure their loyalty and support, ensuring that law enforcement agencies continue to purchase Axon's products exclusively.

343. Axon has made strategic acquisitions, including Dedrone (2024), Fusus (2024), Sky-Hero (2023), and Foundry 45 (2022), to eliminate competition and solidify its monopoly power. These acquisitions have reduced market entry opportunities for competitors and further entrenched Axon's dominance.

344. Axon's anticompetitive practices have significantly harmed competition in the market for body-worn cameras and digital evidence management systems. This conduct has led to higher prices, reduced innovation, and fewer choices for law enforcement agencies and municipalities, which ultimately pass these increased costs onto taxpayers, including the Plaintiffs.

345. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff Raj Abhyanker and the class members have suffered economic harm, including higher sales and property taxes. These taxes were necessary to cover the inflated costs of law enforcement equipment caused by Axon's monopolistic behavior.

346. Plaintiff Illinois municipality and police department DOES 1-500, directly purchased body-worn cameras and digital evidence management systems from Axon. These purchases were made directly from Axon without intermediaries. As a direct and proximate result of Axon's anticompetitive practices, Plaintiff Illinois municipality and

police department DOES 1-500 have suffered economic harm, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across Illinois in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the privacy and security risks not timely disclosed by Axon with respect to the Axon 4 cameras after the Congressional notification to the public on or about January 2024, and overcharges for body-worn cameras and digital evidence management systems thereto. (See: **Exhibit 2**).

347. Under Section 7(2) of the Illinois Antitrust Act, 740 ILCS 10/7(2), any person who has been injured in their business or property by a violation of the Act may maintain an action for damages or for an injunction, or both. This includes indirect purchasers, as the statute explicitly allows indirect purchasers to sue for damages.

348. WHEREFORE, Plaintiff Abhyanker, on behalf of himself and all others similarly situated, prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. An order enjoining Axon from continuing its anticompetitive practices, including but not limited to tying arrangements, exclusive dealing, and any other practices that restrain trade in violation the Illinois Antitrust Act.

b. An order requiring Axon to divest itself of certain assets or businesses to restore competition in the affected markets.

c. For compensatory damages in an amount to be determined at trial, including but not limited to damages for increased taxes paid by Plaintiff

and the class members as a result of Axon's anticompetitive conduct.

d. For compensatory damages in an amount to be determined at trial, including but not limited to damages for the increased costs paid by Plaintiff municipalities and Plaintiff police departments across Illinois in the United States (DOES 1-500) as a result of Axon's anticompetitive conduct, including the a full refund of the purchase price of the Axon 4 cameras, and overcharges for body-worn cameras and digital evidence management systems.

e. For treble damages as provided by law under 740 ILCS 10/7(2).

f. For punitive damages in an amount sufficient to punish Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

g. For an award of attorneys' fees and costs incurred in bringing this action, as provided by law.

h. For an award of pre- and post-judgment interest as allowed by law.

i. An order requiring Axon to formally disclose the risk posed by Quectel chips to each purchaser of Axon Body 4 cameras in the United States. This disclosure should include the option for purchasers to return the cameras, downgrade to Axon Body 3 (which do not apparently contain Quectel chips, upon information and belief), or receive a replacement device without Quectel chips.

j. For such other and further relief as the Court deems just and proper.

**TWELFTH CLAIM FOR RELIEF**

VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT (CCPA)

*(Against Axon by California municipality and police department DOES 1-500)*

349. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

350. Axon failed to disclose that its Axon Body 4 cameras contain Quectel chips, which could lead to unauthorized data collection.

351. This non-disclosure violates the CCPA, which grants consumers the right to know about the personal information collected about them.

352. The undisclosed presence of Quectel chips raises privacy and security concerns for law enforcement agencies and individuals in California.

353. Municipalities and police departments have been deprived of essential information to protect the privacy and security of their operations

354. WHEREFORE, Plaintiff California municipality and police department DOES 1-500, on behalf of themselves and all others similarly situated, prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. Mandatory disclosure of Quectel chips and potential data collection risks.

b. Options for customers to seek remediation, including replacement or refunds.

c. Statutory damages for violations of privacy rights.

d. Costs of the suit and attorneys' fees.

**THIRTEENTH CLAIM FOR RELIEF**

ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (ICFA)

*(Against Axon by Illinois municipality and police department DOES 1-500)*

355. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

356. Axon failed to disclose the presence of Quectel chips in its Axon Body 4 cameras, creating potential security risks.

357. The omission of material facts about Quectel chips constitutes a deceptive practice under the ICFA.

358. The presence and potential risks of Quectel chips are material to purchasing decisions.

359. Illinois municipalities and police departments have been deceived about the safety and integrity of Axon's products.

360. WHEREFORE, Plaintiff Illinois municipality and police department DOES 1-500, on behalf of themselves and all others similarly situated, prays for judgment against Defendant Axon Enterprise, Inc. as follows:

a. Injunctive relief to cease deceptive practices.

b. Restitution for economic damages incurred by the plaintiffs.

c. Mandatory disclosure of Quectel chips' presence and potential risks.

d. Costs of the suit and attorneys' fees.

**REQUEST FOR RELIEF**

361. Plaintiffs on behalf of themselves and all others similarly situated, incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

362. WHEREFORE, Plaintiffs pray for judgment against Defendant Axon Enterprise, Inc. and for any and all damages as described in each Claim for Relief described herein, as well as below::

a. **Immediate Order to Prohibit Use of Axon Body 4 Cameras at Political Events:** An order prohibiting the use of Axon Body 4 cameras at all political events related to the 2024 presidential election cycle, including rallies, debates, and polling stations.

b. **Mandate for Alternative Surveillance Solutions:** An order requiring law enforcement agencies to use alternative, secure surveillance equipment that does not contain Quectel chips or other components with potential foreign adversary access.

c. **Enhanced Security Protocols:** An order mandating the implementation of enhanced security protocols at political events to mitigate the risks posed by existing Axon Body 4 cameras, including regular sweeps for unauthorized surveillance devices and increased cybersecurity measures.

d. **Transparency and Reporting Requirements:** An order requiring Axon Enterprise, Inc. and Microsoft Corporation to disclose any and all foreign

components used in their products, particularly those with potential espionage capabilities, and to report any suspected data breaches or security vulnerabilities immediately to U.S. authorities including law enforcement customers.

e. **Declaratory Relief:** A judicial declaration that Axon's business practices, including its bundling of digital evidence management software with body camera hardware, are unlawful and violate federal and state laws as alleged herein, including but not limited to violations of the Sherman Act, Clayton Act, California Consumer Privacy Act (CCPA), California's Unfair Competition Law (UCL), Arizona Consumer Fraud Act, and/or Illinois Consumer Fraud and Deceptive Business Practices Act.

f. **Injunctive Relief:** An order enjoining Axon from continuing its unlawful business practices, including but not limited to:

i. Requiring the purchase of Evidence.com subscriptions in conjunction with Axon's body camera hardware.

ii. Enforcing any tying arrangements or exclusive dealing contracts that prevent competition in the market for digital evidence management software.

g. **Mandatory Debundling:** An order requiring Axon to:

i. Permit third-party software vendors to integrate their digital evidence management solutions with Axon's body camera hardware.

ii. Offer Axon body camera hardware separately from Evidence.com subscriptions, allowing customers to choose their preferred software provider without being forced into bundled service agreements.

h. **Disclosure and Remediation:** An order requiring Axon to:

i. Formally disclose the presence and potential risks of Quectel chips in Axon Body 4 cameras to each purchaser.

ii. Provide options for customers to return the cameras, downgrade to Axon Body 3 (which does not contain Quectel chips), or receive a replacement device without Quectel chips.

i. **Rectifying harm caused by Axon's migration to Microsoft Azure.** To address the harm caused by Axon's migration to Microsoft Azure and its monopolistic practices, the court should mandate the following corrective actions:

i. Creation of a Download-All Application: Axon should be ordered to develop and provide a "Download-All" application. This application should enable law enforcement agencies to easily download or port their data from Microsoft Azure to another cloud instance of their choice, including competitive vendors such as Google Cloud or Amazon Web Services (AWS).

ii. Data Transfer Flexibility: Ensure that agencies have the flexibility to transfer their data seamlessly to a different cloud provider without

disruption to their operations.

iii. Enhanced Transparency and Choice: Axon must improve transparency regarding its data management costs and provide clear options for agencies to choose alternative digital evidence management solutions. This includes detailed disclosures about long-term costs and the implications of using Axon's integrated services.

j. **Ongoing Compliance and Monitoring:** The court should appoint an independent monitor to oversee Axon's compliance with these requirements, ensuring that Axon does not engage in further monopolistic practices and that law enforcement agencies have genuine alternatives for their digital evidence management needs.

k. **Compensatory Damages:** For compensatory damages in an amount to be determined at trial, including but not limited to damages for increased costs paid by Plaintiff and the class members as a result of Axon's anticompetitive conduct, and any economic harm resulting from the deceptive practice.

l. **Treble Damages:** For treble damages as provided by law under applicable federal and state antitrust statutes, including the Sherman Act and Clayton Act.

m. **Punitive Damages:** For punitive damages in an amount sufficient to punish

Axon for its willful, wanton, and malicious conduct, and to deter similar conduct in the future.

n. **Restitution and Disgorgement:** For restitution to Plaintiff and the class members of all monies unlawfully acquired by Axon through its anticompetitive and deceptive practices, and for disgorgement of all ill-gotten gains obtained as a result of such conduct.

o. **Attorneys' Fees and Costs:** For an award of attorneys' fees and costs incurred in bringing this action, as provided by law, including but not limited to fees under the Clayton Act, RICO, and applicable state laws.

p. **Pre-and Post-Judgment Interest:** For an award of pre- and post-judgment interest as allowed by law, from the date of service of the initial complaint to the date of final payment.

q. **Monitoring and Compliance:** For the appointment of a monitor or special master to oversee Axon's compliance with the Court's orders and to ensure that Axon ceases its anticompetitive and deceptive practices and complies with the terms of the injunctive relief.

r. **Mandatory Debundling for Privacy Protection:** An order requiring Axon to permit third-party software vendors to integrate their digital evidence management solutions with Axon's body camera hardware, without the need for subscriptions to Evidence.com. This debundling is necessary to restore trust and allow police and municipal customers to have a second

source, ensuring that they can choose software solutions that prioritize privacy and security.

s. **Consumer Notification:** Axon must notify all current and future customers of the presence and potential privacy risks associated with Quectel chips in Axon Body 4 cameras. This includes offering alternatives such as returns, downgrades, or replacements without Quectel chips.

t. **Other Relief:** For such other and further relief as the Court deems just and proper.

Respectfully submitted this Monday July 29, 2024.

LEGALFORCE RAPC WORLDWIDE P.C.

/s/ Spencer Keller___
Spencer Keller
Attorney for Plaintiffs and the Proposed Class:
LegalForce RAPC Worldwide, P.C.

/s/ Raj Abhyanker___
Raj Abhyanker
Plaintiff, and Attorney for Plaintiff GovGPT and the Proposed Class (licensed only in California, appearance pro hac vice pending)

**JURY TRIAL DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this Monday, July 29, 2024.

LEGALFORCE RAPC WORLDWIDE P.C.

/s/ Spencer Keller
Spencer Keller
Attorney for Plaintiff and Proposed Class:
LegalForce RAPC Worldwide, P.C.