1  **PAPETTI SAMUELS WEISS MCKIRGAN LLP**
   16430 North Scottsdale Road
2  Suite 290
   Scottsdale, AZ 85254
3  **Charles W. Steese** (State Bar No. 012901)
   Direct Dial: 480.800.3537
   Email: csteese@PSWMlaw.com
4  **Randy Papetti** (State Bar No. 014586)
   Direct Dial: 480.800.3525
5  Email: rpapetti@PSWMlaw.com

6  **AXON ENTERPRISE, INC.**
   Pamela B. Petersen, Bar #011512
7  Gayathiri Shanmuganatha, Bar #030745
   17800 N. 85th Street
8  Scottsdale, Arizona 85255-9603
   Telephone: (623) 326-6016
9  Fax: (480) 905-2027
   ppetersen@axon.com
10 gshanmuganatha@axon.com
   legal@axon.com
11 *Attorneys for Axon Enterprise, Inc.*

12

13                        **UNITED STATES DISTRICT COURT**

14                                 **DISTRICT OF ARIZONA**

15 GovernmentGPT, Inc.; Raj Abhyanker,         Case No. 24-cv-01869-SMB
   individually and on behalf of all other
16 taxpayers similarly situated; and           **AXON'S OPPOSITION TO**
   Municipality and Police Departments         **PLAINTIFFS' EMERGENCY**
17 Does 1-500,                                  **MOTION FOR AB4 INJUNCTION**
                                               **AND REQUEST FOR SHOW**
18                Plaintiffs,                   **CAUSE ORDER WHY SANCTIONS**
                                               **SHOULD NOT ISSUE**
19        v.

20 Axon Enterprise, Inc., formerly dba
   TASER International, Inc.; Microsoft
21 Corporation; and Does 1-50,

22                Defendants.

23

24

25

26

27

28

For the reasons identified herein, the Court should swiftly and soundly reject Plaintiffs GovernmentGPT, Inc. ("GovGPT") and Raj Abhyanker's ("Abhyanker," collectively "Plaintiffs") unsupported Emergency Motion for Immediate Order to Prohibit Use of Axon Body 4 Cameras at Political Events (Doc. 14, "Motion") and issue a show cause order to determine whether it should award Defendant Axon Enterprise, Inc. ("Axon") its fees and costs for having to defend against Plaintiffs' baseless claims. *See* 28 U.S. § 1927; Fed. R. Civ. P. 11(c)(3).

> **While there are many arenas—including print, television, and social media—where protestations, conjecture, and speculation may be advanced, such expressions are neither permitted nor welcomed in a court of law**.

*Lake v. Hobbs*, 643 F. Supp. 3d 989, 1008 (D. Ariz. 2022) (emphasis added and citation omitted).

## I.   INTRODUCTION.

Plaintiffs peddle fear and falsehoods, not facts. Though Plaintiffs brazenly imply that the mere presence of Axon's Body 4 cameras ("AB4") impacted the assassination attempt on former President Donald Trump (Doc. 14, ¶ 5), Plaintiffs failed to offer any evidence to support their outrageous and libelous allegations. Rather, Plaintiffs' Motion relies exclusively on inadmissible hearsay, speculation, and conspiracy theories in seeking an order "prohibiting the use of [AB4] cameras at political events" (*Id*., ¶ 3).

Worse still, Plaintiffs recklessly stoke racism, fear, and paranoia to shamelessly promote investment in their own product. Plaintiffs, self-proclaimed experts in industrial design (Doc. 13 at 6, ¶ 7),[1] and their counsel falsely allege AB4 cameras include "advanced Chinese surveillance technology, such as Quectel chips" or "Quectel chipsets" (*Id*. at 13, ¶ 3; *Id*. at 20, ¶ 6; Doc. 14, ¶¶ 3-4) to stoke paranoia about Chinese or Iranian surveillance, tracking, and data interception (Doc. 14, ¶¶ 4, 6). To be clear, the chipset and base firmware in the AB4 module is designed, developed, and manufactured

---

[1] Doc. 13 is Plaintiffs' Corrected Complaint, which confusingly begins paragraph numbering anew with each section heading. References to Doc. 13 therefore cite both page and paragraph number for clarity.

by Qualcomm Technologies, Inc. ("Qualcomm"), <u>an American company</u>, not Quectel (Ex. 1, D. MacDonald Decl. ¶ 3).

Plaintiffs double down on their false assessment with more untruths. For example, Plaintiffs claim the non-existent "Quectel chips" are "linked to the Chinese government" and contain "remote command and control [function] usable for espionage" (Doc. 13 at 5, ¶ 5; Id. at 25-26, ¶ 14). As this honorable Court recognized, Plaintiffs submitted "**no evidence of an actual known threat**" (Doc. 23 at 2, emphasis added). That's because none exists.

Axon's cybersecurity experts categorically debunk Plaintiffs' unsupported claims, confirming:

- There are <u>no</u> backdoors or vulnerabilities in the Quectel module which would allow for real-time surveillance, GPS tracking, or data interception by adversaries.

- Quectel <u>cannot</u> push any malicious command or control to the AB4.

- The AB4 <u>does not</u> receive Over The Air (OTA) updates from carriers or non-Axon sources.

- <u>Only Axon</u> distributes and controls the firmware running on Axon devices and subcomponents, including the Quectel module.

- <u>None</u> of the data recorded by the AB4 is stored on Quectel's module and no data flows to Quectel servers.

- The Quectel module is as secure as technologically feasible and there is <u>no</u> evidence it poses any threat of improper access, let alone a national security threat.

(Ex. 1, D. MacDonald Decl. ¶¶ 4, 17-21; Ex. 2, M. Wyckhouse Decl. ¶¶ 7, 23, 26). Plaintiffs' wholesale failure to *establish* entitlement to an injunction with *admissible evidence* is not only fatal to Plaintiffs' Motion, but also to their hearing request.

Further, Plaintiffs lack standing because their claims rest on a speculative chain of contingencies that cannot establish an injury-in-fact. They also fail to name and serve the real parties in interest; i.e., all federal, state, and local law enforcement agencies and their officers ("Impacted LEAs") that Plaintiffs seek to preclude from using any

3

purchased product that contains "chips or other components with potential foreign adversary access" (Doc. 14, ¶ 12(b)). Because Plaintiffs seek to deprive the Impacted LEAs of their property, the Impacted LEAs must be given an opportunity to forestall such deprivation.

## II. BACKGROUND.

Axon is an innovator and leader in the field of public safety technology. Among the products Axon develops and sells are body-worn cameras ("BWCs"), digital evidence management systems ("DEMS"), and TASER® energy weapons. BWCs enable police officers to record video of their community interactions and conduct while on patrol or responding to calls. BWCs are often used with DEMS, which help police departments process and maintain the video data recorded by BWCs. Axon develops and sells these products to support its mission to "Protect Life and Protect Truth" by providing law enforcement with cutting-edge technology that protects them and the communities they serve and increases transparency and accountability. Axon's customers are predominately federal, state, and local law enforcement agencies.

### A. The Quectel Module's Role in AB4 Cameras.

The AB4 is Axon's latest, innovative BWC for law enforcement, corrections, military, and security personnel. Pertinently, the AB4 allows officers to:

- <u>Record</u> events and interactions and then transmit those recordings to a secure repository.
- Request supervisors, command staff, and dispatchers to <u>view</u> a livestream of their BWCs while in the field.
- Obtain additional support and expertise via handsfree, bi-directional <u>conversations</u> with dispatchers, command staff, mental health experts, and authorized personnel while in the field.

(Ex. 1, D. MacDonald Decl. ¶ 8). These features allow for real-time command center focus for situational awareness in the field during high profile events, like political rallies and protests (*Id.*, ¶ 9). Thus, the AB4's design includes 4G LTE connectivity,[2] which

---

[2] Plaintiffs falsely claim Quectel assembles a 5G LTE module (Doc. 13 at 25, 15).

allows officers to securely transmit footage in real time to superiors or upload evidence to an agency's evidence repository (*Id*., ¶ 10).

### 1. AB4 cameras are designed with security as a top priority.

Quectel Wireless Solutions Co, LTD ("Quectel") is one of the largest providers of Internet of Things ("IoT") components around the world and is used in a wide range of products by many brands, including AT&T, Verizon, Ericsson, Amazon, Honeywell, Johnson Controls, Cradlepoint, NetNear, and Carrier (*Id*., ¶ 11). Quectel's components are used in many devices we use daily, including smartphones (*Id*., ¶ 12). Quectel <u>assembles</u> the LTE module that connects the AB4 camera to Axon's secure services on the internet (*Id*., ¶ 13). The Quectel module uses a Qualcomm (American company) LTE modem chipset and base firmware (*Id*., ¶ 14). The module's purpose is to form a connection to the LTE carrier and act as a pathway to region-specific Internet endpoints that are controlled by Axon (*Id*., ¶ 15).

Even though Quectel's products were used by many trusted companies known for strong information security teams and data security measures, Axon did not take security for granted. Some of the security measures contained in the AB4 camera's design architecture include:

- **Module separate from processor**. The Quectel module is completely separate from the camera's main processing system, which is designed, developed, and manufactured by Qualcomm. The Quectel module does not store any data recorded or streamed from the AB4 (*Id*., ¶ 17).

- **End-to-end encryption**. The Qualcomm processor fully encrypts all data. The Quectel module merely transmits the encrypted data and cannot access or decrypt any data stored or streamed on the AB4. The data is decrypted only when it reaches a trusted Axon service (*Id*., ¶ 4).

- **Firmware updates controlled solely by Axon**. Axon controls all updates using secure boot technology that prevents unauthorized firmware from being loaded or run on the module to compromise security (*Id*., ¶¶ 18-20).

- **No OTA updates accepted** from carriers or non-Axon sources (*Id*., ¶ 21).

- **No incoming calls from the internet permitted**. Axon BWCs only permits outgoing calls to the internet (*Id*.).

- **Continuous monitoring.** Axon's product teams and Security Operations Center log critical performance and security telemetry of devices and services (*Id.*, ¶ 22).

### 2. Comprehensive vetting of Quectel.

Quectel retained an independent cybersecurity firm, Finite State, Inc. ("Finite State"), to comprehensively and holistically assess the security and integrity of Quectel and the AB4 module (Ex. 2, M. Wyckhouse Decl. ¶ 18). Finite State is a leader in detecting, analyzing, and remediating hidden risks found in connected devices and embedded systems, and its industry-leading binary analysis Platform is considered the most advanced on the market today. This Platform uses proprietary methods and algorithms to identify and match software subcomponents within embedded devices and binary software packages while also highlighting potential backdoors, hardcoded credentials, known vulnerabilities, zero-day vulnerabilities, and critical misconfigurations of applications and services (*Id.*, ¶¶ 9-12). Finite State is well known for leading the comprehensive assessment of Huawei Technologies Co., Ltd.'s ("Huawei") supply chain security and detecting backdoors and vulnerabilities in Huawei's firmware, which garnered significant attention inside the U.S. government and impacted global cybersecurity policy and practices (*Id.*, ¶¶ 13-14).

Quectel provided Finite State with unprecedented access to Quectel's systems, enabling Finite State to delve into every facet of Quectel's software modules (*Id.*, ¶ 22). Every component, source file, and binary underwent a thorough review and assessment by Finite State's experts with vast experience in software supply chain security, penetration testing, and vulnerability assessments (*Id.*). Key findings from Finite State's penetration testing included:

- **No "backdoors" or vulnerabilities** to Quectel's systems, the module, or firmware.
- **No remote access** to the module, dramatically limiting available attack surface and internet exposure.
- Axon, **not Quectel**, controls the network and software security.

(*Id.*, ¶ 23).

### 3. Ongoing diligence: continued monitoring of Quectel.

Following Finite State's comprehensive evaluations of Quectel modules and their supply chain security practices, Axon separately engaged Finite State to continuously monitor, assess, and test the hardware and software of Quectel AB4 modules (*Id.*, ¶ 24). Finite State's continuous assessment of Quectel includes:

- **An automated source code analysis**, deploying Finite State's cutting-edge tools to pinpoint any changes in the source code files received from the upstream supplier, Qualcomm.
- **A comprehensive manual audit** of all source code to unveil any further potential security threats within the codebase and offer an intricate evaluation of issues detected during the automated analysis.
- **A binary analysis of the final products** using the Finite State Platform. This binary analysis step provides an additional security test that ensures no vulnerabilities were introduced via binary software artifacts or during build or configuration settings that happen at the final stages.

(*Id.*). Finite State's multifaceted approach, spanning source code scrutiny to binary analysis, strives to ensure the utmost integrity and security of the AB4 module assembled by Quectel (*Id.*, ¶ 25).

### B. Plaintiffs' Misconceptions of Quectel.

Simply because Quectel is based in China, Plaintiffs have extrapolated wholly unsupported connections between Quectel and assassination plots/attempts on former President Trump, election interference, real-time surveillance, GPS tracking, data interception, espionage and national security risks (Doc. 14). Plaintiffs' allegations and suggestions are premised on the unsupported notion that all Chinese module assemblers have the ability push software updates (i.e., commands/controls) to the module (Doc. 13 at 20-21, ¶ 7).

Finite State collaborates closely with numerous government agencies on high-stakes cybersecurity and intelligence programs, particularly those involving embedded systems security and concerns about Chinese interference (Ex. 2, M. Wyckhouse Decl. ¶¶ 14-15). Cybersecurity experts, like Finite State, are primarily concerned with the following two areas in assessing national security implications arising from a device

manufactured in China: (A) the presence of data flowing to China and (B) the ability to push a command/control to the device from China (*Id.*, ¶ 6). Neither concern exists here.

Finite State has confirmed no data flows from the AB4 to any Quectel server in China or otherwise under the control or influence of Quectel, and Quectel cannot push any over-the-air updates or commands/controls to the AB4. Moreover, Finite State has not detected any backdoors or vulnerabilities in the Quectel module that would allow for "real-time surveillance, GPS tracking, and data interception by foreign adversaries" (*Id.*, ¶ 7).

  C. **GovGPT's $2 Million Funding Plea Rejected By Axon.**

GovGPT is not a competitor of Axon in either the BWC [3] or DEMS space and GovGPT's social media (website and LinkedIn) contain no such product offerings. Indeed, GovGPT is a new start up formed in Delaware six months ago on January 22, 2024 (Ex. 3 at 3, Pertinent GovGPT Emails). Four days later, on January 26, founder Abhyanker contacted Axon and attempted to purchase ten Axon BWCs, subscriptions to Axon's DEMS platform Evidence.com, and training on Axon's products (*Id.* at 1-2). Knowing Axon only sells to law enforcement, Abhyanker falsely claimed GovGPT was "a private security company." (*Id.* at 1). When Axon declined the sale, Plaintiffs apparently turned to Alibaba—China's equivalent of eBay—to obtain Axon BWCs and deconstructed them (Doc. 14 at 24-26; Doc. 1-1).

In February 2024, representatives of GovGPT emailed Axon's CEO and founder Rick Smith, requesting a meeting to introduce its DragonFly product, and proposing Axon make a $2 million investment in GovGPT in exchange for a 20% stake in the company (Ex. 3 at 4). Abhyanker then provided Axon with information about GovGPT's engineering team (all of whom were identified as consultants to be "convert[ed] to full time once we are funded"), and certain future product initiatives (none of which were BWC or DEMS offerings) (*Id.* at 10, 15-31, 32-33). GovGPT's "primary commercial

---

[3] In its marketing and investment materials, GovGPT repeatedly admits DragonFly is not a BWC competitor and does not have the ability to record video (Ex. 3 at 6, 9).

product" and "biggest baseline venture opportunity," DragonFly, was described as "a tactical vest that detects pre-assaultive threats through haptic responses" and "an AI language translator"—a product that does not compete with Axon BWCs (*Id*. at 6, 9-10, 36-37).

Later, in April, Abhyanker asked if Axon "would be willing to invest $500K" for a 5% stake in GovGPT (*Id*. at 37). Henrik Kuhl, Axon's Senior Vice President of Strategy and Corporate Development, agreed to a meeting, but informed Abhyanker that Axon was unlikely to invest "in pre-revenue stage ventures" (*Id*. at 34).

A virtual introductory meeting occurred on May 30, 2024. Plaintiffs' proposals ranged from seeking a cash investment from Axon, to Axon collaborating with GovGPT in developing DragonFly, to Axon buying or merging with GovGPT (Ex. 3 at 37, 39). All of Plaintiffs' proposals were rejected by Axon, with Mr. Kuhl candidly explaining Axon only engaged with companies after they have real data from end users and paying customers, which GovGPT did not have (*Id.*). Only then did Abhyanker hostilely raise "concerns" about Axon's use of Quectel in AB4s, which was wholly unrelated to the stated and understood purpose of the meeting (*Id*. at 41, GovGPT advisor G. Berg Email, stating "I had no idea that Raj was going to bring up the chip manufacturers during the conversation…I told him it was inappropriate to do so and I was embarrassed by how it was handled).

### III. PLAINTIFFS FAILED TO ESTABLISH ANY OF THE REQUIREMENTS FOR A PRELIMINARY INJUNCTION.

A preliminary injunction is "an extraordinary remedy never awarded as of right," and the requesting party "must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Such a "drastic remedy ... should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Arizona v. Mayorkas*, 584 F. Supp. 3d 783, 788 (D. Ariz. 2022) (quoting *Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012)) (emphasis in original). And mandatory injunctions—as Plaintiffs request here[4]—

---

[4] Plaintiffs seek an order (1) prohibiting the use of AB4s at all political events, (2) requiring law enforcement to use "alternative" surveillance equipment that does not

9

are "particularly disfavored;" they should be denied "unless the facts and law clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ("a mandatory injunction goes well beyond simply maintaining the status quo" and orders a party to take action pending determination of merits).

To obtain a preliminary injunction, a plaintiff must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief is denied, (3) that the balance of equities weighs in the plaintiff's favor, and (4) that the public interest favors injunctive relief. *Mayorkas*, 584 F. Supp. 3d at 788. "The first factor incorporates an assessment of both the plaintiff's standing and the merits of the underlying claim." *Id.* at 789. Plaintiffs "carr[y] the burden of proof on each element of the test." *Id.* at 788. Here, Plaintiffs fall far short of carrying their burden of proof and are not entitled to a mandatory injunction, let alone a hearing.

### A. Plaintiffs Lack Standing and Cannot Establish a Likelihood of Success on the Merits.

Article III of the Constitution requires a plaintiff to demonstrate "the core component of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Plaintiffs fail at step one.

A "concrete" and "particularized" injury must be "real," not "abstract," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560), and "must affect the plaintiff in a personal and individual way." *Raines v. Byrd*, 521 U.S. 811, 819 (1997). And to be "actual or imminent," a threatened injury must be "certainly

---

contain components "with foreign adversary access," (3) "mandating the implementation of enhanced security protocols," and (4) requiring Axon and Microsoft to disclose "all foreign components used in their products" (Doc. 14, ¶ 12).

10

1  impending"—"allegations of possible future injury are not sufficient." *Clapper v.*
2  *Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

3  　　　Plaintiffs offer nothing but false and unsupported speculation about "potential"
4  vulnerabilities in the AB4. They do not (and cannot) allege law enforcement's use of
5  AB4s has caused or will cause them harm (Doc. 14, ¶ 9). Rather, as clearly established
6  above, Plaintiffs' allegations depend on a long chain of fallacies to get to their alleged
7  harm: the AB4 is manufactured with Quectel chips (false), the Chinese government can
8  remotely control/command the non-existent Quectel chips (false), this non-existent
9  function can allow China or Iran to surveil, track, and intercept data about law
10 enforcement operations and political figures (false), which implicates national security
11 concerns (false). This is precisely the kind of "speculative chain of possibilities" that
12 cannot establish an actual or imminent injury-in-fact. *Clapper*, 568 U.S. at 414; *Yazzie*
13 *v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (holding failure to make a clear showing of
14 concrete and particularized injury is enough to "doom" standing). Moreover, Plaintiffs'
15 baseless allegations are a far cry from the heightened standard required for mandatory
16 relief—a showing that "the facts and law clearly favor the moving party." *Dahl v. HEM*
17 *Pharm. Inc.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Knapp v. Maricopa Cnty.,*
18 *Arizona*, 2017 WL 4573619, *1 (D. Ariz. Oct. 13, 2017) ("mandatory injunctions require
19 a higher level of proof than prohibitory injunctions" and are "not issued in doubtful
20 cases.").

21 　　　Also missing is any showing that the alleged injury is redressable by a favorable
22 decision from this Court. To demonstrate redressability, Plaintiffs must show "a
23 substantial likelihood that the requested relief will remedy the alleged injury in fact."
24 *Yazzie*, 977 F.3d at 967. Plaintiffs have failed to demonstrate that barring local, state, and
25 federal law enforcement personnel from using AB4s or any equipment containing
26 "components with potential foreign adversary access" will eliminate the articulated
27 threat posed by China or Iran. Issuing the requested injunction would leave many LEAs
28 unable to use their BWCs, one of the most important safety tools they have at their

11

1  disposal. That means barring AB4 cameras from high-profile political events will
2  *decrease* (not increase) safety, transparency, and informed emergency response
3  capabilities. This is particularly true for Axon's AB4, the first BWC on the market that
4  provides livestreaming and bi-directional communications with command centers for
5  real-time situational awareness in the field (Ex. 1, D. MacDonald Decl. ¶ 9).

   **B.     Plaintiffs Lack of Diligence and Irreparable Harm Bars Relief.**

7  Plaintiffs' contention that they only "discovered" the Quectel components in
8  AB4s after they received and deconstructed Axon's product on or after May 11, 2024
9  (Doc. 13 at 24-26, ¶¶ 13, 16), is belied by the public record and Plaintiffs' own "Pitch
10 Deck." On January 25, 2023, Oodaloop published an article about "Chinese Cellular IoT
11 technology: Understanding and mitigating the threat," wherein Oodaloop reported
12 Quectel's development of a component for Axon BWCs.[5] And GovGPT's Pitch Deck,
13 created back in February, contains slides (1) embedding a January 3, 2024 letter from the
14 Select Committee on the Chinese Community Party about Quectel, and (2) seeking to
15 distinguish GovGPT from Axon by claiming GovGPT "is aligned to American national
16 security with a secure global supply chain that is not dependent on China." (Ex. 4 at 2-3,
17 5-6, Relevant Pitch Deck Slides). Thus, GovGPT knew of Axon's use of Quectel
18 components in its AB4 camera months before the filing of this Motion for injunctive
19 relief on July 29.

20 Such delay undercuts any notion of irreparable harm and is itself a basis to deny
21 the Motion. *See Tough Traveler Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir.
22 1995); *Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070,
23 1090 (C.D. Cal. 1999), *aff'd*, 202 F.3d 278 (9th Cir. 1999); *Comic Strip, Inc. v. Fox
24 Television Stations, Inc.*, 710 F. Supp. 976 (S.D.N.Y. 1989) (three-month delay negated
25 irreparable harm claim). As one court put it, courts "typically decline to grant preliminary
26 injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L.*

---

28 [5]   https://www.oodaloop.com/archive/2023/01/25/chinese-cellular-iot-technology-understanding-and-mitigating-the-threat/ (last accessed Aug. 7, 2024).

*v. Campaniello Imports, Ltd.*, 13 F. Supp.2d 417, 419 (S.D.N.Y. 1998); *see also Nina Ricci, S.A.R.L. v. Gemcraft, Ltd.*, 612 F. Supp. 1520 (S.D.N.Y. 1985) (12-week delay warrants denial of motion).

      **C.    The Balance of Equities and Public Interest Favor Axon, Not Plaintiffs.**

In assessing whether Plaintiffs have met this burden, the district court has a "duty…to balance the interests of all parties and weigh the damage to each." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (quoting *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)). "If [ ] the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id*. at 1139. "In fact, courts should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. (internal quotation omitted).

Plaintiffs' interest is plain: they seek to attract media attention and investors to GovGPT with scandalous conspiracy theories at Axon's expense.[6] Plaintiffs' self-interest is sharply outweighed by the unfounded reputational harm to Axon, the *ex parte* deprivation of property owned by local, state and federal law enforcement agencies, and the danger posed by stripping Impacted LEAs of their BWCs in critical situations calling for rapid, coordinated response to protect the public, including at political events.

Moreover, Plaintiffs wholly fail to articulate how this Court can order all LEAs "to use alternative, secure surveillance equipment," how the Court and LEAs can determine whether equipment contain "components with potential adversary access," and how unspecified "enhanced security protocols" can possibly be implemented *before*

---

[6] Media outlets have already quoted Abhyanker as saying Axon is aware the non-existent "Quectel chips" could facilitate real-time surveillance, GPS tracking, and data interception and "they don't want to deal with the problem" and "they don't care." *2024 election security in jeopardy? Emergency motion filed against use of Axon cameras*, Top Class Actions, available at https://topclassactions.com/military-government-political/2024-election-security-in-jeopardy-emergency-motion-filed-against-use-of-axon-cameras/ (last accessed Aug. 5, 2024).

13

all political events, rallies, and debates happening daily during this election cycle. Considering the relevant interests, damage to the named and unnamed parties, and the public consequences, the balance of equities and public interest sharply favors Axon.

Accordingly, for the reasons stated herein, Axon respectfully asks the Court to summarily deny Plaintiffs' baseless Motion.

### IV. THE COURT SHOULD ISSUE AN ORDER TO SHOW CAUSE WHY PLAINITFFS SHOULD NOT BE SANCATIONED FOR FILING A RECKLESS AND INFLAMATORY MOTION.

The Court should compel Plaintiffs and their counsel to show cause why sanctions should not issue for Axon's fees and costs in defense of this baseless Motion. *See, e.g.,* 28 U.S.C. § 1927; Fed. R. Civ. P. 11(c)(3); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) ("Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process."); *Kuschner v. Nationwide Credit, Inc.,* 2009 WL 1531574, *2 (E.D. Cal. Jun. 2, 2009) (issuing order to show cause why the court should not impose sanctions for party proceeding on a frivolous motion).[7]

Plaintiff's' so-called "Emergency" Motion contains reckless and factually misleading information that could cause the public to become alarmed—allegations this Court already found were accompanied by "no evidence of an actual known threat" (Doc. 23 at 2). Clearly, representations that are "legally frivolous" or "factually misleading" are sanctionable. *Truesdell v. S. California Permanente Med. Grp.*, 293 F.3d 1146, 1153 (9th Cir. 2002); *see also Ringgold-Lockhart v. Cnty. of Los Angeles*, 761 F.3d 1057, 1065

---

[7] 28 U.S.C. § 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Fed. R. Civ. P. 11(c)(3) authorizes a court, on its own initiative, to "order an attorney, law firm, or party to show cause why conduct" has not violated Rule 11(b)'s prefiling diligence requirement. Here, Abhyanker, an out-of-state patent attorney who purports to be both an individual plaintiff as well as counsel for his company GovGPT, must be held to these well-recognized professional standards.

(9th Cir. 2014) (sanctions are appropriate remedy for addressing frivolous or abusive filings).

There is nothing unusual about issuing a show cause order at the outset of a case. *Oladiran v. Suntrust Mortgage, Inc.*, 2010 WL 728993 (D. Ariz. Feb. 26, 2010) (issuing show cause order pursuant to Rule 11(c)(3) stating, "this court perceives its duty to include an obligation to manage the cases on its docket so as to dispose of clearly frivolous claims at the earliest stage of the litigation when such is feasible"). Indeed, there is precedent for moving for sanctions in a virtually identical situation. In *RTI Connectivity PTE. Ltd. v. Gateway Network, Connections, LLC,* 2023 WL 2713964 (D. Guam Mar. 30, 2023), plaintiff brought an emergency motion at the outset of a case containing wholly unfounded allegations. The court used Rule 11(c)(3) to determine "whether to sua sponte initiate the procedure for imposition of sanctions." *Id.* at *6-7; *see also Desert Schools Federal Credit Union v. Johnson*, 2012 WL 12969868, *2 (D. Ariz. Dec. 18, 2012) (exercising its inherent authority under Rule 11(c)(3) to "show cause why her conduct in asserting a frivolous motion" should not be sanctioned).

Axon therefore respectfully requests that the Court issue an Order to Show Cause to determine whether to impose sanctions on Plaintiffs for filing this factually baseless and wholly unsupported Emergency Motion.

Dated: August 7, 2024            **AXON ENTERPRISE, INC.**

/s/ *Gaya Shanmuganatha*
Pamela B. Petersen
Gayathiri Shanmuganatha

and

**PAPETTI SAMUELS WEISS MCKIRGAN LLP**

Charles W. Steese
Randy Papetti

*Attorneys for Axon Enterprise, Inc*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on August 7, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

/s/ Nicole Griesbach