**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GovernmentGPT Incorporated, et al., | No. CV-24-01869-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Axon Enterprise Incorporated, et al., | |
| Defendants. | |

Pending before the Court are GovernmentGPT Inc. ("GovGPT") and Raj Abhyanker's ("Abhyanker") (collectively, "Plaintiffs") Motion for Preliminary Injunction (Doc. 2).  Axon Enterprise Inc. ("Defendant") filed a response (Doc. 24), to which Plaintiffs replied (Doc. 25).  The Court granted Defendant's request to file a sur-reply (Doc. 48), which Defendant thereafter filed (Doc. 49).  A scheduling hearing was held on August 20, 2024, neither side requested an evidentiary hearing, and both sides submitted the issue to the Court on the briefing.  After reviewing the Parties' briefing and the relevant case law, the Court will deny Plaintiffs' Motion.

## I.     BACKGROUND

This case arises from a series of alleged antitrust and consumer protection violations.  (*See* Doc. 1.)  Here, however, Plaintiffs seek a preliminary injunction to prevent the use of Defendant's Axon Body 4 Cameras (the "Bodycam") at political events.  (Doc. 2 at 2 ¶ 3.)  Plaintiffs cite "substantial and imminent national security risks posed by the inclusion of Quectel chips in [the Bodycams] . . . which could facilitate espionage and

1    interference by the Chinese Communist Party."  (*Id.*)

2        The relevant alleged facts are as follows: GovGPT is a startup specializing in

3    advanced artificial intelligence solutions for law enforcement, which includes body-worn

4    cameras.  (Doc. 1 at 5–6 ¶ 6.)  One of GovGPT's flagship products includes a body-worn

5    camera, the DragonFly.  (*Id.* at 6 ¶ 7.)  The DragonFly was created, in part, to compete

6    with other comparable items on the market.  (*Id.* at 6–7 ¶¶ 7–8.)  However, Defendant's

7    acquisition of several competitors and collaboration with Microsoft Corporation

8    ("Microsoft") have posed significant market entry challenges for GovGPT.  (*Id.* at 7 ¶ 9,

9    8–9 ¶ 12–13.)

10       Plaintiffs allege that the Bodycams each contain Quectel chips, which are linked to

11   the Chinese government, and thus the Chinese Communist Party ("CCP").  (*Id.* at 5 ¶ 5.)

12   According to Plaintiffs, the presence of the Quectel chips "create a risk of unauthorized

13   access and surveillance, compromising the safety and security of both law enforcement

14   personnel and the public."  (*Id.*)  Moreover, Plaintiffs allege that use of the Bodycams at

15   high-profile events pose significant risks of espionage, (*Id.* at 21 ¶ 8), and raise concerns

16   about real-time surveillance capabilities such that the CCP could interfere with the

17   upcoming elections in the United States.  (*Id.* at 22 ¶ 9.)  Supporting this contention,

18   Plaintiffs cite Federal Communications Commission Chairwoman Jessica Rosenworcel's

19   September 2023 warning to federal government agencies regarding national security risks

20   posed by Quectel chipsets and a January 2024 Congressional Report with similar warnings

21   provided to U.S. Secretary of Defense Lloyd Auston.  (*Id.* at 20 ¶ 6.)  Plaintiffs also cite to

22   a post from the popular online forum, Reddit, in which one user noted concerns about the

23   vulnerability of "Quectel modules."  (*Id.* at 20–21 ¶ 7.)

24       After Defendant rebuked Plaintiffs attempt to purchase units of the Bodycam while

25   posing as a private security company, (Doc. 24 at 8), Plaintiffs purchased four of the

26   Bodycams from Chinese online marketplace Alibaba.  (Doc. 1 at 24–25 ¶ 13.)  Upon

27   disassembling one of the Bodycams, Plaintiffs allege that each included a Subscriber

28   Identity Module ("SIM") card from AT&T, which only operates in the United States, and

"advanced Chinese Quectel real-time streaming chips."  (*Id.* at 25–26 ¶ 14.)  Plaintiffs contacted Defendant to express concerns about the presence of the Quectel chips.  (*Id.* at 26 ¶ 16.)  During an investment meeting with Defendant's senior leadership, Plaintiffs expressed their security concerns about the Bodycams.  (*Id.* at 27–28 ¶¶ 17–19.) Defendant allegedly dismissed any security concerns.  (*Id.* at 28 ¶ 20.)

In their Complaint, Plaintiffs ask for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 because Defendant's "failure to disclose the presence of Quectel chips in its Bodycams poses significant national security risks and constitutes a material omission in violation of applicable laws."  (*Id.* at 83 ¶ 216.)  Plaintiffs' Motion seeks an order from the Court to prohibit the use of Bodycams at political events, an order requiring law enforcement agencies to use alternative surveillance equipment, an order mandating the implementation of enhanced security protocols at political events, and an order requiring Axon and Microsoft to disclose any and all foreign components used in their products. (*See* Doc. 2.)  The Court denied Plaintiffs' request for a TRO (Doc. 23).  The Court held a status conference on August 20, 2024, did not order a hearing, and took the Motion under advisement.

## II.  LEGAL STANDARDS

Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action.  "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis omitted) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.  "But if a plaintiff can only show that there are 'serious questions

going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (emphasis omitted) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

## III. DISCUSSION

### A. Preliminary Injunction

Plaintiffs' Motion does not directly address the merits of their federal and state consumer protection and antitrust claims.  (*See* Doc. 2.)  Instead, it requests this Court to order a preliminary injunction based on "substantial and imminent national security risks posed by the inclusion of Quectel chips in Axon Body 4 cameras, which could facilitate espionage and interference by the Chinese Communist Party."  (*Id.* at 2 ¶ 3.)[1]

"There must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *Brightly v. Corizon Health Inc.*, No. CV-21-00127-TUC-JCH, 2022 WL 2646008, at *1 (D. Ariz. July 8, 2022) ("This relationship is established where the TRO would grant 'relief of the same character as that which may be granted finally.' Absent such a relationship or nexus, district courts lack authority to grant emergency injunctive relief." (citation omitted)).  Plaintiffs have not shown how their antitrust and consumer protection claims are related to their personal concern about the CCP's interference with U.S. national security or the upcoming

---

[1] Plaintiff utterly fails to present any argument on any of the four factors required for injunctive relief.  As to the likelihood of success factor, Plaintiff merely states that "Plaintiff has demonstrated a substantial likelihood of success on the merits of its claims, including violations of federal and state consumer protection and antitrust laws."  (Doc. 2 at 4 ¶ 8.)  As to the remaining three factors, Plaintiffs offer rote recitation of the allegations in their Complaint without advancing any evidence or substantive argument as to why injunctive relief is appropriate.  (*Id.* at 4–5 ¶¶ 8–11.)

2024 elections. (*See generally* Doc. 1.) Indeed, Plaintiffs' Reply highlights that this case is about GovGPT's attempt to compete with Axon and not concern about U.S. national security. (Doc. 25 at 8–9 ¶ 18.) In their Reply, Plaintiffs maintain that "GovGPT has faced significant market entry barriers and reduced revenue opportunities due to Axon's monopolistic practices and concealment of material facts." (*Id.*) The Reply goes on to discuss the various claims and that the "laws provide private parties the right to seek redress for economic and competitive harms they have suffered, even if indirectly." (*Id.*) These claims are related to money, not national security. Put simply, there is no relationship here between Plaintiffs' antitrust and consumer protection claims and their requested relief with respect to espionage and election interference so as to grant "relief of the same character as that which may granted finally." *Pac. Radiation Oncology*, 810 F.3d at 636. Consequently, the Court lacks the authority to grant injunctive relief. *Brightly*, No. CV-21-00127-TUC-JCH, 2022 WL 2646008, at *1.

### B. Lack of Standing

Defendant argues that Plaintiffs lack standing to request a preliminary injunction because they cannot establish that law enforcement's use of the Bodycams has caused, or will cause, them harm. (Doc. 24 at 11.) According to Defendant, Plaintiffs' attempt to show the injury in fact required for standing rests on a long chain of speculative fallacies meant to evince a national security threat. (*Id.*) In reply, Plaintiffs argue that the "barriers [that] have prevented GovGPT from competing fairly . . . lead[] to financial harm." (Doc. 25 at 8 ¶ 17.) Additionally, Plaintiffs argue that GovGPT, Abhyanker, and similarly situated taxpayers and municipalities have experienced "direct and personal injuries due to Defendant's concealment and deception through higher taxes." (*Id.* ¶ 18.)

To bring a justiciable lawsuit into federal court, Article III of the Constitution requires that a plaintiff have "the core component of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff bears the burden of showing that he has standing for each type of relief sought. *Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983). To seek injunctive relief, a plaintiff must show:

1

2

3

4

> [H]e is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

5

6

7

8

9

10

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citation omitted). A "speculative chain of possibilities" cannot establish an actual or imminent injury in fact. *Clapper v. Amnesty Intern. USA,* 568 U.S. 398, 414 (2013); *see also Summers*, 555 U.S. at 496 ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Here, Plaintiffs allege several injuries. First, Defendant's actions have resulted in financial harm for GovGPT, Abhyanker, and numerous taxpayers. (Doc. 25 at 8 ¶¶ 17–18.) For Plaintiffs' requested relief here, the existence of such an injury is inapposite. Instead, for injunctive relief to be granted, Plaintiffs must show they suffered an injury in fact with respect to their allegation that the Quectel chips pose a "substantial and imminent national security risk[] . . . which could facilitate espionage and interference by the [CCP]." (Doc. 2 at 2 ¶ 3.) Plaintiffs argue that the Bodycams contain Quectel chips (Doc. 1 at 23 ¶ 10; Doc. 2 at 2 ¶ 3), the chips might give foreign adversaries—like the CCP and Iran—access to real-time surveillance and GPS tacking (Doc. 1 at 23–24 ¶¶ 10–11; Doc. 2 at 2–4 ¶¶ 2–6), law enforcement use the Bodycams at political events, and therefore national security is at risk (Doc. 1 at 21–22 ¶ 8, 24 ¶ 12; Doc. 2 at 4 ¶ 10). Plaintiffs claim to have relied on Patrick Gibbons and Fred Addy, former law enforcement officers, who allegedly identified "national security risks associated with the Quectel LTE" module in the Bodycam. (Doc. 25 at 9–10 ¶ 21; Doc. 25-1 at 3 ¶ 11–13.) However, Plaintiffs do not provide any report or affidavit prepared by the alleged experts that show how the CCP or Iran may commandeer the Bodycam's internal components to threaten national security.

27

28

Moreover, during the pendency of Plaintiffs' Motion for Preliminary Injunction, their counsel filed a Motion to Seal allegedly confidential documents containing highly

sensitive information about the Quectel chips. (Doc. 43; Doc. 43-1 at 2 ¶ 1.) In that Motion, Plaintiffs ask the Court to appoint a "technical special master" under Federal Rule of Civil Procedure 53 to evaluate the alleged "complex technical risks" contained in confidential documents. (Doc. 43; Doc. 43-6.) Plaintiffs provided a list of "Key Responsibilities" for the special master, such as conducting a "thorough penetration testing" of the Quectel module remote and firmware update process, analyzing exploitable elements of those mechanisms, and writing "detailed reports to the Court on how these vulnerabilities could be leveraged to disrupt or gain control over the [Bodycams]." (Doc. 43-6 at 2.) Additionally, Plaintiffs task the Court to find a technical master with "top secret clearance" to access classified information related to security concerns. (*Id.*) Here, Plaintiffs essentially ask the Court to do their job by searching for and hiring an expert to analyze the Quectel chips to support Plaintiffs' claims. (Doc. 43 at 2 ¶ 3; Doc. 43-1 at 5–6 ¶ 10.) Their failure to do the testing eviscerates their claim of an actual and imminent threat because they have no reliable allegations.

The weakness of Plaintiffs' claims is compounded by their failure to submit evidence that, other than the units purchased on Alibaba, the Bodycams contain a Quectel chip. (Doc. 1 at 24–25 ¶ 13.) In fact, Defendant disputes the presence of Quectel chips altogether. In his affidavit, Axon Principal Security Engineer David MacDonald ("MacDonald") states that the Bodycam does not contain any chips designed, developed, or manufactured by Quectel. (Doc. 24-1 at 3 ¶ 3.) Rather, the chipset "in Quectel's module is designed, developed, and manufactured by Qualcomm Technologies, Inc. ("Qualcomm"), a respected American company." (*Id.*) This module, according to MacDonald, is distinct from a chip in that it is separate from the Bodycam's Qualcomm processor, and therefore, cannot access or decrypt any data stored or streamed on the Bodycam. (*Id.* ¶ 4.) Moreover, MacDonald states that the Bodycams do not receive Over-The-Air ("OTA") updates from carriers or non-Axon sources and only firmware containing Axon's digital signature and certificate are accepted by the Bodycams. (*Id.*) In its sur-reply, Defendant contends that, had Abhyanker removed the faceplate from the

Quectel module, he "would have seen another Qualcomm chip that looks very similar to the one in Plaintiffs' own images."  (Doc. 49 at 3; Doc. 25-2 at 8, 12.)  The record thus belies Plaintiffs' contention that any Quectel chip exists in the Bodycam.  Plaintiffs also peddle unsupported allegations about OTA and local firmware updates for the Bodycam.  Plaintiffs maintain that updates include code provided by Quectel in Shanghai, China and that Bodycam's user manual shows how such updates are carried out.  (Doc. 25 at 6–8 ¶¶ 9–16.)  Not only does MacDonald's affidavit directly contravene Plaintiffs' contention (Doc. 24-1 at 3 ¶ 4), the mention of "China," "Shanghai," and "Quectel" are absent from the Bodycam's user manual.  (*See* Doc. 25-14.)

Without evidence of the Bodycams containing the chips, and that the chips are susceptible to hacking, Plaintiffs cannot show that the CCP, Iran, or any other malicious actor could use the Bodycam to commit any of the acts Plaintiffs allege.  Thus, Plaintiffs' conclusion that "there is a clear and imminent threat posed by the use of [the Bodycams] . . . in politically sensitive environments" is patently unfounded.  (Doc. 25 at 8 ¶ 18.)  The Court already noted that no evidence was presented of an actual known threat.  (Doc. 23 at 2.)  Plaintiffs have not advanced additional evidence to show a known threat, and thus their allegations remain a mere "speculative chain of possibilities" that cannot establish an actual or imminent injury in fact.  *Clapper,* 568 U.S. at 410; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (noting that injuries in the abstract do not satisfy the injury prong).  Because injury, causation, and prevention or redress are all required to satisfy standing, the absence of one precludes invocation federal-court jurisdiction.  *See Warth v. Seldin*, 422 U.S. 490, 498–99 (1975) ("[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction." (citation omitted)).  Here, Plaintiffs cannot show they have suffered an injury, thus they fail to establish the requisite standing for their preliminary injunction.  *See Summers*, 555 U.S. at 493.

Despite Plaintiffs' failure to show that they suffered an injury, the Court briefly discusses both the causation and redress elements of standing.  For causation, Plaintiffs

assert that Defendant's inaction, i.e., its failure to do disclose the presence of Quectel chips in the Bodycams, resulted in their alleged injuries.  (Doc. 1 at 83 ¶ 216; Doc. 25 at 8 ¶ 17.) Causation requires a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.  This element is concerned with ensuring that the injury is "fairly ... trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.*  As discussed, Plaintiffs have not shown that all Bodycams contain Quectel chips.  Even if each Bodycam did contain a Quectel chip, Plaintiffs have not shown that malicious actors can hack the chips to access sensitive information.  Thus, Plaintiffs cannot show how Defendant's failure to disclose any danger of Quectel chips to law enforcement caused Plaintiffs' alleged injuries.

For redress, Plaintiffs merely state that their claims are "grounded in well-recognized legal principles" entitling them to "seek redress for harms suffered." (Doc. 25 at 8–9 ¶ 18.)  Redressability means it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by a favorable decision. *Lujan*, 504 U.S. at 560–61. Plaintiffs seemingly do not afford much argument as to how a favorable judgment from this Court would ameliorate the alleged "imminent national security risks."  (Doc. 2 at 2 ¶ 3; *see also* Doc. 25.)  Again, Plaintiffs have not established the presence of Quectel chips or the danger resulting therefrom.  Thus, granting Plaintiffs' injunction would functionally do nothing to protect national security, but would conveniently prevent Defendant from keeping its Bodycam on the market.

Ultimately, Plaintiffs cannot establish a single prong of the requirements for Article III standing for the requested relief in their Motion (Doc. 2).

### C. Defendant's Request for an Order to Show Cause

In its response to Plaintiffs' Motion, Defendant's ask the Court to issue an Order to Show Cause as to why Plaintiffs should not be sanctioned for filing a frivolous motion. (Doc. 24 at 14.)  Plaintiffs contend that Defendant's request is an attempt to intimidate and silence Plaintiffs.  (Doc. 25 at 11.)  Plaintiffs maintain that their Motion was neither

frivolous nor baseless but is grounded in legitimate security concerns.  (*Id.*)

Federal courts have certain "inherent powers . . . to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630–631 (1962); *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017) (reaffirming this principle). That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991).  Legally frivolous or factually misleading filings are sanctionable under Rule 11(c).  *Ringgold-Lockhart v. County of Los Angeles*, 761 F.3d 1057, 1065 (9th Cir. 2014); *Truesdell v. S. Cal. Med. Grp.*, 293 F.3d 1146, 1153 (9th Cir. 2002) ("Plaintiff's complaint was sanctionable because it was both legally frivolous and factually misleading.").

As Defendant notes, it is not unusual to issue a show cause order in a nascent case. (Doc. 24 at 15); *Oladiran v. Suntrust Mortg., Inc.*, No. CV-09-01471-PHX-GMS, 2010 WL 728993, at *14–15 (D. Ariz. Feb. 26, 2010) (issuing a show cause order pursuant to Rule 11(c)(3) because it the court's "duty to . . . dispose of clearly frivolous claims as early as that may be accomplished").  Here, some of Plaintiffs filings are their Complaint (Doc. 1), Emergency Motion for Preliminary Injunction (Doc. 2) accompanied by additional attachments (Doc. 16), a Reply to Defendant's Motion in Opposition to the Injunction (Doc. 25), and a Motion to Seal (Doc. 43) accompanied by attachments (Doc. 45).  Absent in these filings is any explanation—expert affidavits, reports, or other material evidence—of how the CCP or Iranian government may be able compromise national security by hacking the Bodycams.  Nevertheless, Plaintiffs filed an "Emergency Motion" on the very basis that national security was at risk (Doc. 2).  After the Court found that no known risk existed (Doc. 23), Plaintiffs continued to submit filings with the Court bereft of evidence that would legitimize their claim.  Consequently, the Court will order a show cause hearing for why Rule 11(c) sanctions should not be imposed against Plaintiffs.

**IV.   CONCLUSION**

Accordingly,

1      **IT IS HEREBY ORDERED** denying Plaintiffs' Motion for Preliminary Injunction

2 (Doc. 2).

3      **IT IS FURTHER ORDERED** that Plaintiffs and Defendants shall attend an in-

4 person show cause hearing on **October 21, 2024 at 10:00 a.m.** (45 minutes allowed) to

5 determine whether sanctions should be imposed.  Plaintiffs' counsel should be prepared to

6 justify the filing of the "emergency motion" absent any actual testing of the Bodycams and

7 repeated allegations that a Quectel "chip" is used in the Bodycam.

8      Dated this 18th day of September, 2024.

Honorable Susan M. Brnovich
United States District Judge

- 11 -