**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

GovernmentGPT Incorporated,  )
                             )    No. 2:24-cv-01869-SMB
        Plaintiff,           )
                             )
        vs.                  )    Phoenix, Arizona
                             )    October 21, 2024
Axon Enterprise,             )    10:04 a.m.
Incorporated, et al.,        )
                             )
        Defendants.          )
_____)


**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**SHOW CAUSE HEARING**


Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

For the Plaintiff:

RAJ ABHYANKER PC
By:  **Mr. Raj Abhyanker, Esq.**
1580 W El Camino Real, Ste. 10
Mountain View, CA 94040

LEGALFORCE RAPC WORLDWIDE PC
By:  **Mr. Spencer R. Keller, Esq.**
446 E Southern Ave.
Tempe, AZ 85282

For the Defendant:

AXON ENTERPRISE INCORPORATED
By:  **Ms. Gayathiri Shanmuganatha, Esq.**
       **Ms. Pamela B. Petersen, Esq.**
17800 N 85th St.
Scottsdale, AZ 85255

PAPETTI SAMUELS WEISS MCKIRGAN LLP
By:  **Mr. Charles W. Steese, Esq.**
16430 N Scottsdale Rd., Ste. 290
Scottsdale, AZ 85254

**P R O C E E D I N G S**

COURTROOM DEPUTY:  On the record in civil docket 24-1869, GovernmentGPT Incorporated versus Axon Enterprise Incorporated.  This is the time for a show cause hearing.

Counsel, please announce for the record.

MR. ABHYANKER:  Raj Abhyanker for the plaintiff.

MS. SHANMUGANATHA:  Good morning, Your Honor.  My name is Gayathiri Shanmuganatha, and with me I have Chuck Steese and Pam Petersen for Axon Enterprising.

MR. ABHYANKER:  Your Honor, we also have a second attorney who has withdrawn, but he's here for this hearing.

THE COURT:  Okay.

MR. ABHYANKER:  Announce yourself, Mr. Keller.

MR. KELLER:  Spencer Keller for the plaintiff.

THE COURT:  Okay.  And we're here for a show cause hearing as to why sanctions shouldn't be imposed based on the preliminary injunction pleadings.

Counsel for plaintiff.

MR. ABHYANKER:  Yes, Your Honor.  May I present from the --

THE COURT:  Yes.

MR. ABHYANKER:  Thank you.

So I've prepared some demonstrative exhibits for you so you can kind of follow along why we brought this motion. And without waiving work product privilege, I want to kind of

1    go through that.

2         I also have Mr. Patrick Gibbons here who is willing

3    and ready to testify.  And I do realize that we didn't attach

4    his declaration, and for that reason the emergency motion is

5    denied, but he's willing to testify here in camera for top

6    secret-related information, as well as, potentially, if

7    necessary, but even in open court, just as a general overview.

8         But first I want to point out one of the things in

9    your show cause order is that the attachments we did provide

10   was bereft with evidence, but I draw your attention, Your

11   Honor, to ECF 42, which is portions of it which are exploded

12   here.

13        Spencer, maybe you can help point things out.

14        But in this, this is a -- an author of this research

15   paper is Charlie Parton.  He's a former advisor to the U.S.

16   Embassy in Beijing, spent 22 of the last 27 years in China, and

17   he is part of the EU Delegation in Beijing, was the first

18   consular advising the EU in member states and how China's

19   politics may affect their interests.

20        And in this research paper it describes Quectel

21   specifically.  This is a 2023, February, paper that we first

22   suspected might have Quectel chips, or Quectel modules.

23   They're really a module, which is a collection of chips.  And

24   in this paper it described:  Quectel's in the final stages of

25   developing custom-built designs for Axon.  And it's a, kind of

1    a callout under a section which talks about national security

2    threats.  And, specifically, the article describes four

3    national security threats of having Quectel modules in devices

4    in body cameras, as well as other devices, specifically with

5    that callout with respect to body cameras.

6          And it describes sustained collection and misuse of

7    personal information without consent, the potential for the CCP

8    security organizations that carry out detailed surveillance

9    within our societies as two of those main reasons that he

10   pointed out as a national security threat.

11         And the next kind of demonstrative exhibit --

12         If you could put that up, sir.

13         -- is an exploded view of the Axon Body 4, which I

14   have a number of units here.  These are not just the ones

15   purchased in China, but also ones purchased right here in the

16   United States.  And we have disassembled them as well and

17   confirmed the presence of Quectel modules in those body

18   cameras.

19         But we can talk about specifically the device itself

20   has -- and this is a disassembled -- there is five body cameras

21   at least here, perhaps six.  This is a disassembled Axon Body

22   4, and there is two versions of it, one with the Quectel module

23   here.  It looks like a chip.  You can't just take it off.  It

24   doesn't just pop out.  But you can, you know, with the right

25   tool, take off the faceplate.  And under the faceplate there is

1    a whole bunch of chips underneath it.

2          And those chips they illustrate here, are a whole

3    bunch of different chips.  There is not just the Qualcomm chip.

4    And you can look at it if you'd like.

5          If I can approach the bench, I could hand you this if

6    you'd like.

7          THE COURT:  Counsel, have you seen it?

8          MS. SHANMUGANATHA:  No, Your Honor, but I have no

9    objections.

10          THE COURT:  Okay.  Can you grab that from him?

11          And this photo that you're showing me, is this

12    something that was in the pleadings or is this new?

13          MR. ABHYANKER:  For the sake of not misspeaking, I

14    don't recall it being in the pleadings or not, but it's here

15    before you now.  And this exhibit is prepared specifically for

16    this hearing.  So this was not before you before.  We have

17    given a, kind of the demonstrative exhibits that we wanted to

18    show here to opposing counsel prior to this hearing now.

19          But the faceplate, effectively, once it's removed --

20    this is an exploded view of the faceplate.  There are some

21    chips that are Qualcomm.  There are some chips that are

22    unidentified underneath the faceplate.  So this Quectel module

23    includes a collection of chips, and it's unidentified what

24    those chips are.  In fact, in their own filing they did not

25    identify what those chips are.

1           This is an exploded view of what the module

2   effectively is.  It is a PCB, a printed circuit board, that has

3   chips that are embedded and organized thereon.  Primary

4   processing chip, I understand, is Quectel.  There are other

5   chips that surround it, the gateway that provides LTD and 5G

6   access to the other chips as well, some of which were made in

7   Taiwan, some of which are unidentified where they're made.  So

8   that's the purpose of this exhibit.

9           This also -- bring to your attention, these are a

10  variety of Axon Body 4s that are not disassembled.  This is

11  a -- one of which is a fully functional body camera which is

12  purchased just recently, it's brand new, so that the -- the

13  packing on it -- it's purchased on eBay because we can't buy

14  them directly.  It's the only one we're able to buy from

15  Kansas.  It has a message which describes that it's operational

16  but it cannot be activated until it's docked.  It's currently

17  operational.

18          These are the three that we purchased from -- two of

19  which we purchased from China, one is also purchased here.  I

20  don't know exactly where.  These are all Axon Body 4s.  All of

21  them have Quectel modules.  If we went outside and talked to a

22  Phoenix Police Department and took his body camera, it would

23  also have this same module identified as a potential national

24  security issue by this particular researcher that we attached

25  to this exhibit.  So I can hand this to you as well.

1          So just for comparison, I'm handing you a brand new

2    Axon Body 4 purchased from Kansas.  This one is one from China

3    so...

4          Can you put the next exhibit up?

5          So the Axon Body 4 that I've handed you that's

6    currently battery powered and operational has a message dock

7    device or connect to view XL.  The reason it says that is

8    because the camera is basically a paperweight, as they've told

9    us in the pleading, until you activate it.  So it's impossible

10   for us to effectively penetration test it unless we have a

11   subscription to Evidence.com, because it's not activated.

12         So the camera must be -- this is from the Axon Body

13   Worn 4 manual -- it must be registered by your agency before it

14   can be assigned to users.  So I can't penetrate test it unless

15   I break federal law.  Unless I basically hack into a police

16   department or law enforcement agency, that's the only way I can

17   test the ability to live stream from that camera to

18   Evidence.com.

19         So it was -- your question, one of the things in your

20   show cause order is why we couldn't test it before bringing

21   this motion.  And I'm fully prepared to test it.  In fact,

22   if -- we had asked Axon -- so if you look at the next exhibit

23   there, it was not a lie that we were saying, you know, we are a

24   security testing company.  We, in fact, do that, both for U.S.

25   national security, and through initiatives that we take on our

1    own.

2         We had requested, as you see in exhibit to this --

3    which we attached to the motion of their opposition, we had

4    asked for ten body cameras with subscription to Evidence.com.

5    We asked for this back in January.  We were denied this.  If

6    you look at the Axon website, there is a section on there for

7    security researchers, which denies the ability for private

8    security researchers to access these cameras for testing.

9         So if you give me a court order, Your Honor, that

10   allows me to get a subscription to Evidence.com, I can

11   penetrate test this.  I'll hire the best people I can.  But

12   absent that, I have to basically go through another legal

13   process to get a police department to agree and cooperate to

14   secure a court order.  And that's the only way to penetrate

15   test this is if they give me the subscription to Evidence.com,

16   which we requested and were denied.

17        So let's go to the next -- now, I should also explain

18   why this antitrust case has national security portions in it.

19   And I saw that part of your motion.  I am a plaintiff in my own

20   personal capacity.  We filed this complaint two weeks after the

21   assassination attempt on President Trump where we've been

22   researching these things.  And we had discovered this risk

23   months before.  Axon wasn't willing to take any actions on it.

24   We proactively asked them to.  We also asked for Evidence.com.

25   They didn't deny -- they denied us that ability.

1          So to the extent we can get an order to, you know,

2    either now, or if this case proceeds to discovery, that will

3    allow us the ability to penetrate test it, we will be doing

4    that extensively with the best researchers that we can find.

5    And we are very confident that we can at least come to a

6    conclusion on its security.  And that includes depositions of

7    Quectel people that they've now attached exhibits in their

8    declarations to.

9          But absent making a -- committing a federal -- state

10   crime to hack into police evidence records, there is no way I

11   could penetrate test this to live stream whether I can hack

12   into it and allow someone to have some firmware update to the

13   Quectel module or some kind of other subassembly inside of it

14   which will allow me to access that camera footage from an

15   unauthorized source.

16         I also am a plaintiff in my personal capacity.  I'm

17   not -- at least in the initial complaint when we brought this

18   motion, so I'm not a competitor in that way.  So I believe that

19   our elections were under threat, and I had reasonable belief to

20   think that.

21         As I mentioned before in the complaint, and you are

22   correct, we didn't attach their declarations, that I understand

23   your rationale of why the motion was denied, but we have -- I

24   had talked to two individuals before, even talking to Axon

25   about this threat and whether it makes sense, one of which is

1   Fred Addy.  He's a former Green Beret.  He's a Stanford GSB MBA

2   student, president of the Veterans' Club.  He invented and

3   fielded communications to defend against electronic warfare and

4   threats.  He's a Special Forces soldier.  He's a decorated

5   Special Forces soldier who battled ICIS.  He's a JTAC who had

6   the authority to order drone attacks.  And he told me this risk

7   is real.  I have a reasonable belief to rely on those such

8   individuals.

9          Secondly, one of our cofounders is a Patrick Gibbons.

10  He's a Masters of National Security and Strategic Studies from

11  the U.S. Naval College.  He's a class counselor for the FBI

12  National Academy in Quantico.  He's a 27-year veteran of the

13  FBI as a supervisory special agent, GS-15.  He was stationed

14  abroad, as well as in the United States and Asia and Europe and

15  Middle East, all over, and in the criminal and counterterrorism

16  sides of the FBI.

17         He was in the U.S. embassies around the world,

18  including Jerusalem, Vietnam, Saudi Arabia, Cambodia, and

19  Vietnam.  Vietnam is twice, I'm sorry.  He's also the former

20  FBI police chief for the FBI police unit.  A lot of people

21  don't know the FBI has a police unit, but they have police that

22  guard U.S. secure facilities.  And he was responsible for

23  physical security at five U.S. facilities, including the FBI

24  national headquarters, all containing top secret information.

25         In fact, just last night before flying here

1  Mr. Gibbons met with Christopher Wray who is in this amended

2  complaint.  And he's here from Boston directly on a flight

3  about an hour ago to talk to you, if you'd like, about the real

4  threat this poses.

5          Secondly, aside from these two individuals, I talked

6  to numerous members of Congress, including Ro Khanna, who I'm

7  meeting with tonight, who is on the CCP committee for China,

8  and who I met a number of times prior to bringing this action,

9  as well as before talking to -- to Axon.  We've talked -- and

10  this is -- this is not just recent.  It's not just tonight I'm

11  meeting with him.  I met him in January.  I met him in the end

12  of May.

13          I also met with other congressmen, including

14  granddaughter Sara Jacobs of the Quectel founder of California,

15  informed her about the risks here.  None of them told me that,

16  hey, this is not important, you shouldn't bring it up.  In

17  fact, even in preparation for this hearing, I've apprised

18  members of the staff of Congress.  So this is not a matter to

19  be taken lightly.

20          And if you'd like, Mr. Gibbons is here, and he can

21  testify for you in camera or in public, whether you --

22  whichever one you prefer.

23          THE COURT:  Okay.  Let me hear from defense.

24          MR. GIBBONS:  Good morning, Your Honor.  Patrick --

25          THE COURT:  No.  No.  I'm sorry.  I'm asking to hear

1    from defense.

2            MR. ABHYANKER:  Okay.  Sounds good.

3            THE COURT:  So you can have a seat.

4            MS. SHANMUGANATHA:  Mr. Abhyanker, do you want to take

5    your devices and stuff?  Your phone's here.  And do you want to

6    disconnect your camera?

7            MR. ABHYANKER:  Sure.

8            MS. SHANMUGANATHA:  Your Honor, may I project my

9    presentation to the screens?

10            THE COURT:  Yes.

11            MS. SHANMUGANATHA:  Good morning, Your Honor.  I want

12    to start by addressing the fact that plaintiff's presentation

13    did not identify, or address, or deal with either of the topics

14    identified in Your Honor's order.

15            First, Your Honor ordered them to justify why they

16    repeatedly allege there were Quectel chips in the AB4, and Your

17    Honor asked them to justify why, without doing any evidentiary

18    testing or providing any evidentiary support, they claimed that

19    the AB4 was hackable and warranted an emergency motion.  They

20    failed to even justify the two conducts that were identified in

21    Your Honor's motion.

22            Sanctions in this case is warranted against plaintiffs

23    and their counsel.  It's important, Your Honor, to remember

24    that the conduct was not limited to just one pleading or a

25    discrete filing.  Rather, over the course of eight separate

1    filings and motions, spanning 22 separate documents, plaintiffs

2    allege the false claim that there are Quectel chips in the AB4

3    module, and that the AB4 can be hacked.

4        Your Honor, the narrative that plaintiffs were pushing

5    was not inconsequential.  They argued that every local, state,

6    and federal law enforcement officer wearing an Axon Body 4

7    camera was compromised.  In fact, today they claim that they

8    filed this lawsuit two weeks after the assassination attempt on

9    President Trump, somehow drawing a connection between the

10   assassination attempt and Axon's products.  These claims were

11   not brought out of mere negligence or inadvertence, but rather

12   they were brought in bad faith.

13       That's why Your Honor noted that plaintiff's

14   injunction functionally would do nothing to protect national

15   security, but rather would conveniently keep Axon's body cams

16   from the market.  This is why Axon seeks sanctions for the bad

17   faith by awarding its fees and costs, striking the unsupported

18   allegations that the Quectel component is hackable, and any

19   other sanctions deemed just and appropriate by the Court.

20       Your Honor, I want to talk a little bit more about the

21   bad faith.  So let me talk about the players here.  Plaintiffs

22   and their counsel are sophisticated parties.  They admit that

23   they have the expertise necessary in order to test the very

24   claims they were advancing.  They submitted that they

25   specialize in body worn cameras, that they have an engineering

1    team with expertise in design and mechanical engineering, and

2    that they're advised by experts in AI chip manufacturing.

3          Mr. Abhyanker submitted a declaration saying he has

4    degrees in electrical engineering, business administration, and

5    a JD; he's the owner of GovGPT and the law firm representing

6    it; that he specializes in cyber security, as well as

7    communications engineering.

8          They also acknowledge that in order to assess the

9    security of a device, the assessment must be a holistic one.

10    You need to look at the overall security of a module, its

11    design process and implementation in order to determine whether

12    it's secure or not.

13          More importantly, Your Honor, they admit they had four

14    Axon Body 4 cameras in May of 2024, and they had the ability to

15    disassemble it.  So they had our cameras, they broke it down,

16    they had the experts who would understand what they were

17    seeing, and they claim to have the expertise to test those

18    products.  They also had the time, Your Honor.  They didn't

19    file their claims until July 29th, so they had three months to

20    test the veracity of their allegations before they brought it

21    before this court.  But did they do it?  No.

22          They admit that they still have not tested the AB4

23    module or determined whether there are any vulnerabilities.

24    Yet they filed pleadings with this Court asserting that the AB4

25    contains Quectel chips and that the module was hackable.  In

1    fact, they claimed that there were documented risks associated

2    with the use of the Quectel chips in the AB4 cameras.  But to

3    date they have not produced this document, let alone any

4    documents identifying vulnerabilities with the AB4, even at

5    today's order to show cause hearing.

6         The bad faith is better illuminated by looking at what

7    plaintiffs did after filing and the improper purpose behind

8    their filing.  And that's best determined by looking at their

9    social media.

10         Shortly after filing the complaint and emergency

11   motion, they posted it on LinkedIn.  And they excitedly claimed

12   that they filed the emergency motion to remove AB4s from the

13   law enforcement, falsely promoted the claim that there were

14   Quectel chips, and, again, falsely promoted the claim that the

15   AB4 was hackable.  Both GovGPT and Mr. Abhyanker posted this.

16   And, Your Honor, I have all of their LinkedIn posts, and I can

17   provide it to the Court at the end of my arguments.

18         In addition to filing the complaint, they sought an

19   order from the Court for an expedited hearing.  In ruling on

20   this request, Your Honor, you gave them their first warning.

21   You noted that after reading the complaint and the emergency

22   motion, there was no evidence of an actual threat.  In sum, the

23   Court told plaintiffs and their counsel:  I need evidence, not

24   speculation, not conjecture.  But plaintiffs were undeterred

25   and continued their campaign to embarrass Axon.

1              On August 5th, Mr. Abhyanker told the news media in an
2    article titled:  2024 Election Security in Jeopardy, Emergency
3    Motion Filed Against Use of Axon Cameras.  Mr. Abhyanker
4    claimed that Axon knew there were AB4 -- there were Quectel
5    chips in the AB4, that the AB4 was hackable, yet Axon didn't
6    care and didn't want to deal with the problem.  That was a
7    narrative he was advancing, Your Honor, that Axon didn't care
8    about its device integrity.  And this, as Your Honor knows,
9    couldn't be further from the truth.

10             On August 7th, we filed our robust opposition.  In it
11   we attached declarations from two separate experts, and we
12   explain to plaintiffs there are zero Quectel chips in the AB4,
13   and we also educated plaintiffs on the holistic approach we
14   took to AB4 security.  We told them we vetted the Quectel
15   supplier.  We told them about the layered design architecture
16   within the AB4.  We told them we continuously monitor the
17   Quectel supplier.  We run every line of code through Finite
18   State's platform.

19             Given the mountain of information Axon had provided, a
20   reasonable attorney would have taken a moment, reviewed the
21   information, and questioned whether the claims he was advancing
22   had evidentiary support.  Did plaintiffs and counsel do that?
23   No.  Just 17 hours later they filed their reply in support of
24   the emergency motion.  17 hours, Your Honor, that's all the
25   time they allocated to read Axon's motion and to draft and file

1    their reply.  A reply that did not contain a shred of

2    evidentiary support, despite the Court's August 2nd order; a

3    reply that did not say that the Axon security architecture was

4    insufficient; a reply that continued to propound falsehoods and

5    unsupported claims.

6           For example, they claimed that there was undeniable

7    photographic evidence of a Quectel communication chip in the

8    AB4.  This is also when Mr. Abhyanker submitted his declaration

9    saying he discovered the chip on May 11th, and touted his

10   experience as a communications engineer to give credence to the

11   claim, but we now know this was false.  There is no credible

12   reason why an expert in communications engineering can't tell

13   the difference between a faceplate and a collection of chips.

14          They also created evidence instead of providing some.

15   If Your Honor will recall, they claim that the AB4 user guide

16   explicitly described and provided visual confirmation that

17   firmware updates are at least partially pushed and controlled

18   from Shanghai.  As Your Honor noted, the AB4 user guide did not

19   contain the words:  China, Quectel, or Shanghai.  They,

20   themselves, admit their claims were false.

21          After filing this hastily drafted reply, Mr. Abhyanker

22   continued to post on LinkedIn.  On August 13th he posted that

23   he uncovered critical vulnerabilities in the Axon Body 4

24   camera, a camera he now admits he hasn't tested.  He claims

25   that there was still abilities for the chips to be hacked and

1    for the AB4 to be vulnerable.

2        But it didn't stop there.  On August 15th Politico

3    picked up plaintiff's filings and they filed an article:  Ahead

4    of DNC, Suit Aims to Ban Police Body Cams With Chinese Chips

5    From Political Events.  Unsurprisingly, plaintiffs posted about

6    it on LinkedIn.  They said that the national security risks

7    were embedded into Axon technology, vis-à-vis the Quectel

8    chips, and continue to promote the same untested, unsupported

9    false claims.

10        After the emergency motion had been fully briefed and

11   we had met with Your Honor on August 20th, plaintiffs continued

12   to file motion after motion in order to try and prop up their

13   emergency motion, for example, the motion to appoint special

14   master and the motion to stay ruling on the emergency motion.

15   All of these motions unnecessarily expanded this case, did not

16   offer an iota of evidentiary support for their claims, and

17   needlessly increased Axon's cost of defense.  Despite all of

18   their attempts, on September 18th Your Honor denied the

19   emergency motion and brings us to today.

20        The robust record shows that plaintiffs and their

21   counsel knowingly, recklessly, and in bad faith abused the

22   judicial system for an improper purpose, namely, to do harm to

23   one of their competitors by perpetuating false, unsupported,

24   and untested claims.  The rules, statutes, and the Court's

25   inherent authority allows Your Honor and authorizes Your Honor

1    to sanction plaintiffs and their counsel for the misconduct.

2            Section 1927 allows Your Honor to sanction them for

3    unnecessarily expanding the scope of these pleadings.  A

4    finding of bad faith or knowing or reckless conduct is

5    necessary.  And given the number of pleadings that were filed

6    with a false claim about Quectel chips and untested claims

7    about AB4 vulnerabilities, 1927 sanctions are warranted.

8            Your Honor's inherent authority allows you to fashion

9    sanctions to prevent the abuse of the judicial system.  As Your

10   Honor noted in the order, the purpose -- or the claimed purpose

11   of the emergency motion was to protect national security, but

12   there was no evidence and there was no legal standing, and the

13   asked-for order would not have protected national security, but

14   would, rather, have conveniently hurt an alleged competitor,

15   Axon.  The bad faith purposes for these filings and the motions

16   are illuminated as a result of the fact they could not justify

17   why they filed the claims that they did.

18           Finally, Rule 11(c) authorizes Your Honor to issue

19   sanctions against plaintiffs, an attorney, or a law firm, for

20   any violations of Rule 11(b).  And we've demonstrated that

21   despite the time, expertise, knowledge, and information, time

22   and time again plaintiffs and their counsel chose not to

23   conduct a reasonable investigation before filing their various

24   documents.  They filed the documents for an improper purpose.

25   They didn't have standing to pursue these claims, and they had

1    no evidentiary support for the claims that were advanced.  This

2    is why we're asking Your Honor, in addition to fees -- sorry.

3    Let me go back for a second.

4         Rule 11 sanctions are meant to be narrowly tailored to

5    deter misconduct in the future.  Though Your Honor had issued

6    two separate orders, the findings in those orders have not

7    deterred plaintiff's counsel to date.  On August 2nd Your Honor

8    issued an order saying:  There is no evidence of an actual

9    known threat, yet motion after motion was filed with zero

10   evidentiary support.

11        Your Honor's September 18th order was a little bit

12   more pointed.  You found that they peddled claims about OTA

13   updates.  Their failure to do testing eviscerates their claims

14   of an actual threat.  And they failed to show causation,

15   because there is no evidence that the AB4 is hackable.

16        Despite Your Honor's order, four days later they filed

17   an amended complaint peddling the same untested, unsupported

18   claims about vulnerabilities in the AB4.  All they did was swap

19   chip for module.

20        This is why, Your Honor, another sharply worded order

21   is not going to deter plaintiff's and their counsel's conduct.

22   That's why we're seeking fees and costs pursuant to Section

23   1927 and the Court's inherent authority, and an order striking

24   the unsupported allegations.

25        Your Honor, I want to talk a little bit about some of

1    the claims that plaintiffs have said.  They admit that they

2    haven't tested it and they said Axon denied them from testing

3    the products.  But when they approached Axon for the AB4, they

4    claimed they had ten members in their agencies and wanted to

5    purchase it for a private security company.  But then they're

6    asking:  Well, Your Honor, we filed this lawsuit so we can do

7    the testing.  That's the very definition of a fishing

8    expedition.

9           Plaintiffs, a claimed competitor of Axon, has filed a

10    baseless lawsuit in order to gain discovery about Axon's

11    internal workings.  Moreover, in their arguments they admit

12    there are no Quectel chips, we haven't done testing, but we

13    want to in order to determine whether there are any

14    vulnerabilities in the AB4 because I am worried about our

15    national security, but that's not a basis to file a lawsuit.

16           You need to have evidentiary support of an actual

17    threat before you sue your opponent and competitor.  They

18    didn't sue Congress because they failed to take action about

19    their concerns about Quectel.  Rather, they sued a competitor

20    to try and embarrass them, harass them, and get them out of the

21    way for the improper purpose of promoting themselves and their

22    claims.  This is why sanctions for bad faith are warranted.

23           Thank you, Your Honor.

24           THE COURT:  Okay.

25           MR. ABHYANKER:  Permission to respond, Your Honor?

1              THE COURT:  Yes.

2              MR. ABHYANKER:  So, Your Honor, she's correct, I'm an

3    engineer, I'm not an artful litigator.  And I apologize, I'm

4    trying my best to litigate a matter and run a startup.  And I

5    could have written things differently, I do agree.  And I

6    apologize for that.  I took great efforts to the first amended

7    complaint that we have here to minimize anything that was

8    not -- not clearly laid out as to the factual evidence.  The

9    complaint that we have now before you still includes

10   allegations of this Quectel module with respect to our Lanham

11   claim, the false statements therein.

12             The other thing she mentioned is we didn't do any

13   testing, but that's not exactly true.  The Quectel module

14   itself -- and some of this we still have as work product

15   privilege, but I want to kind of explain to you the history of

16   why this came to us.

17             So we are developing a tactical vest that detects

18   threats.  We were in the market for cellular IoT devices.  I

19   went to CES this year where I met Quectel on January 12th.  And

20   we have engineers on our team that are very familiar with

21   Quectel and they can do over-the-air updates.  So it's not

22   quite the same as saying somehow they're hackable.

23             There is no ambiguity in the manual that you have or

24   other things which describe that it has the ability to do

25   over-the-air updates.  And we know that to be true.  We know

1    that to be true from the manual itself.  We know that to be

2    true from our meeting with Quectel at their booth at CES.

3              THE COURT:  I'm sorry.  Are you talking about Quectel

4    or Axon?

5              MR. ABHYANKER:  So this is a particular --

6              THE COURT:  No, your meeting.

7              MR. ABHYANKER:  With Quectel.  It's a component.  It's

8    a component that's used in our products, as well as other

9    products that we could use.  And the component is a cellular

10   IoT device.  There are many manufacturers of that device.  So

11   we were concerned about the security of that module, but we

12   weren't sure that it's in the Axon camera.  We were concerned

13   with -- we were looking through components for our own product.

14   So we had -- the fact is we did not know that module is inside

15   of Axon Body 4s until May, but prior to May we've been looking

16   for the same type of component for our competitive product.

17   And we had talked to Quectel to determine that there -- after

18   reading the issues from Congress and the CCP committee, that

19   this is a concern.  So we brought it up.  And we knew that that

20   concern existed.  We did not know that concern manifested for

21   sure in Axon Body 4s.

22             The other thing that she mentioned is why did I

23   maintain this case?  So after your initial order, why did I

24   continue, just not dropping this emergency motion voluntarily?

25   And the reason for that is because there is numerous members of

1    the House CCP committee that actually met with me and talked

2    with me on conference calls for hours on end, in fact, even up

3    to this meeting.  And they told me that I'm doing a good thing.

4    They basically recognized there is a risk with these types of

5    Quectel modules, that we are trying to discover that risk.  And

6    I felt, as a person who is concerned about our security of our

7    country, that this was the right -- right thing to do.

8            And I, again, I did not artfully write this.  I did

9    not -- if I had to do it again, I would have attached a

10   complaint with a -- with a declaration, but, you know, I did

11   not mean harm from it.  I --

12           THE COURT:  With a declaration that would say what?

13           MR. ABHYANKER:  Well, the declaration would just

14   support my -- if the declaration was Mr. -- if Mr. Gibbons, and

15   Mr. Addy would have helped, that I have as an attorney a

16   reasonable belief in something that I'm bringing.

17           I think there is a confusion between module and chips.

18   She mentioned that, you know, I -- the module inside does not

19   only have U.S. made chips.  There are chips in there made by

20   the People's Republic of China.  And I don't think that she

21   could deny that.  If you look at that chip that is on that, one

22   of those chips before you in physical form is the ESMT chip

23   which is made in Taiwan.  And so I agree that I, perhaps, could

24   have worded this differently and brought this differently,

25   but --

1          THE COURT:  You just said in your opening statement

2     that these were unidentified chips.

3          MR. ABHYANKER:  They are unidentified chips, not all

4     of them are identified.  Some of them are from Qualcomm, some

5     are not identified, but there is an ESMT chip which has a label

6     on that directly.  If you look that up, directly up right now,

7     it is a chip that's made in the People's Republic of China and

8     Taiwan.  And so it's not true to say they're all Quectel chips.

9     There is a whole bunch of other smaller chips underneath

10    there --

11         THE COURT:  But you don't have any evidence that there

12    is a Quectel chip?

13         MR. ABHYANKER:  Well, an integrated circuit board is

14    what I called a chip, an integrated circuit board having chips

15    thereon.  I should have called it a module, Your Honor.  I

16    apologize.  But it doesn't change the nature of the risk that I

17    identified and...

18         THE COURT:  Okay.  I'm sorry.  Anything else?

19         MR. ABHYANKER:  No, Your Honor.

20         THE COURT:  Okay.

21         MS. SHANMUGANATHA:  Your Honor, a brief rebuttal?

22    Brief one, Your Honor.

23         THE COURT:  Okay.

24         MS. SHANMUGANATHA:  Mr. Abhyanker was just talking

25    briefly about Quectel being able to push OTA updates, however,

1   in Doc. 39, paragraph 8, he admits that it is undisputed that

2   firmware updates are indeed pushed by Axon to the AB4 cameras.

3   So any claims about what Quectel could do for other customers,

4   which we absolutely dispute, are irrelevant, because they admit

5   that Axon and only Axon pushes those updates.

6          MR. ABHYANKER:  The risk doesn't change just because

7   Axon can push those updates.  It's anything that's over the air

8   that has the ability to do that.  That's why we chose not to

9   use Quectel modules in our devices.

10         So I think the failure to warn police departments is

11  the risk, and, again, I apologize for inartfully writing this.

12         THE COURT:  But you have -- okay.  Well, you've

13  essentially answered the question.  You don't know that Axon 4

14  Body Cameras can be hacked; you rely on possibilities; your

15  conversations, which I'm not privy to; your belief, but you

16  don't have any evidence of it, correct?

17         MR. ABHYANKER:  I have evidence that the module that

18  enables the live streaming is capable of having updates and

19  streaming from the device to remote locations through the

20  internet.

21         THE COURT:  Despite their evidence in response of

22  their company's efforts to prevent that.

23         MR. ABHYANKER:  So their company is a -- is a systems

24  provider.  They don't make the actual module.  The module that

25  enables the communications to -- to live stream from the device

1    outward is not something that they can control, even despite

2    their best efforts.  So while they can sit here and tell you

3    they can, yes, update it, they're the only ones that update it.

4    That's their choice.  It's not the risk that poses from

5    national security of having an entity in China which is funded

6    by the U.S. military, that the U.S. Congress has identified,

7    have the ability to make that update.

8         And that is the risk that we're trying to identify and

9    the risk we're trying to prevent, because this is an important

10   election.  This is a critical election.  I'm a citizen.  I

11   believe in this country.  And I believe that risk was real.

12   And I trust the people around me, one of which is here today,

13   before bringing this.  And it's not -- there is no dispute -- I

14   don't think they can dispute that they have the ability to live

15   stream from that camera to a remote location.  And they have no

16   ability to dispute that that live stream occurs because of this

17   Quectel module.  If you removed that module from this device,

18   it could not live stream anymore.

19        And the risk that I'm identifying is a manufacturer

20   who can then use the internet, the IP addresses are being

21   controlled from the internet, has the ability to hack into that

22   device.  And that is proven, not just for this particular body

23   camera today, but for many other devices.  And the FBI, just

24   two, three weeks ago identified 260,000 devices which are using

25   cellular IoT devices that were being hacked.  And there is Salt

1  Typhoon, that is the name that the FBI has placed on it, with a

2  special team whose job is to investigate these types of risks.

3  So it is not the fact that I can show the CCPs is actually

4  hacking this device, what I'm showing is that there is an

5  existent risk that requires a duty to warn.

6       I can also show that this module that exists, that we

7  did actually try to consider for our own company, has the

8  ability and controls that live stream.

9       THE COURT:  Okay.  All right.  Well, even

10 hypothetically if there was a duty to warn, that still wouldn't

11 justify an order prohibiting the use of Axon 4 devices when you

12 still have no --

13      MR. ABHYANKER:  I understand, and that's why you

14 rightfully denied the motion.  And I -- I should, you know --

15 again, I'm not an experienced litigator.  And I -- if I had to

16 do it again, I would not have brought it in this way, but I was

17 concerned and I was scared.  And I, as a citizen, as well as a

18 plaintiff, because I'm not just the attorney in this case, in

19 the initial complaint, I was a plaintiff as well, felt it an

20 important thing to bring up.

21      And this is not just a pure competitor case.  This is

22 also a case about, in my view, national security, because the

23 risks that are identified.  And if you ask Patrick, the things

24 I've done for this country, to protect and look out for this

25 country, go well beyond this case.  And I do not take those

1    obligations secondary to anything.

2              THE COURT:  Okay.  Thank you.

3              MS. SHANMUGANATHA:  Your Honor, if I may?

4              THE COURT:  Yes.

5              MS. SHANMUGANATHA:  This is not a matter of artful or

6    inartful pleading.  And despite Mr. Abhyanker's claim that he's

7    not an experienced litigator, he's been practicing for several

8    decades.  He's a licensed attorney.  He owns his law firm.  And

9    he's responsible for supervising countless attorneys, including

10   Mr. Keller.  He has a duty beyond just to this country, but to

11   the people that he is supposed to supervise, to lead by

12   example.

13             This is not a matter of a simple instance of a lack of

14   evidentiary support.  It's a lack of -- every time you push him

15   back, he creates something new.  In the pleadings, Your Honor,

16   that very chip he claims was made in the People's Republic of

17   China, which it wasn't, he admits it's made in Taiwan.  So he's

18   just going to make things up in order to get his way.

19             MR. ABHYANKER:  Taiwan is the People's Republic of

20   China, isn't it?

21             THE COURT:  Did you just say, "isn't it"?

22             MR. ABHYANKER:  Well, it's a POC, so I understand that

23   it's a claimed territory, but it's under the control of China.

24   So it is an independent nation state, but it's today not part

25   of the UK, or it's been handed over to China to manage.  It's

1    a --

2            MS. SHANMUGANATHA:  So what's the risk, Your Honor?

3    Is it a Quectel chip?  Is it a Quectel module?

4            MR. ABHYANKER:  There is a whole bunch of chips there.

5    That was just one.

6            THE COURT:  All right.  Well, it's very clear to me

7    that this request for a preliminary injunction was brought in

8    bad faith.  Nothing here today has changed that decision.

9            And, Mr. Abhyanker, I agree with defense counsel that

10   your claims of being inartful are also made in bad faith, given

11   your scientific expertise, your legal expertise, and the way

12   you have manipulated wording in one pleading to another to, I

13   guess, avoid sanctions.

14           So I will be awarding Axon attorney fees and costs in

15   relation to the motion for preliminary injunction.  If you can

16   submit your required affidavit and request -- let me just look

17   at the calendar -- by November 1st, and any objection to the

18   reasonableness or that they shouldn't be included should be

19   filed by November 8th.

20           MR. ABHYANKER:  Okay.  And then the last thing I ask,

21   Your Honor, this is entirely my filing.  I ask if there is any

22   sanction, it's on me and not my co-counsel.  He's a junior

23   litigator appearing just in Arizona.  So if -- you know, if

24   there is an issue, I ask it to be to me, because I did this

25   from my own and my own -- he supported me in the case, but I

1    believe, and I continue to believe, that there is a good faith

2    basis for it.

3           I apologize for what I've done here, if this is -- you

4    believe it's bad faith.  I have offered Mr. Gibbons to testify

5    if you'd like.

6           THE COURT:  Okay.  I will impose the sanctions against

7    you.

8           MR. ABHYANKER:  Thank you, Your Honor.

9           THE COURT:  And not co-counsel.

10          Okay.  We're at recess.  Thank you.

11          (Proceedings concluded at 10:54 a.m.)

12                    *          *          *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 28th day of October,

13   2024.

14

15

16

                    /s/ Christine M. Coaly_____
17                  Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25