RAJ V. ABHYANKER, California SBN 233,284
Email: raj@legalforcelaw.com

**LEGALFORCE RAPC WORLDWIDE, P.C.**
1580 W. El Camino Real, Suite 10
Mountain View, CA 94040
Telephone:  (650) 965-8731

Attorney for Plaintiff

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GovernmentGPT, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Axon Enterprise, Inc., formerly d/b/a Taser International, Inc., Microsoft Corporation, Safariland, LLC. <br><br> Defendants. | Case No. CV-24-01869-PHX-SMB <br> Judge:  Hon. Judge Susan M Brnovich <br><br> **OPPOSITION TO AXON'S MOTION FOR FEES AND REQUEST FOR RECONSIDERATION OF SANCTIONS** |

## I. Defendants' Request for Fees Should Be Denied

*A. Objection to Unjustified Fee Request and Potential Windfall Due to In-House Counsel and Paralegal Charges*

1. Axon seeks **$78,849.45** in attorneys' fees; however, only **$19,569.00** was actually paid to outside counsel. Awarding the full amount would significantly exceed the actual costs incurred, resulting in an unjustified financial benefit and windfall of **$59,280.45**.

2. The vast majority (**75%**) of the ledger attached by Axon are based on work done by salaried, in-house attorneys who are performing ordinary duties for their job descriptions. No salary slips or prorated salary with burdened costs are even provided. Rather, a Loadstar rate is applied to in-house litigation counsel time, which bears no relationship to the salaries they were paid. The case that Axon cites *Coe v. Hirsch*, 2022 WL 508841, *1 (D. Ariz. Jan. 21, 2022) does not deal with fees of salaried, in house counsel for applying the Loadstar approach, and expressly says that departure from the Loadstar approach is possible when "amount is unreasonably low or unreasonably high." Here, the amount that Axon seeks is more than 3.5X the fees it actually paid to outside counsel, and therefore is unreasonably high. Moreover, *Coe v. Hirsch* explains that the party seeking a fee award must provide "evidence of the hours worked and the rate paid." *Id.,* citing *Carson v. Billings Police Dept.*, 470 F.3d 889, 891 (9th Cir. 2006) (citations omitted). Here, Axon did not disclose the rate it actually paid to Pamela B. Petersen ("Petersen") and Gayathiri Shanmuganatha ("Shanmuganatha"), because no salary or overhead information was provided.

3. Sanctions are intended to reimburse prevailing parties for the costs incurred due to the litigation, not to provide profits. *Id.* When fees requested for in-house counsel exceed their salaries, courts may consider the request to be inconsistent with this reimbursement principle. If the fee award surpasses the actual compensation, it is often seen as an unjustifiable windfall rather than a reasonable reimbursement. Therefore, all fees to in house counsel and in house paralegals should be excluded.

*B. Even if in-house counsel fees are awardable, they should not be reimbursed because the work performed is within the Ordinary Duties of Petersen and Shanmuganatha.*

4. Axon references *HSBC Bank USA, N.A. v. Cluff*, 2018 WL 5117167, *8 (Ariz. Ct. App. Oct. 18, 2018) (in-house counsel entitled to recover fees) as part of its justification as to why fees are awardable to in-house counsel. The in-house counsel in that case cited *Lacer v. Navajo Cty.*, 141 Ariz. 392 (App. 1984), to support their request for fees and costs. In *Lacer*, the Court of Appeals "set forth some general guidelines to assist the County and future parties seeking recovery of their attorney's fees for in-house counsel." *Id.* at 396 (emphasis added). The court further explained "[w]e realize that governmental and private organizations will vary as to their method of determining hourly costs[,] [w]e require only that the party requesting an award of attorney's fees provide the court with a 'reasonable basis' for its stated hourly cost." *Id*. (emphasis added). In *Lacer,* the fee affidavit stated their hourly rate was based on "attorneys' salaries ... costs of office space, support staff, office equipment and supplies, law library and continuing legal education." However, Axon provided no such correlation to actual salaries and overhead.

5. The court in *Lacer* seemed concerned that compensating for in-house counsel's time would result in a windfall, as their salaries already cover their regular duties. Here the ordinary duties of Petersen and Shanmuganatha are to litigate cases like this one. In paragraph 7 of Petersen's declaration, she admits to being a part of "a team of experienced in-house litigators who appear as counsel of record and substantively participate in all Axon litigation wherever filed." (Dkt 109-1, ¶ 7). Ms. Petersen admits in her declaration in Para. 13 that "Utilizing Ms. Shanmuganatha for the work detailed in Exhibit C saved Axon (and Plaintiffs on this Application) tens of thousands of dollars in outside counsel fees." Decl. of Petersen, ECF 109-1, ¶ 13).

6. A review of the federal case record reflects that Petersen and Shanmuganatha are participating on behalf of Axon for at least two other open federal litigations. Decl. of Abhyanker, **Ex. 1** and **Ex. 2**. Accordingly, any reference to "tens of thousands of dollars" in savings due to work in this litigation is misleading, as their salary-based positions would encompass litigation work for all Axon matters—not just the present action. Thus, any claimed "savings" on outside counsel fees is an inherent feature of their salaried roles, and their involvement should not be considered an extraordinary or litigation-specific cost-saving measure eligible for recovery in attorneys' fees because it reflects a general business expense, not a case-specific necessity.

*C. Half of Axon's fee requests are not related to the Motion for Preliminary Injunction*

7. In its Minute order ECF 97, the court has awarded attorney fees and costs to Axon Enterprise Incorporated related to the Emergency Motion for Preliminary

Injunction. This means that Axon's defense team can recover reasonable legal fees and associated costs incurred in responding to the preliminary injunction motion, and not other motions. **Ex. 3** shows line item by line item review and my audit of Exhibit C of Ms. Petersen's Declaration (ECF 109-1, pg 12-20). Based on this analysis, **$8,734.50** meets the definition of the award attorney fees and costs to Axon Enterprise Incorporated related to the Emergency Motion for Preliminary Injunction from outside counsel, as shown in the table below, summarizing **Ex. 3**:

| Timekeeper | Total Hours that DOES NOT Meets Definition of Sanctions Order | Total Hours that Meets Definition of Sanctions Order | Total |
|---|---|---|---|
| Chuck Steese | 15 | 14.1 | $8,389.50 |
| Randy Papetti | 3.3 | 0.6 | $345.00 |
| Pam Peterson | 17 | 13.8 | * Salaried |
| Gaya Shan | 62.9 | 76.8 | * Salaried |
| | | | $8,734.50 |

\* Salaried. Should be prorated based on salary + overhead paid on a 160 hr month basis. No salary documentation provided, so should be excluded because within primary responsibilities of employment.

8. For in house counsel, nothing should be awarded as the work is within the ordinary course of their job responsibilities. No salary + overhead information was provided for prorating the 13.8 hours to Petersen and 76.8 to Shanmuganatha respectively that relate to the Motion for Preliminary Injunction.[1] The Loadstar approach would cause a windfall to Axon, and would not be equitable. Therefore, their fees should be denied in their entirety even if their time was reimbursable. If anything, the amount they spent versus the salary advertised would yield a total of $6740.64 at

---

[1] Axon advertises an open position for experienced Federal Corporate Counsel with 7 years of experience as of filing this Opposition on its website with a base pay of $148,800, which prorated based on 2000 hours is $74.40 per hour, far short of the $350 an hour claimed by Shanmuganatha See: **Ex. 6**.

prorated $74.40/hour for 13.8 hrs to Petersen and 76.8 hrs to Shanmuganatha total.

9. In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court held that hours must be reasonably expended and that courts should adjust fees to avoid awarding amounts that would be excessive or unjust. The Court emphasized that results achieved should be considered, particularly where excessive fees would unfairly benefit one party. In *Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008), the Ninth Circuit emphasized that courts have broad discretion to make reductions in fee awards when the requested fees do not match the reasonable value of services rendered, preventing windfalls in fee-shifting contexts.

## II. Request for Reconsideration

10. I ask the court to reconsider sanctions against me. I admitted to errors and showed contrition for errors in wording. Notably, I introduced confusion by incorrectly referring to "Quectel chips" when I should have stated "Quectel modules." However, this was not a substantive mistake. I attempted to demonstrate my good faith in the following ways:

   a. **Confirmation of Quectel modules' use in the Axon Body 4:** I brought multiple physical Axon Body 4 cameras containing Quectel modules into the courtroom, including Axon Body 4 purchased within the United States. I handed these devices to your Honor to demonstrate the presence of Quectel modules inside Axon Body 4 devices sold in the United States.

   b. **Research Paper as Evidence of National Security Risk:** A demonstrative

exhibit shown enlarged poster board at the hearing of a research paper by Charlie Parton, a former advisor to the U.S. Embassy in Beijing, to support claims of national security risks posed by Quectel modules. (**Ex. 8**). The paper outlined specific threats associated with Quectel technology, including unauthorized data collection and potential surveillance by Chinese security agencies in devices such as body cameras. I emphasized that this paper, which was included in the filings[2] identified multiple national security concerns with a callout about the threat of Axon's work with Quectel for their new body camera, adding weight to the argument that such technology could pose a significant risk when used during the 2024 presidential election (**Ex. 4-5**).

11. **Expert Consultation and Witness Testimony:** I relied on advice from experienced individuals, such as Patrick M. Gibbons, a former FBI Supervisory Special Agent, who confirmed the potential risks associated with the devices in question prior to me filing the Emergency Motion. I offered to have Gibbons testify in person about these risks, in camera or in open court (**Ex. 5**).

12. **Prior Interactions with members of Congress:** I cited multiple discussions with members of Congress, and their staff, including meetings with Rep. Ro Khanna and staff of the House Select Committee on the Chinese Communist Party who authored the

---

[2] **Ex. 8** and ECF 46-2, pg 17 of 23 (Mot. Special Master, Seal), Charles Parton, Cellular IoT Paper, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023).

public letters and warnings of Quectel modules as a potential security risk.[3] (**Ex. 5**).

13. **Efforts to Conduct Testing:** I attempted to test the Quectel modules for security vulnerabilities, despite being denied full access to Axon's Evidence.com system, which would have enabled comprehensive testing of the Axon Body 4 cameras. In the absence of this access, plaintiff evaluated the Quectel modules independently. This limited testing was aimed at assessing potential security risks associated with the modules, particularly concerning over-the-air updates and live-stream capabilities. Although restricted, these tests contributed to my belief in the existence of security vulnerabilities, which I deemed significant enough to bring before the court as part of his concerns for public safety and national security. (**Ex. 5**).

14. **My Personal Capacity as a Concerned Citizen:** As a plaintiff in my personal capacity, I expressed that my motivations went beyond professional interest and stemmed from a sense of duty as a concerned citizen in light of the assassination attempt on former President Trump just two weeks prior to filing the emergency motion.

### III.  Offer Of Proof: Testimony Of Patrick M. Gibbons

*A. Importance of Gibbons' Testimony*

---

[3] The U.S. Congress describes: Quectel "as a contributor to the PRC military—the People's Liberation Army (PLA)" and is "key to the PRC's military-civil fusion strategy." Reply to Opposition to Emergency Motion, ECF 25-8.  Congress further cited that there is "significant evidence suggesting Quectel may contribute to the defense industrial base" because "Quectel is a key supplier for numerous firms that the Department of Defense has already listed as Chinese military companies." *Id.*

15. In the Order in ECF 71 which led to the Show Cause hearing, it stated that "Plaintiffs claim to have relied on Patrick Gibbons and Fred Addy, former law enforcement officers, who allegedly identified 'national security risks associated with the Quectel LTE' module in the Bodycam… (Doc. 25 at 9–10 ¶ 21; Doc. 25-1 at 3 ¶ 11–13.) However, Plaintiffs do not provide any report or affidavit prepared by the alleged experts that show how the CCP or Iran may commandeer the Bodycam's internal components to threaten national security." (ECF pg. 6, 21-24).

16. Throughout the hearing on the Order to show cause, the I made multiple efforts to have Mr. Gibbons, a former FBI Supervisory Special Agent, testify about the national security risks associated with Quectel modules:

A. **Initial Offer to Testify In-Camera**: Early in the hearing, I informed the court that Mr. Gibbons was present and willing to provide testimony, particularly for sensitive information that could be shared in-camera (privately) due to its classified nature. This testimony was intended to provide firsthand expert insights into the potential security threats posed by the Quectel modules.

B. **Offer to Testify in Open Court**: I indicated that, if necessary, Gibbons was also prepared to testify openly in the court to give a general overview of the national security implications, demonstrating my willingness to ensure transparency and credibility in the claims. Gibbons was brought to the OSC hearing to specifically address the Court's concern to "show how the CCP or Iran may commandeer the Bodycam's internal components to threaten national security." (ECF pg. 6, 25-27).

C. **Follow-Up Request for Testimony**: Later in the hearing, I again raised the possibility of Mr. Gibbons testifying, emphasizing his credentials and background in national security. This attempt underscored my belief that Gibbons's testimony could substantiate claims of risk using Quectel technology in body cameras.

D. **Final Offer to Have Gibbons Testify**: Toward the end of the hearing, I reiterated the request for Mr. Gibbons to provide testimony, either in-camera or publicly. This final attempt reflected my commitment to presenting expert evidence from a highly qualified witness to strengthen the argument regarding potential vulnerabilities.

17. Each of these attempts aimed to establish a credible basis for my national security concerns, showing that I had not acted in bad faith because Mr. Gibbons's testimony would have articulated the risks from Quectel modules' use in Axon's devices.

18. Although the court did not make an explicit FRE 403 ruling, it impliedly made a FRE 403 ruling by refusing to hear his testimony. **Ex. 5**. Under FRE 403, otherwise relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. However, in this case, the probative value of Mr. Gibbons's testimony far outweighed any competing concerns.

*B. High Probative Value of Mr. Gibbons's Testimony*

19. The probative value of Mr. Gibbons's testimony was high. His first-hand expertise in national security and intelligence, combined with his specific knowledge of

foreign interference risks, directly supports my defense that the emergency motion was filed in good faith. Mr. Gibbons flew to Arizona from Boston immediately after a private event involving key federal law enforcement senior leadership, including the FBI Director Christopher Wray (**Ex. 5**). Mr. Gibbons's testimony would have provided critical evidence to show that I had a legitimate, support on well-founded concern regarding the Axon Body 4 cameras and national security risk, countering the claim that the motion was frivolous.

    A. **Relevance to Core Issues**: Mr. Gibbons's testimony was directly related to whether I had a reasonable basis for my emergency motion, which is the core issue in determining if the motion was frivolous or made in bad faith. His expertise would have bolstered my argument that the motion to address legitimate national security concerns.

    B. **No Undue Delay or Waste of Time**: Mr. Gibbons's testimony would not have caused undue delay or wasted time. Instead, it would have efficiently provided the Court with the expert insight necessary to fully understand the basis for my concerns. The limited time required to hear Gibbons's testimony would have been justified by the importance of the evidence and would have responded to the question of whether I had acted in bad faith.

    C. **No Risk of Confusion or Misleading the Court**: Mr. Gibbons's testimony was clear, specific, and based on his professional experience. There was no risk of confusing the issues or misleading the Court. On the contrary, his testimony would have clarified the technical and national security aspects of my concerns, enabling the Court to make a

more informed decision regarding the legitimacy of the emergency motion.

*C. Exclusion of Mr. Gibbons's Testimony Prejudiced Plaintiffs*

20. The exclusion of Mr. Gibbons, a highly qualified expert in national security and law enforcement, from testifying during the sanctions hearing deprived me of a fair opportunity to defend against the sanctions. His extensive credentials, including his background in counterterrorism and security, were highly relevant to the national security concerns at issue. By preventing Mr. Gibbons from testifying, the Court curtailed my ability to fully present their case. Accordingly, awarding fees based on a ruling that excluded such material testimony would be unjust and improper. For this reason, I respectfully request that the Court reconsider its sanctions ruling.

*D. Background of Patrick M. Gibbons*

21. As part of this offer for proof and as provided in the redacted resume of Patrick M. Gibbons file as ECF 25-4, I contend Mr. Gibbons is a national security expert with the following qualifications:

1. Masters in National Security and Strategic Studies, US Naval War College.
2. 27-year veteran FBI Supervisory Special Agent (GS-15) specializing in Criminal and Counter-Terrorism matters.
3. Stationed in U.S. embassies worldwide, including Jerusalem, Vietnam, and Saudi Arabia.

4. Legal Attache to Cambodia and Vietnam.

5. Former FBI Police Chief of the FBI Police Unit, responsible for the physical security of key U.S. facilities, including FBIHQ, containing TS/SCI (Top Secret/Sensitive Compartmented Information) data.

6. Vice President of Security for the energy and armored car industries.

Mr. Gibbons's expected testimony was expected to include:

A. **Identification of Potential Risks from Quectel modules**: Based on his experience in counterterrorism and intelligence operations, Mr. Gibbons would have testified that Quectel modules in Axon Body 4 cameras we reviewed pose a risk of unauthorized surveillance due to their ability to transmit data in real-time and over-the-air firmware updates regardless of Axon's policies to try to mitigate the risk.

B. **Potential Exploitation by Foreign Actors**: Mr. Gibbons was expected to support the credibility of Charlie Parton, and his research paper describing the national security threat of Quectel modules in Axon body cameras. (**Ex. 4-5**) Gibbons would have supported Mr. Parton's contention that foreign adversaries, including the Chinese Communist Party (CCP), could exploit these vulnerabilities for espionage purposes, particularly in the context of high-profile political events such as the 2024 U.S. presidential election.

C. **Reasonableness of My Concerns**: Mr. Gibbons would have supported my position that their concerns about national security risks were not speculative or

frivolous. He would have provided a professional assessment, based on his extensive background in national security, of the realistic threats posed by these modules and the legitimate basis for raising these concerns in an emergency motion.

D. **Good Faith Basis for the Emergency Motion**: Mr. Gibbons's testimony would have demonstrated that my decision to file the emergency motion was made in good faith, based on credible concerns regarding potential national security threats. This would counter the Court's finding that the motion was frivolous and filed in bad faith.

## IV. Limited Credibility and Potential Conflicts of Interest in Axon's Declarations

22. "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. The primary locus of this obligation is Rule 702." *Claar v. Burlington Northern R.R. Co.,* 29 F.3d 499, 502-03 (9th Cir. 1994).

23. The court's reliance on declarations submitted by Axon, without giving weight to the opportunity to hear Mr. Gibbons' in-person testimony was unreasonable and undermined the thoroughness of its sanctions ruling. Despite his national security background, the court instead relied on declarations from individuals with limited or potentially conflicting qualifications on the issues at hand:

24. Two Quectel employees: **Mike Zhou,** senior 5G Product Manager for Quectel Wireless Solutions ("Quectel") U.S. operations. (ECF 54-1). Mr. Zhou holds a Ph.D. from Shanghai Jiaotong University[4], designated high risk for its high level in defense

---

[4] **Ex. 7**., Zhou, Mike. LinkedIn profile.

research and alleged links to cyber attacks.[5] The university's cybersecurity degree program is located on a People's Liberation Army information engineering base in Shanghai.[6] Prior to joining Quectel in May 2023, Mr. Zhou was the Chief Engineer of ZTE R&D Center in Shanghai.[7] The FCC has banned ZTE as a national security threat as of June 30, 2020.[8] The founder of Mr. Zhou's former employer ZTE, Qian Penghe, is one of the main private shareholders in Quectel.[9] **Molly Kaster,** a Quectel salesperson with no technical background. (ECF 54-2).

25. **David MacDonald**, a Principal Security Engineer at Axon, who has no national security background based on his declaration. (ECF 24-1).

26. **Matt Wyckhouse**, a CEO of cybersecurity firm Finite State, Inc. (ECF 24-4), a firm who was hired by Quectel to "comprehensively and holistically assess Quectel and the AB4 module" before being hired by Axon.

27. The declarations relied upon by the court include statements from Quectel employees and a cybersecurity contractor hired by Quectel and Axon, raising serious

---

[5] **Ex. 10**, Shanghai Jiaotong University, Australian Strategic Policy Institute, https://unitracker.aspi.org.au/universities/shanghai-jiaotong-university/ (last visited November 5, 2024) and

[6] **Ex. 11**, Dakota Cary, *Testimony before the U.S.-China Economic and Security Review Commission*, Georgetown University Center for Security and Emerging Technology, https://cset.georgetown.edu/wp-content/uploads/Testimony-before-U.S.-China-Economic-and-Security-Review-Commission-Dakota-Cary.pdf (February 17, 2022).

[7] **Ex. 7**., Zhou, Mike. LinkedIn profile.

[8] **Ex. 10**, Federal Communications Commission. (2020, June 30). Public notice: DA 20-691A1. https://docs.fcc.gov/public/attachments/DA-20-691A1.pdf.

[9] **Ex. 8** and ECF 46-2, pg 17 of 23 (Mot. Special Master, Seal), Charles Parton, Cellular IoT Paper, with significant technical expertise provided by Dr. Samantha Hoffman, OODA Loop (Feb. 2023).

questions of impartiality and reliability. Unlike Axon's declarants, Gibbons has a credible, substantial national security background and firsthand knowledge of assessing risks related to foreign technology. His in-person presence in the courtroom would have provided the court with a unique opportunity to hear from an unbiased expert on the national security risks posed by Quectel modules. This was a crucial factor in assessing the risks presented in the Emergency Motion. By not hearing Mr. Gibbons' real-time testimony, the court denied itself an unfiltered, professional security perspective, instead relying on declarations that lacked this level of credibility. Mr. Gibbons' in-person testimony would have allowed for direct questioning, cross-examination, and real-time clarification—advantages that static declarations cannot provide. The court would have had the opportunity to fully understand and explore the basis of Mr. Gibbons' concerns about the Quectel module. In contrast, declarations were pre-prepared by Axon counsel, and lack the dynamism of live testimony, where credibility, expertise, and reasoning can be rigorously evaluated.

**V.  Inherent Bias in Declarations Relied Upon by the Court.**

28. In *Weaver v. Bright Horizons Family Solutions, Inc.*, United States District Court, C.D. California, June 26, 2017, Not Reported in Fed. Supp.2017 WL 1142873, the court described that "declaration was drafted by her attorney for use in her lawsuit after she was no longer available for cross-examination weighs heavily against its trustworthiness." citing *Wilander v. McDermott Inter*, 887 F.2d 88, 92 (5th Cir. 1989).

29. Indeed, the **17.4 hours** of billing entries that Axon now seeks to have reimbursed include its counsel's direct role in drafting declarations, editing them, and finalizing them for David MacDonald, Matt Wyckhouse, Molly Kaster, and Mike Zhou. **Ex. 12.** This heavy involvement of litigation counsel in shaping declarations introduces a significant bias into the witness statements, particularly when contrasted with the court's decision to deny live testimony from Mr. Gibbons, an independent expert with no affiliation to Axon. Counsel's direct involvement in crafting these declarations can lead to framing the narrative in Axon's favor, emphasizing information that supports their case while potentially omitting or downplaying details that might indicate security risks or vulnerabilities in the Quectel modules.

30. Declarations prepared by Axon litigation counsel do not reflect the same degree of independent, unfiltered testimony that would come from a former senior federal government counterterrorism FBI agent like Gibbons. In this case, the declarations from Quectel employees (Mike Zhou and Molly Kaster), Axon's security engineer (David MacDonald), and Quectel's contractor (Matt Wyckhouse) were not spontaneous expressions of their professional opinions. Instead, they were pre-scripted by Axon's legal team, which has a vested interest in mitigating any appearance of security vulnerabilities in its products. This reduces the reliability and objectivity of the declarations, as they are more likely to align with Axon's defense strategy than to provide a comprehensive, unbiased view.

**VI. <u>Axon's Failure to Notice of Exhibits Undermined the Integrity of the Hearing</u>**.

31. Although the Court did not explicitly require advance disclosure of demonstrative exhibits before the hearing, the principle of fairness in adversarial proceedings demands that both parties are given equal opportunities to prepare and respond. See Abhyanker Decl. ¶15-17. This imbalance deprived me of a fair opportunity to prepare for and contest Axon's exhibits.

### VII.  Constitutional Right to Petition the Government

32. The emergency motion is protected under the First Amendment's guarantee of the right to petition the government. Abhyanker Decl. ¶ 18. By bringing these matters before the Court, I exercised their fundamental right to petition over issues of public safety and election integrity. *Id.* Awarding fees and sanctioning a Plaintiff in the original complaint (Raj Abhyanker) effectively penalizes a Plaintiff for invoking a protected right intended to foster government accountability and address threats impacting the public interest.

### IIX.  Conclusion

33. In light of the foregoing, the Court should reconsider and deny its imposition of sanctions on me, and in the alternate, deny any monetary sanctions or apply a downward departure in the sanctions.  If any fees are awarded, I request that $8,734.50 are reasonable based on a complete review of each billing entry, less $6,326.00 that Axon counsel spent on drafting, editing, or finalizing expert declarations (**Ex. 12**), or **$2,408.50** total.  I further that any collection or payment of such fees be delayed until all appeals are exhausted, and this matter be certified for appellate review.

Respectfully submitted this November 8, 2024.

                                  LEGALFORCE RAPC WORLDWIDE P.C.

                                  /s/ Raj Abhyanker
                                  Raj Abhyanker
                                  Attorney for Plaintiff GovGPT