**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GovernmentGPT Incorporated, | No. CV-24-01869-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Axon Enterprise Incorporated, et al., | |
| Defendants. | |

Before the Court are Microsoft Corporation ("Microsoft"), Axon Enterprise Inc. ("Axon"), and Safariland LLC's ("Safariland") separate Motions to Dismiss (Doc. 90; Doc. 106; Doc. 110; Doc. 111) Plaintiff GovernmentGPT Inc.'s ("GovGPT") First Amended Complaint ("FAC") (Doc. 74). The briefing is complete, and the Motions are ripe. Having reviewed the briefing and the relevant case law, the Court will grant Axon's Motion, grant Microsoft's Motion, and grant Safariland's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 110) but deny Safariland's Motion to Dismiss for Failure to State a Claim (Doc. 111) as moot.

## I.    BACKGROUND

Despite the FAC clocking in at just under one-hundred and ten pages, the background of this case is rather straightforward. In capsule form, this action arises from a series of alleged illegal acquisitions and anticompetitive agreements occurring between the named Defendants. (*See* Doc. 74.) Now, before describing the background of those claims, the Court will briefly discuss the procedural history of this case.

### A. Procedural History

GovGPT and a group of now-excised Plaintiffs filed their Initial Complaint on July 29, 2024.  (Doc. 1.)  They concurrently filed a Motion for Preliminary Injunction titled: "Emergency Motion for Immediate Order to Prohibit use of Axon Body 4 Cameras at Political Events," citing the potential danger Quectel "chips" housed in the Axon Body 4 (the "AB4").  (Doc. 2 at 2.)  Shortly after the filings, this Court set a telephonic status conference to discuss the Motion (Doc. 23).  At that conference, the Court announced that it would forego a hearing and take the Motion under advisement.  (Doc. 51.)

While the Court was considering the request for a preliminary injunction, Axon and Microsoft filed Motions to Dismiss the Initial Complaint.  (Doc. 66; Doc. 67; Doc. 68.)  Shortly thereafter, the Court denied GovGPT's Motion for Preliminary Injunction (Doc. 2), finding that the Motion, the supporting memoranda, and the initial Complaint failed to support ordering the requested relief.  (*See* Doc. 71.)  In that Order, the Court scrutinized GovGPT's allegations about the Quectel "chips," finding them to be unsubstantiated.  (*See id.*)  There, the Court also ordered GovGPT and former Plaintiff Raj Abhyanker to appear for a hearing in which they needed to (1) justify the filing of the "emergency motion" absent any actual testing of the AB4 and (2) to support the repeated allegations that a hackable Quectel "chip" is used in the AB4.  (*Id.* at 11.)

At the hearing, the Court asked Mr. Abhyanker whether he had tested or specifically identified the presence of a Quectel "chip" in the AB4 that was susceptible to hacking by the Chinese Communist Party.  (Doc. 105 at 25–26.)  Mr. Abhyanker responded, stating:

> They are unidentified chips, not all of them are identified. Some of them are from Qualcomm, some are not identified, but there is an ESMT chip which has a label on that directly. If you look that up, directly up right now, it is a chip that's made in the People's Republic of China and Taiwan. And so it's not true to say they're all Quectel chips. There is a whole bunch of other smaller chips underneath there—
>
> . . . .
>
> Well, an integrated circuit board is what I called a chip, an integrated circuit board having chips thereon. I should have called it a module,
>
> . . . .
>
> Taiwan is the People's Republic of China, isn't it?

(*Id.* at 26, 30.)  These statements, among others, led the Court to find that the Quectel chip allegations and Emergency Motion were brought in bad faith.  (*Id.* at 31–32.)  Consequently, the Court sanctioned Mr. Abhyanker.  (*Id.*)

Then, on September 22, 2024, GovGPT filed its FAC, which added Safariland as a Defendant and regurgitated many of the allegations in the Initial Complaint.  (Doc. 74.)  Safariland has filed two Motions to Dismiss the FAC, one for lack of personal jurisdiction and the other for failure to state a claim.  (Doc. 110; Doc. 111.)  Axon and Microsoft also filed new Motions to Dismiss for failure to state claim.  (Doc. 106; Doc. 90.)

On December 20, 2024, GovGPT gave notice to the Court and Defendants of its intent to "Seek Motion before the Judicial Panel on Multidistrict Litigation to Consolidate and Transfer the Cases to One District," (Doc. 123; Doc. 124), and sought a stay pending a panel decision (Doc. 144).  The Court denied issuing a stay.   (Doc. 144.)  Defendants have opposed consolidating the case and have requested expedited consideration of the pending Motions to Dismiss.  (Doc. 127; Doc. 131.)  This Order follows Defendants' request.  (Doc. 144.)

**B.  The FAC**

1.  The Parties

GovGPT is a Delaware corporation with its principal place of business in California.  (Doc. 74 ¶ 4.)  It is an early-stage startup that develops and markets artificial intelligence technologies, such as 360-degree body camera vests.  (Doc. 74 ¶ 4.)  The company also offers a digital evidence management system ("DEMS"), hostable on "AWS, Microsoft, Google Cloud, private storage, or other vendors."  (*Id.* ¶ 25.)  It seeks to compete with Axon in the market for body-worn cameras ("BWCs") and DEMS.  (*See generally id.*)  Although, GovGPT does not operate in the "Public Safety Video Integration and Management Platforms," market but intends to compete directly with Axon at some undesignated future time.  (*Id.* ¶ 25 n.2.)

Defendants in this case include Axon, Microsoft, and Safariland.  Axon is a publicly traded Delaware Corporation with its principal place of business in Arizona.  (*Id.* ¶ 5.)

Axon designs, manufactures, and sells, among other things, BWCs and DEMS. (*Id.*) The FAC claims that Axon supplies over 94% of American law enforcement agencies. (*Id.* ¶ 2.) Axon's DEMS, Evidence.com, is an integrated software product that works in conjunction with Axon's BWCs, including the AB4. (*Id.* ¶¶ 2, 109, 175.) Microsoft is a publicly traded technology company incorporated in Washington and maintains datacenters in El Mirage and Goodyear, Arizona. (*Id.* ¶ 6.) The FAC alleges that Axon exclusively uses Microsoft's cloud platform, Microsoft Azure, to store footage uploaded to Axon's Evidence.com platform. (Doc. 13 ¶ 5; Doc. 74 ¶ 41.) Safariland is a Delaware-organized limited liability company headquartered in Florida. (Doc. 74 ¶ 7.) The antitrust violations asserted against it in this case center around the 2018 sale to Axon of former Safariland subsidiary, VieVu, LLC ("VieVu"). (*Id.* ¶ 27.)

### 2. The Claims

GovGPT asserts the following claims for relief: (1) false advertising under the Lanham Act; (2) violation of Section 7 of the Clayton Act; (3) conspiracy to retrain trade in violation of Section 1 of the Sherman Act; (4) monopolization in violation of Section 2 of the Sherman Act; (5) attempted monopolization in violation of Section 2 of the Sherman Act; (6) conspiracy to monopolize in violation of Section 2 of the Sherman Act; and (7) violation of California Unfair Competition Law (the "UCL"). (*See* Doc. 74.)

For the Lanham Act and UCL claims, GovGPT alleges that Axon makes several false or misleading statements on its "Responsibility" and "Principles" webpages. (*See id.* ¶¶ 152–191, 310–317.) Regarding the antitrust claims, GovGPT alleges that Axon violated the Clayton and Sherman Acts when it acquired Fusus, a real-time crime center ("RTCC") company. (*See* Doc. 74 ¶¶ 200–205, 267–283.) Similarly, GovGPT alleges that both Axon and Safariland violated the Clayton and Sherman Acts when Safariland sold VieVu to Axon. (*See id.* ¶¶ 192–266, 284–309.) Additionally, GovGPT alleges that Axon and Microsoft violated the Sherman Act by entering an anticompetitive cloud services agreement in 2018. (*See id.* ¶¶ 231–248, 284–309.) Axon's alleged violations are also based on the acquisitions and agreements having created a self-contained BWC and DEMS

1    ecosystem that prevents competitors from meaningfully participating the market.  (*See*

2    *generally id.*)

3        The FAC also asserts many of the same claims regarding the Quectel "chips" but

4    now labels them "modules" and "components."  (*See, e.g., id.* ¶¶ 53–55, 58, 61, 154–157,

5    213.)  These claims echo the same concerns about the Chinese Community Party being

6    able to exploit the Quectel "components" or "modules" to compromise national security.

7    (*See, e.g., id* ¶¶ 154–157, 164, 167, 213, 265, 311.)  Like the Initial Complaint, the FAC

8    does not allege that GovGPT has tested the "components" or "modules."  (*See id.*)  Instead,

9    GovGPT generally alleges that several congresspersons and persons testifying before

10   Congress have noted the danger of Quectel IoT Modules (*See id.* ¶¶ 78–79), and that

11   GovGPT "warned" Axon about the danger of Quectel chips.  (*Id.* ¶ 85.)

12   **II.    LEGAL STANDARD**

13       **A.  Rule 12(b)(2)**

14       Personal jurisdiction refers to the power that a court has over the parties.  This

15   jurisdiction is proper when it is provided for by law and the exercise of jurisdiction

16   comports with due process.  *Walden v. Fiore*, 571 U.S. 277, 283 (2014).  "Federal courts

17   ordinarily follow state law in determining the bounds of their jurisdiction over persons."

18   *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014).  Arizona has authorized its courts to

19   exercise jurisdiction over persons "to the maximum extent permitted by . . . the United

20   States Constitution."  Ariz. R. Civ. P. 4.2(a).

21       Due process requires that a defendant have at least "minimum contacts" with the

22   forum state so that "maintenance of the suit does not offend traditional notions of fair play

23   and substantial justice."  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal

24   quotations omitted).  "[T]he defendant's conduct and connection with the forum State

25   [must be] such that he should reasonably anticipate being haled into court there."

26   *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  When analyzing

27   sufficient minimum contacts, courts distinguish between general jurisdiction and specific

28   jurisdiction.  General jurisdiction exists when the defendant has "continuous and

systematic" contacts with the forum state, whereas specific jurisdiction exists when the controversy arises from or is related to the defendant's contact with the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984). The court "employ[s] a three-part test to assess whether a defendant has sufficient contacts with the forum state" to establish specific personal jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). If the plaintiff satisfies the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

### B. Rule 12(b)(6)

To survive a Rule 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Rule 8(a)(2). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This exists if the pleader sets forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Dismissal under Rule 12(b)(6) "can be based on the lack of a cognizable legal theory

or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A complaint that sets forth a cognizable legal theory will survive a motion to dismiss if it contains sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility does not equal "probability," but requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In ruling on a Rule 12(b)(6) motion to dismiss, the well-pled factual allegations are taken as true and construed in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). A court ordinarily may not consider evidence outside the pleadings in ruling on a Rule 12(b)(6) motion to dismiss. *See United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003). "A court may, however, consider materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *Id.* at 908.

### C. Rule 9(b)

Claims sounding in fraud or mistake are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy Rule 9(b), the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen*

*v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Thus, claims sounding in fraud must allege "an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir.2007) (per curiam). The plaintiff must set forth "what is false or misleading about a statement, and why it is false." *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as stated in Ronconi v. Larkin*, 253 F.3d 423, 429 n. 6 (9th Cir.2001).

### III.    DISCUSSION

#### A. Judicial Notice

In ruling on a motion to dismiss, the Court may consider "matters of judicial notice," *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), including information that is "generally known within the trial court's territorial jurisdiction; or can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b); *but see Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("[A] court cannot take judicial notice of disputed facts contained in . . . public records."). Importantly, considering matters of judicial notice does not transmute a motion to dismiss into one for summary judgment. *See Ritchie*, 342 F.3d at 908. Moreover, a court should not accept as true "allegations that contradict matters properly subject to judicial notice," nor "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). Proper subjects of judicial notice include judgments and other court documents. *See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007); *see also Khoja*, 899 F.3d at 999 ("Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth.").

GovGPT asks the Court to take judicial notice of an opinion issued in a case involving Axon's acquisition of VieVu in the District Court of New Jersey. (Doc. 145.) Since the time of the request, the case has been made available on Westlaw. *See In re Axon*

*Vievu Antitrust Litig.*, No. 23-7182 (RK) (RLS), 2025 WL 366751, at *1 (D.N.J. Jan. 31, 2025). Seeing no objection, the Court will grant GovGPT's Motion (Doc. 145) and take judicial notice of the opinion.

**B. Safariland's Motions to Dismiss (Doc. 110; Doc. 111)**

In its first Motion to Dismiss, Safariland offers two arguments for why this Court lacks personal jurisdiction over it: (1) Section 12 of the Clayton Act does not apply to limited liability companies ("LLCs"), like Safariland; and (2) Safariland lacks sufficient minimum contacts with Arizona. (Doc. 110 at 6.) Unsurprisingly, GovGPT disagrees. (*See generally* Doc. 117.)

1. Section 12 of the Clayton Act

Section 12 provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. With respect to corporations, the Ninth Circuit has held that "the worldwide service provision of [Section] 12 justifies [the] conclusion that personal jurisdiction may be established in any district, given the existence of sufficient national contacts." *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1415 (9th Cir. 1989). Here, as with other cases, the parties' fervently dispute whether Section 12 applies to LLCs. By its plain terms, the statute governs service upon "corporations." *See* 15 U.S.C. § 22.

Faced with whether Section 12 applied to a "voluntary association," one district court reasoned:

> "Persons," as defined in the Clayton Act, are "deemed to include corporations and associations"; yet section 12 of the same act, which authorizes extraterritorial service, specifies only "corporation." This specificity necessarily excludes individuals and voluntary associations from those amenable to extraterritorial service.

*McManus v. Tato*, 184 F. Supp. 958, 959 (S.D.N.Y. 1959) (cleaned up). Safariland contends that this reasoning also applies to LLCs because Congress has not extended Section 12 to unincorporated entities. (Doc. 110 at 7.) The Court agrees.

As Safariland points out, time and again courts have cabined Section 12's applicability to corporations. *See Cal. Clippers, Inc. v. U.S. Soccer Football Ass'n*, 314 F. Supp. 1057, 1061 (N.D. Cal. 1970) ("NASL is, however, an unincorporated association, not a corporation, so Clayton Act § 12 is [sic] inapplicable by its own terms to provide for services of process against NASL in this action."); *S.F. Comprehensive Tours, LLC v. Tripadvisor, LLC*, No. 2:20-CV-02117-GMN-DJA, 2021 WL 4394253, at * 5 (D. Nev. Sep. 24 2021) (holding that Section 12 did not apply to defendant because it is an LLC); *Shat Acres Highland Cattle, LLC, v. Am. Highland Cattle Ass'n*, No. 21-CV-1348-WJM-SKC, 2023 WL 7089906, at *3 & n.3 (D. Colo. Oct. 26, 2023) ("Section [12], by its terms, only applies to corporations."); *In re Chicken Antitrust Litig.*, 407 F. Supp. 1285, 1299 (D. Ga. 1975) (holding that Section 12's "transacting business" test was inapplicable to a partnership); *Kingsepp v. Wesleyan Univ.*, 763 F. Supp. 22, 25 (S.D.N.Y 1991) (collecting cases) ("Given the narrow construction of the term 'corporation' in section 12 and the reluctance of courts to extend nationwide service of process under section 12 to non-corporate defendants, it would be inappropriate to extend section 12 to encompass a trust . . . .").

In response, GovGPT contends that the Supreme Court has recognized LLCs, among other entities, may fall with Section 12's ambit when they act in concert with corporations to suppress competition. (Doc. 117 at 5 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984)).) In the same breath, however, GovGPT admits that its offered authority is "not directly related to Section 12." (*Id.*) Indeed, *Keeton* dealt with the application of one state's long arm state and the traditional minimum contacts analysis to assert jurisdiction in a libel action. 465 U.S. at 770. Despite offering no apposite authority, GovGPT posits that the Court ought to extend its jurisdiction based on "the functional involvement of entities in relevant conduct affecting the forum state." (Doc. 117 at 5.) This approach not only comes before the Court without support, but also contravenes the wealth of well-reasoned, persuasive case law offered by Safariland. Therefore, the Court rejects GovGPT's arguments.

Based upon the statute's plain language, and the supporting persuasive case law, there is no question that Section 12 does not apply to Safariland. As an LLC, and not a corporation, it is not subject to the jurisdictional hook that 15 U.S.C. § 22 provides. Therefore, whether the Court has personal jurisdiction over Safariland must be determined through a traditional minimum contacts analysis.

### 2. Minimum Contacts

Safariland argues that this Court lacks personal jurisdiction over it because (1) it does not have continuous or systematic contacts with Arizona; and (2) it does not purposefully direct activities at Arizona residents such that litigation would arise out of those activities. (Doc. 110 at 8–11.) To support this argument, Safariland points out that it owns no property in Arizona, employs one remote employee in the state, and its sales in the state are not related to BWCs or DEMS. (Doc. 110 at 9–10.) In response, GovGPT contends that Safariland's sale of VieVu to Axon in 2018, coupled with extensive non-compete agreements, satisfies minimum contacts such that the Court has jurisdiction over Safariland. (Doc. 117 at 5–8.)

The traditional minimum contacts analysis requires the Court to determine whether it has "general" or "specific" personal jurisdiction over Safariland. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017). General jurisdiction exists over entities where its forum state "affiliations" are "so continuous and systematic as to render [it] essentially at home." *Daimler*, 571 U.S. at 139. Generally, an entity is "at home" in its place of organization and its principal place of business. *Id.* at 134. Safariland is an LLC organized in Delaware and headquartered in Florida. (Doc. 74 ¶ 7; Doc. 110 at 9.) Therefore, under the traditional "at home" view, the Court would not have general jurisdiction over Safariland. *See Daimler*, 571 U.S. at 139. Safariland further posits that the Court lacks general jurisdiction over it because it owns no real property in Arizona, employs a single remote employee in the state, and does not sell BWCs or DEMS in Arizona. (*See* Doc. 110 at 9; Doc. 110-1 at 2 ¶¶ 6–9.) GovGPT seemingly does not attempt to rebut this argument. At bottom, Court agrees that Safariland's limited contacts with

1    Arizona precludes finding that the Court possesses general personal jurisdiction over the

2    company.

3        Specific jurisdiction exists when an out-of-state defendant (1) purposefully directs

4    his activities at residents of the forum state, or purposefully avails himself of the privilege

5    of conducting activities in the forum; (2) the asserted claim must be one arising out of the

6    defendant's forum related activities; and (3) exercising jurisdiction must be reasonable.

7    *Picot*, 780 F.3d at 1211.  GovGPT "bears the burden of satisfying the first two prongs of

8    the test."  *See Schwarzenegger*, 374 F.3d at 802.

9        Regarding prong one and two, GovGPT asserts that Safariland's intentional act was

10   selling VieVu to Axon and executing the related non-compete agreements.  (Doc. 117

11   at 5–6.)  According to GovGPT, Safariland knew that selling VieVu to Axon would "have

12   substantial effects in Arizona."  (*Id.* at 6.)  Further, GovGPT contends that the Court "must

13   look beyond" Safariland's incorporation and headquarters, and instead consider that

14   Safariland holds a vested financial interest in Axon's Arizona-based monopoly through

15   stock arrangements and Axon's monopolistic pricing.  (Doc. 117 at 6–7.)

16       GovGPT's muddled allegations and argument misunderstand what "purposeful

17   direction" requires.  To show that Safariland purposefully directed its acts at Arizona,

18   GovGPT must show that Safariland has "(1) committed an intentional act, (2) expressly

19   aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered

20   in the forum state."  *Wash. Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 673 (9th

21   Cir. 2012).  The only relevant intentional act that GovGPT contends Safariland directed at

22   Arizona was enter a contract to sell VieVu to Axon.  However, "a contract alone does not

23   automatically establish minimum contacts in the plaintiff's home forum."  *Boschetto v.*

24   *Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008).  Rather, there must be "actions by the

25   defendant himself that create a 'substantial connection' with the forum State."  *Burger*

26   *King*, 471 U.S. at 475 (quoting *McGee v. Int'l Life Ins.*, 355 U.S. 220, 223 (1957)).  Further

27   attenuating Safariland's alleged contacts to Arizona is the argument that the sale of VieVu

28   in 2018 was governed by Delaware law without reference to Arizona or its laws.  (*See* Doc.

110 at 11.)   To be sure, as Safariland contends, that transaction involved Safariland, Delaware-organized LLC headquartered in Florida, selling VieVu, a Washington-organized LLC headquartered in Washington, to Axon, a Delaware-organized corporation headquartered in Arizona.  (*Id.*)  Thus, to some degree, Arizona is implicated in the sale of VieVu.  However, given the specific facts of this case show that the sale was not purposefully directed at the forum state, nor did Safariland avail itself of Arizona law to affect the transaction.  (*See id.*)

The remainder of GovGPT's argument is seemingly directed at the fallout from the sale of VieVu to Axon.  (*See, e.g.*, Doc. 117 at 6 ¶ 13.)  Whether the sale VieVu impacted "Arizona's law enforcement agencies and GovGPT" is not the standard.  Rather, GovGPT must show that Safariland undertook an "external manifestation of [will]" to direct actions at Arizona without relying on such act's "results, even the most direct, immediate, and intended." *Morill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017).  To affect the forum state is not always enough, there must be a showing of an intentional act expressly aimed at it. *Washington Shoe*, 704 F.3d at 673.  As Safariland puts it, GovGPT must show more than the alleged effects that the sale of VieVu had on the location of the ultimate purchaser—Axon.  (Doc. 12 at 5); *see also Helicopteros Nacionales de Colombia*, 466 U.S. at 417 ("[The] unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.").

Therefore, the Court finds that GovGPT has failed to carry its burden to show that Safariland (1) purposefully directs its activities at Arizona; and (2) that the asserted claim arose from Safariland's forum related activities. *See Picot*, 780 F.3d at 1211.  As a result, Safariland lacks the minimum contacts required for this Court to have personal jurisdiction over it.[1]  Therefore, the Court will grant Safariland's Motion to Dismiss (Doc. 110) and

---

[1]  The FAC alleges that Safariland's contacts arise from substantial business in this district, including the sale of BWCs.  (Doc. 74 ¶ 22.)  In response, Safariland provided an affidavit from its Vice President of Legal and Compliance, who averred that Safariland does not make sales for BWCs or DEMS in Arizona, casting doubt on the plausibility of GovGPT's allegation.  (Doc. 110-1 at 2 ¶ 9.)  GovGPT does not engage with its own allegation or the affidavit in its Response, and instead directs its argument at Safariland's sale of VieVu to

1    dismiss it from this case with prejudice.  With this dismissal, Safariland's other Motion to

2    Dismiss (Doc. 111) is now moot.  Therefore, the Court will deny that Motion (Doc. 111).

3        **C.  Microsoft's Motion to Dismiss (Doc. 90)**

4        Microsoft argues that GovGPT's FAC must be dismissed because: (1) the claims

5    are time barred; (2) GovGPT has not pleaded an antitrust injury and therefore lacks

6    standing; and (3) the FAC does not plausibly allege an unlawful agreement.[2]  (Doc. 90

7    at 6–7.)  For the reasons set forth, the Court agrees with Microsoft.

8            1.   The Statute of Limitations and Antitrust Standing

9        Under federal antitrust laws, an action must be commenced within four years after

10   the cause of action accrues.  *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321,

11   338 (1971); *see also In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1211

12   (N.D. Cal. 2015) (dismissing antitrust claims as time barred).  "A cause of action in

13   antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute

14   of limitations runs from the commission of the act."  *See Pace Indus., Inc. v. Three Phx.*

15   *Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (citation omitted).  A plaintiff may plead that a

16   defendant's acts constitute a continuing violation, in which case allegations of "an overt

17   act by the defendant is required to restart the statute of limitations and the statute runs from

18   the last overt act."  *Id.*; *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

19       Here, GovGPT alleges that Microsoft injured it by entering into an unlawful

20   agreement with Axon in 2018, which was then extended in 2022 (the "2022 Extension").

21   (Doc. 74 ¶¶ 26–27, 40, 44, 208–212.)  Because GovGPT's claims accrued when Microsoft

22   and Axon executed the 2018 agreement, the inquiry becomes whether the 2022 Extension

23   was a continuing violation.  *See Pace Industries*, 813 F.2d at 237.

24       Courts in the Ninth Circuit have explained that pleading a continuing violation

25   Axon.  (*See* Doc. 117.)  The Court, therefore, finds that GovGPT has conceded the
     allegation regarding Safariland's sale of BWCs in Arizona.  *See Morgan v. Kalaco*
26   *Scientific, Inc.*, No. CV-07-0786-PHX-SRB, 2008 WL 11449239, at *2 (D. Ariz. Mar. 5,
     2008) ("Generally, where a party fails to respond to a non-frivolous legal argument raised
27   by opposing counsel in a dispositive motion, that argument is deemed conceded.").
     [2] Microsoft also moves to dismiss Plaintiff's Clayton Act claim.  Plaintiff states that it has
28   not alleged such a claim against Microsoft.  (Doc. 94 at 10.)  Therefore, the Court will not
     address the parties' arguments on the Clayton Act claim.

requires more than "bald assertion[s]" that a defendant adhered to, enforced, and reaffirmed the alleged anticompetitive agreements. *See, e.g.*, *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1070–71 (N.D. Cal. 2016); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884 (N.D. Cal. 2015) (finding allegations that defendant had non-solicitation agreements it "maintained and renewed" to be "insufficient to quality for the continuing violation doctrine"). For a continuing violation to restart the limitations period, GovGPT must plead an overt act that (1) "[is] a new and independent act that is not merely a reaffirmation of a previous act"; and (2) "[the overt act] must inflict [a] new and accumulating injury on the plaintiff." *See Pace Indus.*, 813 F.2d at 238.

GovGPT's allegations regarding the 2022 Extension are inconsistent and difficult to follow. For example, it alleges that the 2022 Extension "grant[ed] Microsoft continued exclusive access to the extensive law enforcement data." (Doc. 74 ¶ 208.) And "[t]hrough the 2022 extension, Microsoft maintained exclusive control over Axon's body camera data," (Doc. 74 ¶ 209), which "enabled Microsoft to monopolize AI development . . . by providing it with unparallelled access to data that competitors could not obtain, (*Id.* ¶ 210). Then, however, GovGPT seemingly asserts that only after the 2022 Extension did the agreement require Axon's Evidence.com platform "to work exclusively with Microsoft Azure." (*Id.* ¶ 41.) In his Response to the Motion, GovGPT explains that the 2022 Extension "included new terms granting Microsoft *ongoing* exclusive access to Axon's body camera data and related AI technologies." (Doc. 94 at 3 (emphasis added).); *cf. Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1204 (9th Cir. 2014) (expanding a license agreement in 2006 to include products not covered by the previous 2003 license agreement was an overt act because the "2003 license did not contemplate future expansion").

On one hand, GovGPT seems to allege that Microsoft and Axon extended, maintained, and reinforced its existing agreement, which would not amount to an overt act. *See Pace Industries*, 813 F.2d at 238. On the other, GovGPT's allegations suggest that the 2022 Extension added "exclusivity" terms that were not part of the 2018 cloud storage

contract, including a term that "requires [Axon's] Evidence.com platform to work exclusively with Microsoft Azure." (Doc. 74 ¶ 41; *see also id.* ¶¶ 40, 42, 44.) However, GovGPT has not expressly pleaded what terms in the 2022 Extension are "new" to satisfy the continuing violation requirement of a new and independent act that inflicts a new and accumulating injury. *See Ryan* 147 F. Supp. 3d at 884 ("[W]here the defendant entered into an allegedly unlawful contract prior to the limitations period, the defendant still must take an unlawful new and independent act that is not merely a reaffirmation of a previous act during the limitations period." (quotation marks omitted)). And, reading the allegations in the light most favorable to GovGPT, the Court cannot determine what aspect of any cognizable "new" allegations materially changed the agreement such that the 2022 Extension was an overt act by Microsoft. *See id.*

GovGPT does draw the Court's attention to the following allegation, which it believes shows an overt act:

> Microsoft has been known to offer better pricing and incentives, like cloud credits, to entice companies to move more data to Azure. Microsoft's preferential pricing strategy, such as offering $500 million in Azure credits exclusively to OpenAI, gives preferential pricing or better terms to select partners. Upon information and belief, this preferential pricing was extended to Axon.

(Doc. 74 ¶ 40; Doc. 94 at 3–4.) According to GovGPT, Microsoft's pricing strategy "reinforced the barriers to entry for competitors," and has ostensibly cost GovGPT opportunities and profit. (Doc. 94 at 4.) Even assuming that this allegation is true, it has nothing to do with the 2022 Extension that GovGPT so fervently believes reset the statute of limitations. And, as Microsoft has pointed out, offering discounts or incentives generally cannot support a separate antitrust claim. (Doc. 90 at 18 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223–24 (1993) (analyzing a predatory pricing claim under § 2 of the Sherman Act requires showing "prices complained of are below an appropriate measure of its rival's costs . . . . [And] demonstrat[ing] that the competitor had a reasonable prospect . . . of recouping its investment in below-cost prices"). As it stands, Plaintiff has done no more than allege that Microsoft uses an effective pricing model to entice businesses to use its Azure cloud service rather than

competing services.  Thus, GovGPT has failed to plead an overt act.  *See, e.g.*, *Garrison*, 159 F. Supp. 3d at 1070–71; *Ryan*, 147 F. Supp. 3d at 884.

Even if GovGPT had pleaded a new and individual act, the FAC fails to allege that such an act caused a cognizable antitrust injury.  Antitrust laws were designed to redress injuries suffered by plaintiffs "injur[ed] in the market where competition is being restrained."  *Am. Ad Mgmt., Inc. v. Gen. Tele. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999) ("As a broker for the advertisements whose prices are allegedly retrained, [plaintiff] is a participant in the relevant market and it has suffered an injury in that market, the loss of commissions on advertisement purchases.").[3]  In other words, the injured party "must be a participant in the *same* market as the alleged malefactors."  *In re Dynamic Access Memory (DRAM) Antitrust Litig.* ("*DRAM II*"), 536 F. Supp. 2d 1129, 1137 (N.D. Cal. 2008) (internal quotation marks omitted).

Here, GovGPT alleges that the relevant market is "body-worn cameras, digital evidence management systems, and public safety video integration and management platforms."  (Doc. 74 ¶¶ 125–28.)  Somewhat troubling, however, is GovGPT's contention that it "intends to enter and compete in the digital evidence management market," (Doc. 94 at 10), which calls into question the veracity of its market allegations, (*see* Doc. 74 ¶¶ 125–128.)  If GovGPT has not entered the market, claims that it was injured in such market are merely speculative, which does not suffice to show injury for an antitrust claim or standing purposes.  *See DRAM II*, 536 F. Supp. 2d at 1137; *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 414 (2013) (finding that a "speculative chain of possibilities" cannot establish an actual or imminent injury in fact); *see also City of Oakland v. Oakland Raiders*, 20 F.4th 441, 458 (9th Cir. 2021) ("The harm may not be derivative and indirect or secondary, consequential, or remote." (quotation marks omitted)).  That concern aside, conspicuously absent from the FAC are any allegations of the market in which Microsoft competes.  (*See generally id.*)  Thus, on its face, the FAC does not set forth any allegation

---

[3]  An antitrust injury has four requirements: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type that antitrust laws were intended to prevent.  *Id.* at 1055–57.

1    that GovGPT and Microsoft compete in the same market.

2         GovGPT contends that it need not show that it participates in the "same" market if

3    its injury was a direct result of the anticompetitive conduct.  (Doc. 94 at 9.)  Supporting

4    this argument is a passing reference to *Blue Shield of Virginia v. McCready*, 457 U.S. 465,

5    484 (1982) ("Although [plaintiff] was not a competitor of the conspirators, the injury she

6    suffered was inextricably intertwined with the injury the conspirators sought to inflict on

7    psychologists and the psychotherapy market.").  In *McCready*, the Supreme Court held

8    that, under § 4 of the Clayton Act, the defendant's act of selectively refusing to reimburse

9    the plaintiff under an employer health plan brought defendant within the relevant market

10   for antitrust injury purposes.  457 U.S. at 450–51.  Here, GovGPT has not alleged that it

11   had a previous relationship with Microsoft such that the company's denial of service would

12   bring it within the alleged markets.  (*See generally* Doc. 74.)

13        At bottom, GovGPT has not alleged that Microsoft engaged in a "new and

14   independent act," or that such act caused a cognizable antitrust injury to GovGPT.  *Pace*

15   *Indus.*, 813 F.2d at 238; *Am. Ad Mgmt.*, 190 F.3d at 1057.  Thus, based on the allegations

16   in the FAC, the statute of limitations bars GovGPT's claims, and GovGPT has failed to

17   allege an antitrust injury that would confer standing.

18        GovGPT also asserts that the statute of limitations was tolled under 15 U.S.C.

19   § 16(i) because the Federal Trade Commission ("FTC") filed a complaint against Axon for

20   its acquisition of VieVu, LLC from Defendant Safariland.  (Doc. 74 ¶¶ 134–141.)  To toll

21   the statute of limitations under § 16(i), a plaintiff must show that the current suit is "based

22   in whole or in part on any matter complained of in [a government antitrust] proceeding."

23   Further, a plaintiff must show a "real relation" between the private and public causes of

24   action.  *Leh v. Gen. Petrol. Corp.*, 382 U.S. 54, 59 (1965); *Chipanno v. Champion Int'l*

25   *Corp.*, 702 F.2d 827, 831–32 (9th Cir. 1983).  To determine whether a plaintiff has met its

26   burden, courts consider the following: (1) the "substantial identity of the parties"; (2)

27   whether the plaintiff has alleged "a conspiracy that included the objectives, means, time

28   span, and geographic scope of the conspiracy alleged in the government suit"; and (3)

whether "evidence adduced in the trial of the government suit would be of practical assistance to plaintiff." *Garrison*, 159 F. Supp. at 1067–68 (cleaned up).

Microsoft contends that the statute cannot toll GovGPT's claims against it because the FTC complaint against Axon did not "have anything to do with Microsoft." (Doc. 90 at 14.) GovGPT contends that Microsoft's argument is "without merit" because the FTC complaint is directly relevant to "Microsoft's role as an enabler of Axon's monopolistic practices." (Doc. 94 at 4.) GovGPT's argument completely ignores § 16(i)'s requirements. The FTC complaint does not name, involve, or implicate Microsoft. (*See generally* Doc. 95.) The complaint concerns Axon's acquisition of a competitor, not its use of Microsoft's cloud service as a repository for its Evidence.com footage. (*See id.*) GovGPT even admits that Microsoft is not a direct party to the FTC's action, but nevertheless constructs an unsupported narrative about how the FTC complaint "addresses barriers to competition, including switching costs and data migration challenges," which is "relevant to cloud hosting services." (Doc. 94 at 5.) Section 16(i) requires a party to show a "real relation" and not a conspiracy theory that rests on a series of dubious, conclusory accusations. Therefore, GovGPT's argument is without merit, and the Court finds that 15 U.S.C. § 16(i) does not toll the statute of limitations on its claims against Microsoft thus its claims are time barred.

### 1. The Unlawful Agreement

Although GovGPT lacks standing and its claims are barred, the Court will afford some discussion regarding the unlawful agreement allegations. Microsoft argues that GovGPT's FAC is replete with conclusory allegations regarding the agreement, but that no allegation suggests that the companies did anything more than enter an arms-length, vertical supply agreement. (Doc. 90 at 15.) In response, GovGPT contends that the FAC sets forth allegations showing that Microsoft and Axon entered a strategic partnership designed to foreclose competing firms from providing DEMS to law enforcement agencies. (Doc. 94 at 6.)

To plausibly allege a claim under § 1 or § 2 of the Sherman Act, a plaintiff must

allege that defendant engaged in anti-competitive conduct and harm flowed from that conduct. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (Section 1); *Aerotec Int'l, Inc v. Honeywell Int'l, Inc.*, 4 F. Supp. 3d 1123, 1137 (D. Ariz. 2014), *aff'd*, 836 F.3d 1171 (9th Cir. 2016) (Section 2). For a § 2 claim, a plaintiff must allege a "specific intent to monopolize." *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003). Consistent with Rule 12's pleading requirements, it is not enough to merely allege that parties merely entered an unlawful agreement. *See Twombly*, 550 U.S. at 551; *cf. Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1155 (9th Cir. 2003) (explaining "[a]bsent additional evidence that the [agreement's] restrictive provisions were adopted for improper reasons," an agreement alone cannot "support a conspiracy to monopolize claim").

A plaintiff alleges an anticompetitive agreement when it plausibly asserts "a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Toscano v. Pro Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). But a scheme will not be inferred "when factual allegations just as easily suggest rational, legal business behavior." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015). Therefore, courts have required plaintiffs to plead more than "ultimate facts," which means that allegations cannot simply label a defendant's actions a "conspiracy" or assert unsupported legal conclusions. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047–48 (9th Cir. 2008). Instead, a plaintiff must plead "evidentiary facts" that plausibly allege "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several states, or with foreign nations; (3) which actually injures competition." *Id.*; *Twombly*, 550 U.S. at 556–57.

Here, GovGPT pleaded no more than ultimate facts and legal conclusions to support its Section 1 and Section 2 claims. It describes Microsoft and Axon's agreement as a "strategic partnership" and an "exclusive agreement" that created barriers for competing

firms in the digital evidence management market.  (Doc. 94 ¶ 11; Doc. 74 ¶¶ 117, 288).  Those allegations, however, lack supporting evidentiary allegations that elucidate how the agreement amounts to more than a supply contract for cloud services.[4]  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy."); *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 889–92 (2007) (recognizing that vertical agreements often have procompetitive justification and thus do not commonly give rise to Sherman Act violations).  Moreover, GovGPT's Section 2 claim predicated on conspiracy to monopolize theory otherwise fails because it is premised upon a "dual monopoly" theory, upon which a Section 2 claim cannot be based.  *See Standfacts Credit Serv's Inc. v. Experian Info. Sol., Inc.*, 405 F. Supp. 2d 1141, 1152–53 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2."); (Doc. 74 ¶ 292 ("[T]he collaboration between Microsoft and Axon established a dual monopoly.").)

GovGPT has failed to state a claim for relief against Microsoft under the Sherman Act.  Therefore, the Court will dismiss Microsoft, and the Counts asserted against it, without prejudice.

### D. Axon's Motion to Dismiss (Doc. 106)

Axon moves to dismiss the entirety of the FAC, arguing lack of standing, issues with conflicting, insufficient factual allegations, untenable legal theories, and outright false assertions regarding the danger of its AB4.  (Doc. 105 at 8–9.)  GovGPT maintains that its FAC plausibly states a claim for relief under each of its asserted legal theories.  (*See* Doc.

---

[4] *Twombly* is instructive here.  There, the Supreme Court held that the defendant telephone companies "have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another" insufficient because no evidentiary facts were pleaded which could prove the conspiracy.  550 U.S. at 551. The Court is faced with a complaint, as Plaintiff alleges that Microsoft and Axon entered an illegal, exclusive agreement that injured it and competitors.  Alas, no evidentiary facts abut these allegations, and thus, the claims are insufficient.

121.)

### 1. Count I—Lanham Act

#### a. Standing

When a claim is brought under a federal statute, courts must make sure the plaintiff comes within the "zone of interests" protected by that statute. *See Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal citations omitted). "To come within the zone of interests in a suit for false advertising under [the Lanham Act] a plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014). A statutory cause of action is presumed to be limited to plaintiffs whose injuries are "proximately caused by violations of the statute." *Id.* at 132. A plaintiff suing under the Lanham Act for false advertising "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. "That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff." *Id.* at 133–34. When a plaintiff and a defendant are direct competitors there is a presumption of harm, although they do not have to be direct competitors for the plaintiff to be injured. *See TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011); *ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*, No. CV-18-04189-PHX-JAT, 2019 WL 3840988, at *6 (D. Ariz. Aug. 15, 2019) (citing *Lexmark*, 572 U.S. at 120–21).

Axon argues that that GovGPT's claims do not fall within the zone of interest because the FAC does no more than allege vague and conclusory injuries to reputation and sales. (Doc. 106 at 12.) Additionally, Axon argues that GovGPT failed to plead that its economic or reputational injury flows directly from Axon's alleged deceptive advertising. (*Id.*) In response, GovGPT contends that it has sufficiently pleaded a commercial injury directly caused by Axon's deceptive statements. (Doc. 121 at 12.) Specifically, GovGPT maintains that it "allege[d] a causal connection between misleading statements and lost

sales." (*Id.*)

GovGPT alleges that it seeks to compete with Axon in the BWC and DEMS market. (*See* Doc. 74 ¶¶ 23, 85.) The extent to which GovGPT has engaged in such competition is not alleged. (*See generally id.; id.* ¶ 133 (describing GovGPT as a "potential entrant[]" of the alleged cluster market of BWCs and DEMS), ¶ 25 n.2 (GovGPT announces that it currently does not operate in the RTCC market).) GovGPT does plead that Axon's behavior injured GovGPT through "reduced opportunities to compete for business" due to Axon's failure to disclose risks associated with Quectel modules. (*See id.* ¶ 180.) Additionally, GovGPT contends that because of Axon's "material omission, competitors like GovGPT have suffered commercial harm, including lost sales and diminished market value." (Doc. 74 ¶¶ 180, 184.)

Based on the FAC, GovGPT's current market position is unclear. GovGPT alleges it has developed products to "compete" with Axon in the alleged markets but uses language like "GovGPT and other potential entrants" and "potential entrants like GovGPT" when making allegations of harm. (*See, e.g.*, *id.* ¶¶ 88, 133.) In other places, GovGPT's allegations of harm paint GovGPT as an active competitor: "Microsoft and Axon . . . significantly harm[ed] competition . . . including GovGPT." (*Id.* ¶ 292; *see also id.* ¶¶ 163, 177, 202.) Without clearly describing its own attempts to compete, GovGPT goes on to allege lost sales due to Axon's failure to disclose the presence of Quectel modules. (*See id.*)[5] GovGPT's allegations of harm to its supposed sales are anything but clear. (*See, e.g.*, *id.* ¶¶ 166–167, 182–184.) Therefore, the Court finds that the FAC does not sufficiently allege an injury to its sales based on Axon's alleged false advertising under the Lanham Act. *See TrafficSchool.com*, 653 F.3d at 827.

The link between GovGPT's purported lost sales and Axon's failure to disclose the Quectel module is tenuous. To show proximate cause, false advertising must drive customers away from GovGPT's product. *See Lexmark*, 572 U.S. at 133. Here, GovGPT

---

[5] GovGPT tries to explain away the absence of its allegations relates to sales in its Response, the Court "[will] not consider new allegations plaintiffs try to 'sneak' into their responses." *See Sobh v. Phx. Graphix. Inc.*, No. CV-18-04073-PHX-DWL, 2019 WL 3973697, at *6 (D. Ariz. Aug. 22, 2019).

alleges that Axon's corporate value and responsibility statements promoting transparency and equitable business practices are false and that the statements themselves impacted GovGPT's sales. (*See* Doc. 74 ¶¶ 166, 184.) Further, GovGPT alleges that if customers were "informed about the [Quectel] security risks, it is likely they would have reconsidered purchasing Axon's products or chosen alternative vendors." (*Id.* ¶ 182.) Accepting these allegations as true still does not ameliorate the lack of claims that the omission of the presence Quectel modules or components resulted in customers shying away from GovGPT's DragonFly or Hiago to instead buy the AB4 and an Evidence.com subscription. (*Id.* ¶¶ 182–183; *but see id.* ¶ 184 ("[C]ompetitors like GovGPT have suffered commercial harm, including lost sales.").) To be sure, hypothetical plaintiffs need not provide definitive proof that a defendant's advertisements caused plaintiffs to lose sales, *TrafficSchool.com*, 653 F.3d at 827, but those plaintiffs must otherwise put forth sufficient facts to show a plausible inference of economic or reputational injury wrought by the deceptive marketing, *Lexmark Int'l*, 572 U.S. at 133. GovGPT must allege with greater specificity how Axon's deceptive marketing resulted in customers not purchasing GovGPT's comparable products. It is not enough to allege that customers *may* have chosen Axon over other unnamed competitors or GovGPT. *Cf. ThermoLife Int'l LLC v. BPI Sports LLC*, No. CV-20-02091-PHX-SPL, 2021 WL 661981, at *5 (D. Ariz. Feb. 19, 2021), *aff'd*, No. 21-15339, 2022 WL 612669 (9th Cir. Mar. 2, 2022). In the absence of such allegations, GovGPT has not alleged that its purported injury was proximately caused by Axon's allegedly false statements. *See Lexmark*, 572 U.S. at 133.

Because GovGPT has failed to establish standing, its Lanham Act claim must be dismissed. That notwithstanding, the Court will otherwise provide an analysis on why the claim fails on the merits.

///

### b. False Advertising

Count I is premised on 15 U.S.C. § 1125(a)(1)(B), which provides in pertinent part:
(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or

device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The elements of a Lanham Act false advertising claim include:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). Further, the Lanham act requires allegedly false statements to pertain to a product. *Jack Russel Terrier Network of N. Cal. v. Am. Kennel Club*, 407 F.3d 1027, 1037 (9th Cir. 2005).

Axon first argues that Count I fails to allege a plausible violation of the Lanham Act because it is premised on unfounded claims that the AB4 house hackable Quectel modules. (Doc. 106 at 9.) Beyond that, Axon asserts that most of GovGPT's claims fail as a matter of law as they do not pertain to a product, or are, at most, inactionable puffery. (*Id.* at 9–10.) Finally, Axon argues that the single statement that references a product fails because GovGPT admits it is true. (*Id.* at 11.)

GovGPT responds by asserting that certain alleged false statements are in fact directed at Axon's products, including the AB4. (Doc. 121 at 5.) Moreover, the statement about Evidence.com's export potential has plausible falsity and is misleading. (*Id.* at 10.) And, unsurprisingly, GovGPT claims that the statements are not mere puffery. (*See id.*)

GovGPT alleges that the following five statements are false:

1. WINNING RIGHT: We maintain transparency and operate equitably.

2. We're Transparent.

3. We also allow for bulk exports of your evidence data out of Evidence.com in case you want to try another system.

4.  We will win and retain your business by providing great products and an awesome user experience, not by restricting your ability to leave.

5.  We use data to drive ideas and constantly put ethical rigor behind how we design.

(Doc. 74 ¶ 159).  The related allegations in the FAC argue that the statements are directed at the AB4 as well as Axon's failure to disclose the presence of Quectel components to law enforcement agencies.  (*See id.* ¶¶ 154–155.)  The claims are further based on the codependency of the AB4 and Evidence.com, meaning law enforcement agencies are unable to try another DEMS without rendering their AB4's inoperable.  (*Id.* ¶¶ 173–174.)

### a.  Statements 1, 2, 4, and 5

The FAC makes clear that these statements are cabined to the "responsibility" and "principles" web pages on Axon's website.  (Doc. 74 ¶ 159, nn.82–83.)  Facially, statements 1, 2, 4, and 5 do not reference any product.  (Doc. 74 ¶¶ 161, 168–170, 175–177, 178, 181–183.)  Nevertheless, GovGPT maintains that these statements tie into the AB4's marketing, and the failure of Axon to disclose the Quectel components somehow render statements of transparency and ethical business practice false.  (Doc. 121 at 5–10.)  The location on Axon's website and the plain language of these statements are enough to dispense with GovGPT's claims.  Indeed, while both transparency and ethical practices are positive tenets for business, the statements simply do not refer to a product as required by the Lanham Act.[6]  *Jack Russel*, 407 F.3d at 1037.

_____

[6] Even if Statements 1, 2, and 5 implicated the AB4, the allegations and supporting argument are predicated on claims nearly identical to those the Court previously found to be implausible, unsubstantiated, and brought in bad faith.  (*See* Doc. 71; Doc. 105 at 31; Doc. 24-2 ¶ 23.)  Truly, the only difference is that GovGPT has altered its diction, pleading that the Quectel "chips" are now "components" or "modules."  (Doc. 71; Doc. 121 at 5, 7, 10.)  When the Court denied GovGPT's request for preliminary injunction (Doc. 71), it considered affidavits containing uncontroverted attestations that "[t]he [Quectel] module cannot be remotely accessed."  (Doc. 24-2 ¶ 23.)  This information is important because GovGPT's false advertising allegations are, in large part, predicated on a theory that the Chinese Communist Party use Quectel modules as "gateways to espionage" through over-the-air ("OTA") updates.  (Doc. 74 ¶¶ 72–73.)  To be clear, the Court will not vitiate its obligation to read well-plead allegations as true, and will not consider Axon's affidavit as conclusive evidence that defeats the FAC.  However, the Court is skeptical that these allegations are plausible after having closely scrutinized them throughout the life of this case.  (*See, e.g.*, Doc. 105 at 23, 25, 31.)

GovGPT claims that statement 4 "is misleading because it implies that Axon does not restrict the ability to leave its platform, when in fact, Axon body cameras only work with Evidence.com subscriptions."  (Doc. 74 ¶ 175.)  The statement itself does not reference the AB4, Evidence.com, or the alleged codependency.  And even assuming the statement did reference either product, GovGPT does not sufficiently allege that the statement led to an injury.  (*See id.* ¶¶ 25, 175–177.)  More specifically, GovGPT does not allege that the statement caused potential customers to purchase Axon's AB4 and an Evidence.com subscription instead of GovGPT's "Hiago" product.  (*See id.* ¶¶ 25, 175–177.)

If a statement claimed to be false constitutes mere "puffery," then they are not actionable under the Lanham Act.  *See Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990); *see also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008) ("[T]he determination of whether an alleged misrepresentation is a statement of fact or is instead mere puffery is a legal question that may be resolved on a Rule 12(b)(6) motion.").  Puffery "is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely."  *Southland Sod Farms*, 108 F.3d at 1145; *cf. Cook*, 911 F.2d at 246 (explaining that an actionable false advertising claim involve "specific or absolute characteristics of a product").

Axon contends that the challenged statements simply elucidate Axon's company principles and values, rather than describe specific characteristics of a product that a customer can evaluate.  (Doc. 106 at 11.)  In response, GovGPT suggest that the statements are objectively measurable, capable of verification, contrary to Axon's business practices, and explicitly tied to Axon's claims of "ethical rigor" to its design practices.  (Doc. 121 at 4–9.)

The Ninth Circuit has held that generally describing the "high priority" that defendant placed on product development "d[id] not state an actionable fraud or negligent misrepresentation claim" because such claims were "generalized, vague and unspecific assertions" that constituted mere puffery.  *Glen Holly Enter., Inc. v. Tektronix, Inc.*, 352

F.3d 367, 379 (9th Cir. 2003).  Similarly, this Court has resounded the common holding that claims of "innovative" designs or "proprietary ingredients" are "not specific, concrete, not measurable, and therefore puffery."  *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F. Supp. 2d 1118, 1133 (D. Ariz. 2008) (citing *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l., Inc.*, No. 05 C 4088, 2005 WL 3557947, at *10 (N.D. Ill. Dec. 26, 2005); *Oestricher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008)); *see also Summit Tech., Inc. v. High-Line Med. Instr., Co.*, 933 F. Supp. 918, 931 (C.D. Cal. 1996) ("The Court agrees that [defendant's] statement that the used Excimer lasers are 'perfectly reliable' is mere puffery, not actionable under the Lanham Act.").  Finally, statements about "ensur[ing] transparent regulatory compliance" have been deemed non-actionable puffery.  *In re Lottery.com, Inc. Sec. Litig.*, 715 F. Supp. 3d 506, 550 (S.D.N.Y. 2024).

Statements 1, 2, 4, and 5 are quintessential puffery.  General, unspecified claims about transparency, operation and design, as well as ethical standards have frequently been regarded as inactionable under the Lanham Act.  *See id; Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 344 (S.D.N.Y. 2015) (explaining "statements about reputation, integrity, and compliance with ethical norms" are non-actionable puffery); *Glen Holly Ent.*, 352 F.3d at 379; *Soilworks*, 575 F. Supp. 2d at 1133.  GovGPT's Response does not address any of these cases, let alone set forth a discernable, legally-supported theory as to why these statements are not puffery.  (*See* Doc. 121.)  Therefore, the Court finds that, even had these statements referenced a product, they would at most be non-actionable puffery.  At bottom, statements 1, 2, 4, and 5 do not make any specific claim about a complained about Axon product, and thus fall outside the scope of a Lanham Act false advertising claim.

### b.  Statement 3

Statement 3 references Axon's Evidence.com platform, which GovGPT claims is "misleading" because there are "practical limitations on data export," making the process potentially "cumbersome, incomplete, or technically challenging."  (Doc. 74 ¶¶ 59, 173.) Axon contends that customers in the DEMS market would likely be aware that "bulk export" of large data repositories would be cumbersome and technically challenging.  (Doc.

106 at 11.)  Moreover, Axon argues that the FAC fails to allege any customers were or would likely be deceived by statement 3 and GovGPT essentially admits that bulk export is possible and therefore not false.  (*Id.*); *see also Southland Sod Farms*, 108 F.3d at 1139 (an actionable false advertising statement must be factually untrue).  In response, GovGPT argues that "while technically true," the statement entices customers to use Evidence.com without realizing the financial barriers associated with trying another DEMS.  (Doc. 121 at 10–11.)

By its own admission, GovGPT concedes that statement 3 is true.  (Doc. 121 at 9; Doc. 74 ¶¶ 59, 173.)  When an advertisement is not "literally false," a plaintiff may still obtain relief under the Lanham Act if it can show that "the advertisement has misled, confused, or deceived the consuming public."  *See Southland Sod Farms*, 108 F.3d at 1140.  The FAC maintains that "Axon creates an illusion of freedom" that "prevents competitors from attracting customers who believe they have the flexibility to switch [DEMS]" and thus "customers are deceived into believing they have options when they do not."  (*Id.* ¶¶ 173–174.)  GovGPT's allegations are confusing in light of its admission that the statement is literally true.  (Doc. 121.)  Indeed, customers can leave Axon's DEMS with their data in tow.  Bulk export may be difficult on any number of DEMS platforms, not just Evidence.com.  Moreover, the statement itself does not promise a seamless transition, it simply maintains that Axon offers customers the ability to bulk export its data if it wishes to try another service.  And, contrary to GovGPT's allegations, the statement does not promise that law enforcement agencies AB4's would work with another DEMS platform. (*See* Doc. 74 ¶ 174.)  GovGPT has failed to sufficiently plead that statement 3 is either false or misleading to sustain a Lanham Act claim.

Thus, GovGPT has failed to state a claim for relief under the Lanham Act and the Court will dismiss Count I without prejudice.

## 2.  Count VII—UCL

GovGPT claims that Axon violated the UCL by failing to disclose that the AB4 contains Quectel modules.  (Doc. 74 ¶¶ 310–317.)  Axon argues that GovGPT failed to

allege a sufficient violation of any of the UCL prongs.  (Doc. 106 at 13 (citing Cal. Bus. & Prof. Code § 17200 *et seq.*).)  In response, GovGPT contends that the FAC demonstrates Axon's failure to disclose the Quectel modules created an uneven playing field by misleading customers.  (Doc. 121 at 15.)  According to GovGPT, Axon's failure to disclose has "unfairly lock[ed] customers into its ecosystem through deceptive practices."  (*Id.*)

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  "An act can be alleged to violate any or all of the three prongs of the UCL—unlawful, unfair, or fraudulent."  *Berryman v. Merit Prop. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 186 (Cal. Ct. App. 2007).  The Court will discuss each prong in turn.

To allege that conduct is "unlawful," a plaintiff must allege a violation of a different statute.  *See Stearns v. Select Comfort Retain Corp.*, 763 F. Supp. 2d 1128, 1150 (N.D. Cal. 2010) ("[T]he UCL borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." (quotation marks omitted)).  GovGPT alleges that Axon's conduct violated the Lanham Act and California's Consumer Legal Remedies Act ("CLRA").  (Doc. 74 ¶ 312.)  GovGPT's UCL claim based on violation of the Lanham Act fails because it has failed to establish standing or plead a valid Lanham Act claim.  Moreover, GovGPT does not provide any more than a passing reference to the CLRA in its FAC, leaving any claim of violation threadbare and conclusory.  It has therefore failed to plead the necessary facts to show Axon's omission was "unlawful" under the UCL.

Under the UCL, the factors that define unfairness are: "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.  *Camacho v. Automobile Club of S. Cal.*, 48 Cal. Rptr. 3d 770, 776 (Cal. Ct. App. 2006).  GovGPT alleges that Axon's failure to disclose the Quectel modules "reduces competition because it conceals a material fact that [AB4s] could be compromised by foreign interference, hurting public safety."  (Doc. 74 ¶ 313.)  This

allegation is deficient for a few reasons.  First, GovGPT largely ignores the UCL requirements of pleading a substantial consumer injury and instead merely concludes that Axon's failure to disclose reduced competition.  (*See* Doc. 74 ¶ 313.)  Second, GovGPT's allegations of hacking and espionage related to the Quectel modules are preposterous.  (*See* Doc. 71; Doc. 105 at 31.)  Therefore, GovGPT has not stated a claim under the unfair business practice prong.

Finally, to allege conduct is a "fraudulent" business practice likely to deceive the public, a plaintiff must satisfy the heightened standard of Federal Rule of Civil Procedure 9(b).  *See Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1051 (N.D. Cal. 2014).  Rule 9(b) requires a plaintiff alleging fraud "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see also Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009).  Additionally, plaintiffs asserting a theory of fraud predicated on false advertising and misrepresentation must "demonstrate actual reliance on the allegedly deceptive or misleading statements." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 888 (Cal. 2011) (cleaned up).  GovGPT's fraud allegations maintain that Axon's omissions of the Quectel security risks "was likely to deceive and mislead customers who reasonably relied on Axon's representations."  (Doc. 74 ¶ 314.)  Noticeable absent is demonstrable reliance or particularized allegations regarding Axon's fraudulent acts.  As a result, GovGPT has failed to state a UCL claim under the fraudulent business practices prong.

Because GovGPT has failed to state a claim under any of the three UCL prongs, the Court will dismiss the claim.

### 3.  Counts II–VI—The Antitrust Claims

"Section 7 of the Clayton Act generally prohibits business acquisitions whose effect may be to substantially lessen competition, or tend to create a monopoly in a relevant market." *DeHoog v. Anheuser-Bush InBev*, 899 F.3d 758, 762 (9th Cir. 2018).  To plausibly allege a claim under Section 1 or Section 2 of the Sherman Act, a plaintiff must allege that defendant engaged in anti-competitive conduct and harm flowed from that conduct. *Brantley*, 675 F.3d at 1197 (Section 1); *Aerotec*, 4 F. Supp. 3d at 1137 (Section

2). "The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458, (1993). Here, GovGPT offers three theories to show how Axon violated the Clayton Act: (1) the 2018 agreement with Microsoft; (2) the 2024 acquisition of Fusus; and (3) the 2018 acquisition of VieVu. (*See* Doc. 74 ¶¶ 192, 200, 208.) Similarly, GovGPT relies on the acquisitions, the Microsoft agreement, and the Quectel allegations to substantiate its Sherman Act claims. (*See* Doc. 74 ¶¶ 192–309.)

### a.  The Microsoft Agreement

The Court is unsure why GovGPT brought a Section 7 Clayton Act claim against Axon predicated on the 2018 Microsoft agreement, as the Act governs the acquisition by one corporation of the stock of another, not cloud computing contracts. *See* 15 U.S.C. § 18. GovGPT's Response does not clarify its position on the matter. (*See* Doc. 121.) Thus, GovGPT's Clayton Act claim must be dismissed with prejudice to the extent that it is premised on the 2018 Microsoft contract or 2022 extension.

The Sherman Act claims predicated on the Microsoft agreements will be dismissed for the reasons the Court stated in the portion of this Order dismissing the claims against Microsoft. Namely, the statute of limitations has run, and GovGPT has not sufficiently pleaded an overt act to toll the statute. *See, e.g.*, *Garrison*, 159 F. Supp. 3d at 1070–71; *Ryan*, 147 F. Supp. 3d at 884.

### b.  Standing to Challenge Fusus Acquisition

Axon argues that GovGPT lacks standing to challenge the 2024 acquisition of Fusus because GovGPT does not compete in the Public Safety Video Integration and Management Platforms' ("real-time crime centers" or "RTCC") market. (*See* Doc. 74 ¶ 25 n.2 (GovGPT does not operate in the [RTCC] market today. However, it has plans to.") In response, GovGPT contends that its products inherently compete with offerings in the RTCC markets, and therefore, it has standing. (*See* Doc. 121 at 18.) Interestingly, in its Response to Safariland's Motion to Dismiss (Doc. 110), GovGPT claims that it is a "new entrant into the BWC, DEMS, and now [RTCC] markets." (Doc. 117 at 2.)

The attorney argument offered in GovGPT's Response directly contradicts the allegations in its FAC.  (*See id.*; Doc. 74 ¶ 25 n.2.)  The FAC explicitly alleges that GovGPT does not compete in the RTCC market.  (Doc. 74 ¶ 25 n.2.)  A party challenging the legality of an acquisition or merger under the Clayton Act *must* compete in the market with the party against whom the claim is asserted.  *United States v. Marine Bancoration, Inc.*, 418 U.S. 602, 621 (1974); *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013).  Since the FAC does not allege GovGPT's participation in the RTCC market, any subsequent argument that GovGPT currently competes in this market through its existing products is disingenuous and without merit.  Because GovGPT admittedly does not compete in this market, it lacks standing to challenge the Fusus acquisition.  Therefore, the Court will dismiss with prejudice the Clayton Act claim to the extent that it is based upon the Fusus acquisition.  Additionally, Count V—attempted monopolization of the RTCC market—will be dismissed with prejudice.  *See Somers*, 729 F.3d at 963.

### c.  Antitrust Standing

Axon argues that GovGPT fails to establish antitrust standing as it merely "complains that as a new startup it is difficult to compete with Axon's product offerings." (Doc. 106 at 30.)  With respect to the claims relating to the VieVu Acquisition, Axon argues that GovGPT has only recently joined the BWC and DEMS market and therefore lacks injury because it was not a market participant when the alleged violative conduct occurred.  (*Id.*)  Seemingly, GovGPT does not attempt to refute Axon's argument regarding standing to challenge the VieVu Acquisition or the Microsoft Agreement.  (*See* Doc. 121.)

To bring a claim under the Clayton and Sherman Acts, GovGPT must have antitrust standing.  "[C]ourts have constructed the concept of antitrust standing, under which they evaluate the plaintiff's harm, the alleged wrongdoing by defendants, and the relationship between them, to determine whether a plaintiff is a proper party to bring an antitrust claim." *Am. Ad Mgmt.*, 190 F.3d at 1054 (internal citation omitted).  Our Supreme Court recognized that it is "virtually impossible to announce a black-letter rule that will dictate the result in every case," and thus offered several factors.  *Associated Gen. Contractors of Cal., Inc. v.*

*Cal. State Council of Carpenters*, 459 U.S. 519, 530–535 (1983).  Those factors include: (1) The nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) The directness of the injury, i.e., causation; (3) The speculative measure of the harm; (4) The risk of duplicative recovery; and (5) The complexity in apportioning damages.  *See Amarel v. Connell*, 102 F.3d 1494, 1507 (9th Cir. 1996) (citing *Associated General Contractors*, 459 U.S. at 535).  These factors must be balanced, i.e., "[n]o single factor is decisive," but great weight is given to the nature of the plaintiff's alleged injury.  *R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 146 (9th Cir. 1989); *Amarel*, 102 F.3d 1507.  But an injury is necessary.  *See Oakland Raiders*, 20 F.4th at 456 ("[T]he first factor—antitrust injury—is mandatory.").

"Antitrust injury is defined not merely as an injury caused by an antitrust violation, but more restrictively as 'injury of the type of the antitrust laws were intended to prevent and that flows from that which makes [defendant's] acts unlawful.'"  *Glen Holly Ent.*, 352 F.3d at 371 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Antitrust laws protect against anticompetitive conduct, not competition in the marketplace.  *United States v. Topco Assoc., Inc.*, 405 U.S. 596, 608 (1972).  Antitrust injury has four requirements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054–55 (9th Cir. 1999).  As stated by the Supreme Court:

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise systems as the Bill of Rights is to the protection of our fundamental personal freedoms.

*Topco*, 405 U.S. at 608.  "One form of antitrust injury is "[c]oercive activity that prevents its victims from making free choices between market alternatives."  *Glen Holly Ent.*, 352 F.3d at 374 (citing *Amarel*, 102 F.3d at 1509). However, "[antitrust] injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive practice under scrutiny."  *Atl. Richfield Co.*

*v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  This is because "[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–110 (1986).

With respect to the Clayton Act, GovGPT resounds Section 7's requirements before it was injured due to "[t]he effect of th[e] [VieVu] acquisition" having substantially lessened competition thereby creating a monopoly in the Markets.  (Doc. 74 ¶ 194.)  Thereafter, GovGPT declares that "[h]igh barriers to entry and expansion have made it infeasible for a competitor like GovGPT to enter the Markets."  (*Id.* ¶ 198.)  Reading past the conclusory nature of these allegations, and taken as true, the claimed harm is a common injury to competition that the antitrust laws were intended to forestall.  *See Cargill*, 479 U.S. at 113 (explaining that a private plaintiff must show an injury "of the type the antitrust laws were designed to prevent").  However, the sufficiency of GovGPT's injury is maligned by its position as a competitor and its non sequitur allegations.

Reduced competition and quality, as well as higher prices, are prime types of consumer injuries that the antitrust laws aim to prevent.  *See Brunswick Corp.*, 429 U.S. at 489.  However, GovGPT, as a competitor, would primarily seek to gain from these consequences.  *See Am. Ad Management.*, 190 F.3d at 1056 ("There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct."); *Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 319 (D.D.C. 2011) ("[While] harm to consumers by way of increased prices is the type of injury the antitrust laws were designed to prevent, . . . it is not an injury-in-fact that competitors suffer.").  Courts have recognized that reduced competition and the ability to charge higher prices would, in most circumstances, benefit competitors.  *See Matsushita*, 475 U.S. at 583 ("[R]estraints that have the effect of either raising market price or limiting output . . . actually benefit competitors by making supracompetitive pricing more attractive."); *Novation Ventures, LLC v. J.G. Wentworth Co., LLC*, 156 F. Supp. 3d 1094, 1101 (C.D. Cal. 2015) ("If the merger has benefitted Defendants by reducing the number of competitors in the market . . . then it has similarly benefitted the other participants in that market by reducing

competition for them.").  Although, the Ninth Circuit has found that a competitor who may gain from a defendant's alleged anticompetitive conduct is not completely precluded from showing an antitrust injury. *Cf. Ellis v. Salt River Proj. Improvement and Power Dist.*, 24 F.4th 1262, 1274–75 (9th Cir. 2022).  Although, the Ninth Circuit's finding does not change the fact that the plaintiff must plead a cognizable injury, it may not, as GovGPT has done here, cobble together a mix of consumer, competitor, and conspiracy-based injury allegations related to an acquisition, and hope that the Court pieces the puzzle together. *See Atl. Richfield*, 495 U.S. at 334.

GovGPT's allegations of high barriers to market entry are similarly insufficient. (Doc. 74 ¶ 198.)  Aside from declaring that Axon's anticompetitive conduct made it "infeasible for a competitor" to enter the market, GovGPT provides no factual enhancement to demonstrate that it has been foreclosed or impeded from the opportunity of competing in the relevant product market because of the VieVu acquisition.  (*See generally id.*); *cf. Novation Ventures*, 156 F. Supp. 3d at 1102.  Again, the law requires GovGPT to demonstrate that it has suffered an injury the antitrust laws were designed to prevent, which requires more than regurgitating the elements in myriad allegations.  (*See* Doc. 74 ¶¶ 198, 205.)

GovGPT also alleges that the acquisition restrained trade because "conceal[ed] critical information about the security vulnerabilities . . . [of] Quectel modules, and thereby misleading [customers] into buying Axon products." (*Id.* ¶ 213); *Glen Holly Ent.*, 352 F.3d at 374 (explaining that antitrust injury may result from "[c]oercive activity that prevents its victims from making free choices between market alternatives.")  According to GovGPT, but for Axon's deception, law enforcement agencies would have bought from competing firms, and this failure to disclose "has distorted the competitive landscape . . . at the expense of competitors like Plaintiff."  (*Id.*)  This allegation, however, does not stand up to even modest scrutiny.  First, the procedural history of this case casts some doubt on the plausibility of GovGPT's allegations regarding the Quectel "chips," "components," or "modules."  (*See* Doc. 71; Doc. 105.)  Second, GovGPT's FAC is unclear as to whether it

is even a competitor.  (*See* Doc. 74 ¶¶ 88, 133, 163, 177, 202.)  Third, GovGPT alleges no more than bald conclusions that the presence of the Quectel parts *actually* led to it losing business.  (*See id.* ¶ 213.)  And fourth, the link between the acquisition of VieVu, the Quectel parts, and GovGPT's alleged injury is tenuous and nearly incomprehensible.  (*See id.*)  In other words, the FAC not only fails to allege an antitrust injury for a Section 7 claim, but also fails to comply with the fundamental requirement of Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The facts alleged concerning the Quectel parts do little to enhance GovGPT's generalized allegations of "substantially lessened competition" and "monopolization."

Interestingly included in the Section 7 allegations is the following: "Plaintiff have [sic] been injured and have [sic] paid artificially inflated prices for the Products."  (Doc. 74 ¶¶ 228, 233, 253, 261.)  The same or similar allegations of injury are present in Counts III and VI as well.  The FAC is having an identity crisis, as it has failed to the draw the line between consumer-based injury and competitor-based injury.  GovGPT's has not pleaded an antitrust injury that would confer standing upon it for a Section 7 Clayton Act claim.

GovGPT similarly fails to plead an antitrust injury for its Sherman Act claims.  In Count III, which alleges a conspiracy to restrain trade, GovGPT contends that Axon entered into several agreements with Safariland and Microsoft that have reduced competition in violation of Section 1.  (Doc. 74 ¶ 233.)  GovGPT does not plead specific allegations regarding the conspiracy to restrain trade as it relates to the VieVu Acquisition.  (*See id.*)  Instead, this section is largely directed at Axon and Microsoft's agreements and hosting of bodycam footage.  (*See id.* ¶¶ 231–248.)  The Court has previously explained that the statute of limitations bars GovGPT's antitrust claims based on the 2018 Microsoft agreement.  Additionally, as alleged, it is unclear how the agreements with Safariland establish an injury, as the non-compete provisions have been rescinded.  (*Id.* ¶¶ 134, 233.)

To the extent that the injury is premised on the Quectel modules, GovGPT's claim is no more successful.  As explained, those allegations lack plausibility and factual enhancement, making them at most, an attempt to further support an already rejected

conspiracy theory about the AB4.  Unfortunately, the allegations in Count III, like most of the FAC, is rife with ultimate, conclusory facts about GovGPT's alleged injuries.  (*See, e.g., id.* ¶ 238 ("Defendants' conduct has caused Plaintiff to suffer damages in the form of injuries to their business or property.).)

Count IV, which alleges monopolization of the BWC and DEMS markets, GovGPT contends that the VieVu acquisition has resulted in "substantial anticompetitive effects" such as higher prices in the product markets and injured competition.  (Doc. 74 ¶ 253.) GovGPT goes on to allege that Axon's conduct has caused it to suffer injuries to its business and property due to the acquisition and because of "Axon's deliberate concealment of the security risks associated with the Quectel Modules . . . mislead [consumers] into adopting Axon's technology." (*Id.* ¶ 265.)  Like the preceding Counts, the FAC lacks any factual enhancement to show how the VieVu Acquisition resulted in injurious conduct that has or will injure GovGPT.  (*See id.*)  Instead, GovGPT peddles its conspiracy theory about the potential danger of Quectel modules and Axon's deceptive sales practices.  (*Id.*)

Similarly, Count VI, which alleges conspiracy to monopolize, does not set forth how Axon's illegal conduct related to the VieVu Acquisition injured GovGPT as a competitor.[7] (*See id.* ¶¶ 284–309.)  Even if GovGPT successfully established standing for this claim, it would otherwise fail because it is premised upon a "dual monopoly" theory, upon which a Section 2 claim cannot be based.  *See Standfacts Credit Serv's Inc. v. Experian Info. Sol., Inc.*, 405 F. Supp. 2d 1141, 1152–53 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under section 2."); (Doc. 74 ¶ 292 ("[T]he collaboration between Microsoft and Axon established a dual monopoly.").)

Earlier, the Court afforded GovGPT Lanham Act claim some analysis after finding that it lacked standing to bring it.  The same benefit will not be afforded to GovGPT

---

[7] In Count VI, GovGPT contends that competitors are unable to compete in part because Axon will not provide competitors with footage from its Evidence.com repository.  (*Id.* ¶ 288.)  Or in other words, GovGPT's claim is partly based on its issue with the fact that, without a court order, it cannot utilize Axon's work for its own gain.  (*See id.*)

1    regarding its antitrust claims, as the FAC and its Response to Axon's Motion are near
2    indecipherable regarding these claims.    GovGPT has consistently misrepresented and
3    attempted to rewrite the allegations in its FAC and the precedent upon which it relies.  (*See,*
4    *e.g.*, Doc. 121 at 22 (citing *In re Lithium Ion Batteries Antitrust Litigation*,
5    No.:13-MD-2420 YGR, 2024 WL 309192, at *1 (N.D. Cal. Jan. 21, 2014)).)

6         On its face, the FAC is confusing, inconsistent, and as a result, fails to properly
7    plead antitrust injury.  Similarly, the FAC fails to state a claim for relief under the Lanham
8    Act or the UCL.  Consequently, the entire FAC will be dismissed without prejudice as to
9    Axon.

10   **IV.    LEAVE TO AMEND**

11        Federal Rule of Civil Procedure 15(a) requires that leave to amend be "freely give[n]
12   when justice so requires."  Leave to amend should not be denied unless "the proposed
13   amendment either lacks merit or would not serve any purpose because to grant it would be
14   futile in saving the plaintiff's suit."  *Universal Mortg. Co. v. Prudential Ins. Co.*, 799 F.2d
15   458, 459 (9th Cir. 1986).  Therefore, "a district court should grant leave to amend even if
16   no request to amend the pleading was made, unless it determines that the pleading could
17   not possibly be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122,
18   1127 (9th Cir. 2000) (cleaned up).

19        Here, GovGPT filed an Initial Complaint, a Proposed Amended Complaint (Doc.
20   69) which it later withdrew, and now the FAC (Doc. 74).  Each iteration of the Complaint
21   in this case has asserted similar claims, including those claims regarding the potential
22   danger of Quectel "chips," "components," or "modules."  (*See* Doc. 1; Doc. 69; Doc. 74.)
23   Axon contends that the FAC ought to be dismissed with prejudice because GovGPT has
24   had ample opportunities to cure its deficient allegations and has failed to do so.  (Doc. 106
25   at 32 (citing *McHenry v. Renne*, 84 F.3d 1172 (9th Cir. 1996)).)

26        The Court agrees that GovGPT's FAC fails to state a claim, but it does not believe
27   that all claims in this case should be dismissed with prejudice at this time.  Although the
28   Court can say with certainty that GovGPT has not buried a cognizable claim somewhere

in his 110-page FAC.  Indeed, the FAC is so long, dense, and inconsistent that GovGPT's claims often collapse in on themselves.  That notwithstanding, the Court will allow GovGPT an additional attempt at amendment.  However, the Court warns GovGPT that its Second Amended Complaint must comply with Rule 8(a).  The Court will not pronounce a hard-and-fast page limit, but the Court notes that 110-pages is excessive in a case wherein a great deal of the alleged facts more to do with supporting a conspiracy theory than substantiating Lanham Act or antitrust claims.  It is not lost on the Court that the very nature of antitrust actions typically begets a detailed complaint.  However, pleadings in such cases ought to (1) avoid alleging a horde of irrelevant, conspiratorial facts; and (2) comport with the requirements that pleadings in federal court be "short and plain."  *See* Fed. R. Civ. P. (8)(a)(2).  Failure to comply with this directive will result in the dismissal of GovGPT's amended pleading.  If GovGPT wishes to have another bite at the apple, it will file a Second Amended Complaint within thirty (30) days of the date of this Order.

## V.    CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED granting** Safariland's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 110) and **denying as moot** Safariland's Motion to Dismiss for Failure to State a Claim (Doc. 111).  Because the Court cannot exercise jurisdiction over Safariland, it will be dismissed from this case with prejudice.

**IT IS FURTHER ORDERED granting** Microsoft's Motion to Dismiss (Doc. 90) and dismissing Microsoft from this case without prejudice.

**IT IS FURTHER ORDERED granting** Axon's Motion to Dismiss (Doc. 106) and dismissing Axon from this case without prejudice.

**IT IS FURTHER ORDERED instructing** GovGPT that if it wishes to file a Second Amended Complaint, it must do so within thirty (30) days of the date of this Order.

Dated this 7th day of March, 2025.

Honorable Susan M. Brnovich
United States District Judge

- 40 -